IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 25-30002 |
| | ) | (Chapter 11) |
| GENERATIONS ON 1ST, LLC | ) | |
| | ) | |
| Debtor | ) | |
| _____ | ) | |
| | ) | Case No. 25-30003 |
| In re: | ) | (Chapter 11) |
| | ) | |
| PARKSIDE PLACE, LLC | ) | Jointly Administered |
| | ) | |
| Debtor | ) | |
| _____ | ) | |
| | ) | Adv. Case No. _____ |
| GENERATIONS ON 1ST, LLC, | ) | |
| PARKSIDE PLACE, LLC and THE | ) | |
| RUINS, LLC | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RED RIVER STATE BANK | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

## **COMPLAINT**

Come now Generations on 1st, LLC ("Generations"), Parkside Place, LLC ("Parkside")

and The Ruins, LLC ("Ruins") (collectively, the "Debtors" or "Plaintiffs" and each a "Debtor" or

"Plaintiff"), by and through undersigned counsel, pursuant to Federal Rule of Bankruptcy

Procedure 7003 and Federal Rule of Civil Procedure 3, and as and for their complaint (the

"Complaint") against Red River State Bank ("RRSB" or the "Defendant") state as follows:

1

**Introduction**

1.      This case presents a story of ineptitude and illegality that begat desperation, desperation that somehow begat greed, and greed that begat unconscionable—and civilly actionable—conduct on the part of RRSB.

2.      The Defendant is a small bank located in Minnesota, with assets and resources so scant that RRSB does not even enjoy the privileges requisite to directly send or receive wire transfers.

3.      Minnesota law—like that of most (if not all) states—places limitations on the funds that may be loaned by depository institutions.

4.      These limits serve both as a means of mitigating potential reliance on the Federal Deposit Insurance Corporation (the "FDIC") should a bank fail and, too, as a means of protecting borrowers from the volatility of loan servicing on the part of overly-risked banks that do not so much *want* to collect debts for healthy performance metrics as they *need* to collect debts to avoid regulatory seizure.

5.      For reasons that are rather genuinely unknown, RRSB somehow thought it advisable for a tiny Minnesota bank, with less than $105 million in deposits, to loan well in excess of $19 million to a consortium of businesses based in North Dakota, for purposes of constructing a trio of apartment buildings in South Dakota.

6.      To be sure, it is not merely that RRSB agreed to make these loans; a banker employed by RRSB actively solicited this lending business, persuading the North Dakota entities to undertake work in South Dakota with bank funds.

7.      In so doing, RRSB exceeded—dramatically—the state-imposed lending limits that bind the bank.

8.     In an effort to conceal this legal violation, RRSB resorted to the utilization of so-called "nominee lending," insisting that a series of loans be made by the Defendant not merely to the entities actually constructing apartment buildings in South Dakota but, too, to the principles of those entities, to related entities and, in at least one instance, with the involvement of a seemingly wholly unrelated entity that just happened to be under partially (but not fully) common control.

9.     Perhaps worst of all, though, RRSB could not actually loan the monies it committed to these projects, seemingly either lacking the resources to do so or being unwilling to undertake actions that would invite so much direct regulatory scrutiny.

10.     So RRSB set out to make these loans by soliciting "participant" banks to share in the exposure; such is an entirely common practice—and useful tool for de-risking loan exposure—in the banking industry.

11.     Remarkably, however, RRSB seemed to fundamentally misunderstand how the loan participation process works, failing to line up a sufficient number of loan participants before committing to furnishing funds and, instead, hoping to garner such participants *after* commitments were made.

12.     RRSB failed to ultimately find sufficient participants for some of the loan commitments that were made, and thereby discovered itself in the position of being obligated to loan monies it could not actually loan, in sums that were not lawful, to borrowers that had already broken ground in reliance upon the bank's representation of funds being available.

13.     What ensued is the precise variety of malfeasant Kafkaesque conduct that Minnesota—and other states—endeavor to preempt through lending limits: a desperate bank took desperate measures to conceal wrongdoing, departing wildly from all notions of good faith and

fair dealing in endeavoring to rapidly recover monies through a series of ill-conceived—and seemingly increasingly reckless—collection actions.

14.     These desperate measures included (but were not nearly limited to) reneging on financing commitments, trying to strong-arm the Debtors into selling their assets at a discount to an insider of RRSB, declaring technical defaults as a means of coercing the Debtors into signing a forbearance agreement—replete with claim waivers and interest rate adjustments—even though those agreement was well devoid of anything even vaguely approaching reasonably equivalent consideration, fraudulently altering the terms of the forbearance agreement between the time of presentation for review and the time of execution, and cutting off financing to the Ruins project.

15.     In January 2025, the three Debtors—owning each of the three respective development projects—were compelled to seek bankruptcy protection in this Honorable Court; but for RRSB's pattern and practice of illegality and bad faith, such never would have been necessary.

16.     This suit is accordingly now brought to avoid fraudulent conveyances undertaken by RRSB, to recover monetary damages occasioned by the tortious conduct of RRSB, and to liquidate the actual obligations of the Plaintiffs to RRSB.

17.     The last point merits emphasis: The Debtors do *not* dispute that they owe money to RRSB. Each Plaintiff borrowed significant funds from the Defendant and each Plaintiff must, through its respective plan of reorganization, ensure the proper repayment of those funds. There exists no delusion of debt being judicially cancelled *en toto* or of equity relieving the fundamental obligation of a borrower to repay loaned funds. But there does exist a significant delta between the grotesque sums RRSB purports to be due and those actually supported by governing law, with the

numbers being palpably eroded upon consideration of the damages proximately occasioned by RRSB's conduct as well as the punitive damages that necessarily stem from the same conduct.

## Parties

18.     Generations, Parkside, and Ruins are each limited liability companies formed pursuant to the laws of South Dakota, wholly owned by a bona fide domiciliary and resident of the State of North Dakota, that exist for purposes of developing and operating residential apartment buildings in Watertown, South Dakota.

19.     Generations, Parkside, and Ruins are also debtors-in-possession in this Honorable Court, having each petitioned for chapter 11 relief on January 6, 2025.

20.     RRSB is a community bank holding charter number 1640 from the State of Minnesota.

## Jurisdiction and Venue

21.     This Honorable Court enjoys jurisdiction over the instant dispute pursuant to the allowances of Section 1334 of Title 28 of the United States Code, as this case (i) concerns administration of the Debtors' estates, 28 U.S.C. § 157(b)(2)(A); (ii) concerns the liquidation— and allowance, *vel non*—of claims against the Debtors' estates, 28 U.S.C. § 157(b)(2)(B); (iii) sets forth counterclaims against a creditor that has filed claims against all three estates, 28 U.S.C. § 157(b)(2)(C); (iv) is a proceeding to determine, avoid, and recover fraudulent conveyances, 28 U.S.C. § 157(b)(2)(H); (v) seeks a determination as to the extent of liens held on account of disputed debts, 28 U.S.C. § 157(b)(2)(K); and (vi) concerns the adjustment of the debtor-creditor relationship, 28 U.S.C. § 157(b)(2)(O).

22.     Venue is properly laid in this Honorable Court pursuant to Section 1334 of Title 28 of the United States Code, as various claims herein arise under Title 11 of the United States Code and all claims herein are related to one or more proceedings pending in this Honorable Court.

### General Allegations: Red River State Bank

23.     Core to this case, and contextually relevant to almost every occurrence alleged herein, is the utterly petite nature of RRSB.

24.     The Defendant was established in or about January 1934 and has, at all times relevant, been an exceedingly small, state chartered bank.

25.     The Defendant is not now, and never has been, a member of the Federal Reserve System (the "FRS"), despite having been in operation for more than 90 years.

26.     Based on numbers reported to the FDIC for the third quarter of 2024, the Defendant currently has two locations, with a cumulative total of 19 employees.

27.     Based on the same reported data, the Defendant holds just over $104.5 million in deposits.

28.     In the first quarter of 2020, when RRSB began soliciting the lending activity at issue in this case, the bank had only $89.5 million in deposits and did not report holding *any* multifamily residential real estate loans on its balance sheet.

### General Allegations: Loan Solicitations and Promises

29.     Despite holding such a small deposit base, despite having no meaningful connection to South Dakota, and despite not having any extant experience in the multifamily residential real estate lending market, RRSB hired a banker named Martin Peterson ("Mr. Peterson"), who had previous successful experience working with Jesse Craig ("Mr. Craig") on various development projects, and promptly solicited Mr. Craig to have Generations, Parkside and

Ruins borrow funds from RRSB for purposes of financing construction of three apartment buildings in South Dakota.

30.     Mr. Peterson undertook this solicitation on behalf of RRSB and the bank's executive vice president, Charles Aarestad ("Mr. Aarestad").

31.     Specifically, Messrs. Aarestad and Peterson represented that RRSB would finance construction of the Generations, Parkside and Ruins projects.

32.     Messrs. Aarestad and Peterson gave assurances that RRSB could afford to provide these loans, indicating the bank had plans to properly "participate" the subject loans to other lenders so as to ensure both the availability of capital and regulatory compliance.

33.     On October 19, 2020, RRSB provided Parkside with a loan term sheet (the "Parkside Term Sheet"), promising a construction loan of $3,862,148.00, at an interest rate equal to 1.1% over the prevailing prime interest rate, with interest-only payments to be made for 18 months and with a "draw period" of 12 months.

34.     The Parkside Term Sheet also promised that, upon the conclusion of construction, the debt would become subject to a long-term loan, being a 10 year loan, amortized over a 20 year period, bearing the same interest rate as the construction loan.

35.     On November 23, 2020, RRSB provided Generations with a similar loan term sheet (the "Generations Term Sheet"), promising a construction loan in the amount of $8,340,000.00, at the same interest rate, with the same construction loan period and with the same "draw period."

36.     The Generations Term Sheet further promised that, upon the conclusion of construction, the bank's loan would become a 5-7 year loan, amortized over a 25 year period, bearing the same interest rate (prime plus 1.1%) as the construction loan.

37.     On January 26, 2021, RRSB also provided Ruins a comparable loan term sheet (the "Ruins Term Sheet"), promising construction financing of $7,200,000.00, with the same interest rate as the other two projects as well as the same "draw period" and interest-only payment period as the other two projects.

38.     The Ruins Term Sheet further promised "permanent" financing, upon the close of construction, of $7,200,000.00, in the form of a 10 year loan, amortized over a 20 year period, bearing the same interest rate (prime plus 1.1%) as the construction loan.

39.     Additionally, all three term sheets promised to have a third party, reputable title company handle "Draws and Lien Waivers," indicating such would "be done through First Dakota Title Watertown SD."

40.     Through the three term sheets, RRSB promised to deliver a total of $19,402,148.00 in financing across these three projects, on terms each of Generations, Parkside and Ruins found to be commercially reasonable in nature.

41.     At the time the last two of the term sheets were issued, RRSB had $112,823,000.00 in deposits, meaning the bank was proposing to lend over 17% of its deposit base to three entities under the ownership of Mr. Craig, for purposes of constructing three apartment buildings in a city located in a separate state and being almost 200 miles from the bank's nearest branch.

42.     Upon information and belief, RRSB was never able to obtain sufficient participant financing for the three projects.

43.     RRSB would later acknowledge violating lending limit laws, with Mr. Aarestad comparing the offense (and potential penalties) to the inebriated operation of a motor vehicle, writing to Mr. Craig, via e-mail, "Martin created the lending limit violation on Parkside and Generations; RRSB completed the funding beyond the commitment letters and are dealing with

8

fallout to that still with Generations. RRSB found a solution for the Ruins at the initial $7.74m commitment letter and took it up beyond the commitment letter to max LTV FDIC banks typical stop at of 85%. This was a further violation of MN law with the $2.75m. **Waiting on finding out what my penalty is personally for doing so as originating loan officer. It's the equivalent of a DUI (Jail time and fines).**" (Emphasis added).

44.     RRSB also never engaged First Dakota Title—or any other third party title company—to handle draws and lien waivers in connection with the three projects, instead opting to put the onus for such on Craig Development, LLC ("CDL"), a general contractor that did not feign expertise in this field.

45.     As noted *infra*, numerous problems would arise on account of the bank breaching its promise to use a title company for purposes of handling draws and lien waivers, as RRSB would end up comingling funds for multiple projects into single distributions to CDL and would later point to CDL as having the same principal as the three Debtors in furtherance of an effort to shift blame for such comingling onto the Debtors.

### General Allegations: Multiple Promissory Notes, Bank Disorganization, and Spoliated Evidence

46.     Likely due to the lack of sufficient participant financing, RRSB eschewed the industry standard practice of offering Generations a single construction revolving line of credit, instead entering into no less than seven separate promissory notes with Generations—and at least an additional three such notes with the spouse of Generations' principal—to facilitate the provision of financing.

47.     Each of these promissory notes were secured by liens on the Generations property, with several also being secured by some combination of (i) the Parkside property, (ii) the assets of

a related third party entity also under the ownership of Mr. Craig, and (iii) the assets of Mulinda Craig ("Ms. Craig"), Mr. Craig's spouse.

48.     Ms. Craig does not own any interest in any of the three Debtors.

49.     Ms. Craig never received any of the loaned funds, with the monies all being disbursed to—or for the benefit of—the Debtors.

50.     When it came to Parkside, RRSB took a comparably scattered approach, with there being one promissory note executed by Parkside and at least three promissory notes—secured by the assets of Parkside—executed by Ms. Craig.

51.     Again, none of the monies "loaned to" Ms. Craig would ever actually go to Ms. Craig; she was merely a nominee designated by the bank in furtherance of an effort to evade lending limit laws.

52.     For Ruins, RRSB would insist upon three separate construction promissory notes.

53.     RRSB would also quickly dishonor its promise to the Debtors of an 18 month "interest only" period, with the "interest only" period for Parkside being a scant six months and the "interest only" period for Generations being shortchanged by approximately four months.

54.     As of the filing of this complaint, the Debtors still—rather genuinely—do not know exactly which promissory notes correlated to which draws of money, which liens were placed on which assets, which of the Debtors pledged their real estate for the obligations of one or more other Debtors, or how RRSB accounted for payments made by the Debtors (and, later, under an assignment of rents and receivership proceedings); records are often non-correlative in nature, the bank somehow managed to fund multiple draws for different Debtors in single distributions to the same general contractor, and the bank's own records exist in a state of marked disarray.

55.     Complicating matters even further, RRSB also made personal loans to the Debtor's principal, and appears—as part of the bank's pattern and practice of funding multiple borrowers' draws through a single distribution to the same general contractor—to have disbursed personal funds to Mr. Craig in at least one single distribution that also included monies destined for one or more of the Debtors.

56.     Stated more simply: RRSB managed, rather remarkably, to comingle the very loans it was making, using single disbursements for loans to multiple Debtors.

57.     Highlighting the cacophony of poor accounting on the bank's part, it appears RRSB has, as of present, more than $30 million in recorded liens against at least one of the Debtor's assets, despite the bank having not loaned anywhere near that much money to all three Debtors combined, much less to any one Debtor.

58.     Punctuating that disarray, it also appears RRSB caused all of Mr. Peterson's e-mails to be permanently deleted from the bank's servers. It is unclear what, if any, other relevant evidence was similarly spoliated by RRSB.

59.     The foregoing merits emphasis: RRSB deleted all e-mails sent from—or received by—Mr. Peterson, the same banker that Mr. Aarestad has acknowledged to have subjected the bank to criminal liability for violating state and/or federal lending laws.

60.     When the deletion of e-mails was first reported to the Debtors, RRSB appears to have selected none other than Mr. Aarestad to serve as the information technology specialist who would investigate the matter and the recoverability, *vel non*, of the e-mails. Unsurprisingly, Mr. Aarestad has reported that the e-mails cannot be recovered.

61.     All three Debtors made significant payments on their respective debts, with Generations and Parkside also seeing significant payments made pursuant to a pre-petition

11

assignment of rents and a pre-petition receivership; nonetheless, RRSB has never provided—and does not affix to any of its proofs of claim in these cases—a payment history showing how or when those funds were applied, to which debts they were applied, or even if the monies have been accounted for at all.

**General Allegations: Forbearance Agreement and Fraudulent Alteration**

62.     In or around February 2022, Generations completed construction, received a certificate of occupancy, and asked RRSB to provide the long-term financing promised in the Generations Term Sheet.

63.     RRSB failed and refused to provide the promised long-term financing to Generations in February 2022 and has failed and refused to do so at all times since.

64.     Upon information and belief, in or about January 2023 RRSB came to realize that the bank lacked sufficient funds to finance the ongoing construction of Ruins in the manner previously promised.

65.     Upon recognizing this financing issue, RRSB declared the Ruins debt to be in default based on various delays occasioned by the COVID-19 pandemic, so as to avoid having to continue furnishing financing for the project.

66.     Shortly thereafter, RRSB asked all three Debtors to execute a forbearance agreement (the "Forbearance Agreement").

67.     On January 31, 2023, Mr. Aarestad e-mailed a draft of the Forbearance Agreement to Mr. Craig, attaching a document (the "Draft Forbearance Agreement") that would increase applicable interest rates by 1.4%, from 4.35% to 5.75% per annum.

68.     Mr. Craig reviewed the Draft Forbearance Agreement and, though he found it unpalatable, he also recognized that he had no real choice in the matter, so he agreed to sign the same.

69.     Slightly over two weeks later, Mr. Aarestad traveled to visit Mr. Craig, personally presenting a forbearance agreement for signature.

70.     Unbeknownst to Mr. Craig, Ms. Craig, and all other agents of the Debtors, Mr. Aarestad changed the document between when it was shared for pre-execution review and when it was presented for in-person execution.

71.     Specifically, Mr. Aarestad (or one or more other agents of RRSB) changed the interest rate, such that it would now increase by 2.15% (not the advertised 1.4%), from 4.35% to 6.5%.

72.     This change was not discovered by the Debtors until documents were being reviewed by counsel in preparation for the docketing of this Complaint.

73.     The increased interest rate is far from the only problematic component of the Forbearance Agreement, however, with the document suggesting the various Generations and Parkside loans to be in default because of maturity dates having occurred without payment being made, failing to recognize that RRSB itself expressly promised—on the term sheets—to provide long-term financing upon the completion of construction.

74.     The Forbearance Agreement compelled the Debtors to acknowledge these pretextual defaults and to further acknowledge (i) the validity of loan documents; (ii) the enforceability of loan documents; and (iii) the complete absence of any defenses to the putative defaults.

75.     The Forbearance Agreement also contains an express waiver of any defenses the Debtors may hold, together with an acknowledgement that judgment may be entered—and a foreclosure may be occasioned—on account of all such defenses having been waived.

76.     Perhaps most egregiously of all, the Forbearance Agreement recites that RRSB has performed its obligations fully, even though such was objectively and demonstrably counterfactual at the time of the document's execution.

77.     In exchange for all of the foregoing, the Debtors received from RRSB a promised forbearance period of two months and two weeks—and absolutely nothing else.

78.     The "from RRSB" caveat in the foregoing sentence is of some note, however, as Mr. Aarestad—in one of the many remarkable and seemingly-illegal moves he would make during the timeline at issue *sub judice*—promised to loan Mr. Craig $600,000.00, to be used to pay subcontractors on the Ruins project, if Mr. Craig executed the Draft Forbearance Agreement.

79.     Mr. Aarestad actually did honor this promise—sort of.

80.     A $600,000.00 note was presented to Ruins, by three family members of Mr. Aarestad (although certainly not be RRSB).

81.     Mr. Aarestad's family members would later sell the promissory note to RRSB.

82.     It is unclear if RRSB had Mr. Aarestad's family members make this loan personally so as to evade lending limit laws, so as to allow his family members to make a profit—at the bank's expense—by quickly flipping the promissory note to the bank, so as to sidestep funding issues, or for some other reason, but such will be explored through discovery in this matter and may invite the pleading of further causes of action (or joining of additional defendants).

**General Allegations: Mr. Aarestad Tries to Steal the Debtors' Equity**

83.     In or around November 2023, Mr. Aarestad—individually and, somehow, as an officer of RRSB—commenced pressuring Mr. Craig to sell Generations and Parkside to Mr. Aarestad for an amount equal to the then-extant outstanding debt on the two properties (subject to certain adjustments discussed *infra*).

84.     Both Generations and Parkside had significant equity and cash flow at the time, so the pressure from Mr. Aarestad—who was endeavoring to purchase the assets in his own capacity—struck as particularly strange and was seemingly undertaken in contravention of state and/or federal law.

85.     Mr. Craig demurred to this pressure campaign, instead asking that RRSB provide copies of payment records and accurate payoff statements for the various promissory notes held by the bank.

86.     RRSB, in turn, refused Mr. Craig's request; as noted *supra*, to this day—including in the proofs of claim filed in these cases—RRSB has failed to *ever* provide records of payments received from the Debtors (or for the benefit of the Debtors) and/or to which loan(s) those payments were applied.

87.     Shortly after Mr. Craig declined to sell Generations and Parkside to Mr. Aarestad for well below fair market value, RRSB declared both entities' loans to be in default and made various demands of the two debtors.

88.     Strangely, in declaring the defaults, RRSB—through counsel—reiterated the demand that the two properties be sold to Mr. Aarestad, specifically demanding Parkside, *inter alia*, "On or before December 31, 2023, execute and deliver a signed purchase agreement for the sale of the Parkside Property acceptable to the Bank. The closing must occur on or before March

31, 2024. In that it does not appear a sale to a third party is viable at this point, Charles Aarestad and/or his assignors will provide a draft purchase agreement for the sum of $5,440,771.81."

89.     Comparable language was used with Generations, offering the sum of $10,645,702.97.

90.     RRSB followed through on these demands, too, presenting draft sale documents to the Debtors' former counsel on or about December 20, 2023.

91.     Remarkably, these demands were made *after* Mr. Aarestad wrote to Mr. Craig, via e-mail, more than a year earlier, *inter alia*, "Vogel regulatory lawyer doesn't think me buying into Generations until its [sic] out of our bank is a good idea due to Reg O (directors) issue. Still researching this btw."

92.     Equally remarkably, when Mr. Craig procured a potential arm's length, third party buyer for the assets, with a seeming willingness to acquire the assets on comparable terms, Mr. Aarestad flatly demurred to the suggestion—if Generations and Parkside were going to be acquired to satisfy their debt, it would have to be by either Mr. Aarestad or his personal nominee.

93.     Parkside was worth well more than $5.4 million at the time, just as Generations was worth well more than $10.6 million at the time.

94.     The proposed sales to Mr. Aarestad, when initially suggested, included the bank's forgiveness of certain sums of interest and late fees, creating an odd paradigm where the bank would be waiving monies it is putatively owed so that an insider of the bank could acquire assets at sums well bellow market value; though this was not expressly stated in the more formal letter from RRSB's counsel, it remans unclear—to this day—how RRSB believed it permissible to insist on a discounted asset sale to an insider of the bank whilst rejecting, out of hand, all notions of a comparable asset sale to an arm's length third party.

16

95.     When Generations and Parkside again rejected Mr. Aarestad's efforts to commandeer the properties, RRSB imposed an assignment of rents on the two properties, several months thereafter causing them to be placed in receivership.

96.     The assignment of rents proved particularly perilous, as the bank collected the majority of the entities' rents while not making any contribution toward the properties' expenses and, on at least one occasion, nearly allowing the entities' policies of insurance to lapse and nearly allowing utilities to be disconnected for non-payment.

97.     The bank never did pay for the insurance or utilities, even upon learning of these impending perils; the Debtors' chosen outside property manager stepped in and made the payments out of its own funds (giving rise to claims against the two Debtors' estates).

### General Allegations: Defaults

98.     For the avoidance of doubt, Parkside and Generations do *not* contend that there has never been a default under their respective loan documents.

99.     After RRSB initiated the above-described pressure campaign to have Mr. Craig sell the assets to Mr. Aarestad, and after RRSB reneged on numerous promises set forth in the term sheets (as well as myriad other verbal representations), Parkside was late—by a few days—making its December 2023 payment to the bank.

100.    Similarly, after RRSB ran roughshod over all notions of good faith and fair dealing, after RRSB pressured Mr. Craig to sell the assets to Mr. Aarestad, and after Mr. Aarestad fraudulently swapped out the form of a forbearance agreement (albeit with such being then-unknown to the Debtors), Generations did miss payments in or about December 2023, January 2024, and/or February 2024.

101.    As noted *supra*, the Debtors do not feign to be rid of obligations to RRSB, nor do the Debtors suffer any delusions of confirming plans of reorganization without providing for the payment of the bank's lawful claims. The Debtors also do not feign perfection and suffer no delusions of flawless performance histories. They simply note, *passim*, that whatever defaults— technical or, later, substantive—that may have been committed by the Debtors, such are stunningly *de minimis* when juxtaposed to the first breaches of RRSB, the ensuing breaches of RRSB, and the numerous tortious acts undertaken by RRSB throughout the past several years.

### Count I – Fraudulent Conveyance (11 U.S.C. § 548)

102.    The Debtors repeat and reallege each and every foregoing paragraph of this Complaint, as fully set forth herein.

103.    Each Debtor is a signatory to the Forbearance Agreement.

104.    The Forbearance Agreement provides a 103 day forbearance period, whilst affording the Debtors no other consideration whatsoever.

105.    In exchange for the forbearance period, RRSB received (i) a 2.25% increase on the interest rate being charged to the Debtors; (ii) an assignment of rents; (iii) an acknowledgement of the enforceability of loan documents; and (iv) a complete release and waiver of all claims against RRSB.

106.    A 103 day forbearance period was not—and is not—of a value reasonably equivalent to the various concessions made by the Debtors in the Forbearance Agreement.

107.    Specifically, and without limitation, the monetary value of the claims putatively waived against RRSB is far greater than that of a 103 day forbearance period.

108.    Specifically, and without limitation, a 2.2% increase in interest is of a value far greater than that of a 103 day forbearance period.

109.   None of the Debtors could pay their debts, as they came due, at the time of the Forbearance Agreement.

110.   The increased interest obligation set forth in the Forbearance Agreement left each Debtor with unreasonably small capital.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) avoid the Forbearance Agreement and declare the same null and void; (ii) award the Debtors their reasonable attorneys' fees and suit costs incurred in this action and reduce the same to a judgement in favor of each Debtor and against the Defendant; and (iii) afford such other and further relief as may be just and proper.

**Count II – Fraudulent Conveyance (11 U.S.C. § 544; N.D.C.C. § 13-02.1-04)**

111.   The Debtors repeat and reallege each and every foregoing paragraph of this Complaint, as fully set forth herein.

112.   Each Debtor is a signatory to the Forbearance Agreement.

113.   The Forbearance Agreement provides a 103 day forbearance period, whilst affording the Debtors no other consideration whatsoever.

114.   In exchange for the forbearance period, RRSB received (i) a 2.2% increase on the interest rate being charged to the Debtors; (ii) an assignment of rents; (iii) an acknowledgement of the enforceability of loan documents; and (iv) a complete release and waiver of all claims against RRSB.

115.   A 103 day forbearance period was not—and is not—of a value reasonably equivalent to the various concessions made by the Debtors in the Forbearance Agreement.

116.   Specifically, and without limitation, the monetary value of the claims putatively waived against RRSB is far greater than that of a 103 day forbearance period.

117.    Specifically, and without limitation, a 2.2% increase in interest is of a value far greater than that of a 103 day forbearance period.

118.    None of the Debtors could pay their debts, as they came due, at the time of the Forbearance Agreement.

119.    The increased interest obligation set forth in the Forbearance Agreement left each Debtor with unreasonably small capital.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) avoid the Forbearance Agreement and declare the same null and void; (ii) award the Debtors their reasonable attorneys' fees and suit costs incurred in  this action and reduce the same to a judgement in favor of each Debtor and against the Defendant; and (iii) afford such other and further relief as may be just and proper.

## Count III – Deceit

120.    The Debtors repeat and reallege each and every foregoing paragraph of this Complaint, as fully set forth herein.

121.    RRSB suggested to the Debtors that the bank had the ability to lawfully make the loans at issue in this case.

122.    RRSB either knew, or should have known, that the bank could not lawfully make the loans at issue in this case.

123.    RRSB suggested to the Debtors that the bank had—or had access to—the funds requisite to make the loans at issue in this case.

124.    RRSB either knew, or should have known, that the bank lacked the funds requisite to make the loans at issue in this case.

20

125.    RRSB did not disclose to the Debtors that the loans at issue in this case would violate applicable lending limit laws, thereby misleading the Debtors through want of communication of this very relevant fact.

126.    RRSB knew that Mr. Aarestad swapped out the form of a forbearance agreement, after presenting the same to Mr. Craig for review.

127.    RRSB did not disclose to Mr. Craig that the document he was being presented to sign was materially different than the document he had been first sent to review.

128.    RRSB did not disclose to Ms. Craig that the document she was being asked to sign was materially different than the document Mr. Craig had been first sent to review, though RRSB also never shared the Forbearance Agreement or Draft Forbearance Agreement with Ms. Craig at all, instead only leaving signature pages with Mr. Craig and instructing him to have her sign the same.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of Ruins, and against RRSB, in a sum equal to the cost of all construction delays occasioned by RRSB's inability to furnish financing to complete the Ruins construction project; (ii) enter judgment in favor of Ruins, and against RRSB, in a sum equal to all interest that has accrued on the debts of Ruins (including those to third parties), from the date RRSB ceased the provision of financing through the date upon which judgment is entered; (iii) enter judgment in favor of each of the Debtors individually, and against RRSB, as and for punitive damages; (iv) should the relief prayed for in Counts I and II hereof not be granted, and only if such relief is not granted, enter judgment in favor of each of Generations, Parkside and Ruins, and against RRSB, in a sum equal to all interest accrued on account of the rate increase set forth in the Forbearance Agreement; and (v) afford such other and further relief as may be just and proper.

## Count IV - Fraud

129.    The Debtors repeat and reallege each and every foregoing paragraph of this Complaint, as fully set forth herein.

130.    RRSB suggested to the Debtors that the bank had the ability to lawfully make the loans at issue in this case.

131.    RRSB either knew, or should have known, that the bank could not lawfully make the loans at issue in this case.

132.    RRSB suggested to the Debtors that the bank had—or had access to—the funds requisite to make the loans at issue in this case.

133.    RRSB either knew, or should have known, that the bank lacked the funds requisite to make the loans at issue in this case.

134.    RRSB did not disclose to the Debtors that the loans at issue in this case would violate applicable state and federal lending limit laws, thereby misleading the Debtors through want of communication of this very relevant fact.

135.    RRSB knew that Mr. Aarestad swapped out the form of a forbearance agreement, after presenting the same to Mr. Craig for review.

136.    RRSB did not disclose to Mr. Craig that the document he was being presented to sign was materially different than the document he had been first sent to review.

137.    RRSB did not disclose to Ms. Craig that the document she was being asked to sign was materially different than the document Mr. Craig had been first sent to review, though RRSB also never shared the Forbearance Agreement or Draft Forbearance Agreement with Ms. Craig at all, instead only leaving signature pages with Mr. Craig and instructing him to have her sign the same.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of Ruins, and against RRSB, in a sum equal to the cost of all construction delays occasioned by RRSB's inability to furnish financing to complete the Ruins construction project; (ii) enter judgment in favor of Ruins, and against RRSB, in a sum equal to all interest that has accrued on the debts of Ruins (including those to third parties), from the date RRSB ceased the provision of financing through the date upon which judgment is entered; (iii) enter judgment in favor of each of the Debtors individually, and against RRSB, as and for punitive damages; (iv) should the relief prayed for in Counts I and II hereof not be granted, and only if such relief is not granted, enter judgment in favor of each of Generations, Parkside and Ruins, and against RRSB, in a sum equal to all interest accrued on account of the rate increase set forth in the Forbearance Agreement; and (v) afford such other and further relief as may be just and proper.

### Count V – Negligence Per Se

138.    The Debtors repeat and reallege each and every foregoing paragraph of this Complaint, as fully set forth herein.

139.    RRSB, as a Minnesota chartered bank operating within the State of Minnesota, had a duty to adhere to the various Minnesota laws governing the conduct of depository institutions.

140.    As acknowledged directly by Mr. Aarestad, RRSB violated these lending limit laws in extending credit to the Debtors herein without first securing a sufficient number of loan participants to derisk the exposure of RRSB.

141.    As borrowers, Generations, Parkside and Ruins are all intended beneficiaries of applicable lending limit laws, with the legal scheme being designed—in part—to ensure borrowers not be subjected to the risks of irrationality incidental to a lender being overly invested in a single consortium of loans, with the legal scheme aiming to ensure regulated lenders always have the ability to operate—and service loans—in good faith and without undue financial pressure.

142.     This statutory breach has proximately caused the incursion of losses on the part of each Debtor, as the breach beget (i) the declaration of loan defaults in contravention of principles of good faith and fair dealing; (ii) an inability—or unwillingness—on the part of RRSB to furnish the long-term financing it committed to provide Generations; (iii) a risk environment where the bank felt compelled to thrust an egregiously one-sided (and facially unconscionable) forbearance agreement upon the Debtors; (iv) a situation where RRSB felt compelled to increase interest rates as a mechanism for endeavoring to make promissory notes more marketable to potential participant financial institutions; and (v) a situation where RRSB has been unable to service debt with any devotion to senses of equity and, rather, has felt compelled—under pressure from regulators and at least one participant—to assume a recklessly aggressive posture.

143.     The Debtors do not currently have a good faith basis to allege that this statutory breach is also what caused RRSB to destroy all e-mails sent to—or from—Mr. Peterson, but it is believed that such a theory can be more fully explored in discovery in this case, with it being supremely odd—if not temporally suspect—that a heavily regulated financial institution suddenly destroyed all e-mail records attendant to a senior employee it acknowledges to have spearheaded a violation of various laws.

144.     The Debtors have suffered compensable damages on account of these breaches, with (i) Generations being without permanent financing; (ii) the interest rates on *all* loans having been increased by an amount that cumulatively equates to hundreds of thousands of dollars *per year*; and (iii) construction on The Ruins having been shut down due to a lack of funding, with the project accordingly unable to commence collecting rents—and generating revenue—for a protracted period of time.

WHEREFORE, the Debtors respectfully pray this Honorable Court (i) enter judgment against RRSB, and in favor of each Debtor individually, in a sum equal to the damages sustained each such Debtor on account of RRSB's violation of applicable lending laws; and (ii) afford such other and further relief as may be just and proper.

## Count VI – Negligence Per Se

145.    The Debtors repeat and reallege each and every foregoing paragraph of this Complaint, as fully set forth herein.

146.    Section 215(a)(2) of Title 18 of the United States Code prohibits any "officer, director, employee, [or] agent . . . of a financial institution" from "corruptly solicit[ing] or demand[ing] . . . anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution."

147.    This statute is designed to protect members of the public from the deleterious actions of corrupt bank officers, directors, employees and agents.

148.    Amongst the actions this statute is designed to prevent are ones whereby a borrower incurs the wrath of a bank executive, and correlatively disproportionate collection efforts on the part of a bank, for failing to abide by the solicitation of the bank executive.

149.    Mr. Aarestad is, and at all times relevant has been, an officer, director, employee and agent of RRSB.

150.    Mr. Aarestad offered—repeatedly—to have certain obligations of Parkside and Generations forgiven if the two entities would sell their assets (or if their equity holder would sell the entities themselves) to Mr. Aarestad or his nominee(s) for a sum of money well below market value.

25

151.    Shortly after Generations and Parkside demurred to these entreaties, Mr. Aarestad—by and through RRSB—caused both entities to become subjected to an assignment of rents, thereafter causing both entities to be placed in receivership.

152.    These actions have caused Parkside and Generations to suffer, with the entities being without sufficient funds to pay operating expenses during the assignment of rents and with the entities being compelled to pay disproportionately expensive sums to a receiver as and for the operations of the entities' assets.

153.    Parkside and Generations has been damaged in accord with the incursion of these economic harms, now owing money to third parties that paid expenses for the entities during these time periods, now being without the inflated sums paid to a receiver, and having—for some time— been without the benefit of a bank counterparty moored to the standards of good faith and fair dealing that are legally expected to underlie the lender/borrower relationship.

154.    RRSB, as Mr. Aarestad's employer, is vicariously liable for the harms he has caused to third parties while performing his job.

WHEREFORE, the Debtors respectfully pray this Honorable Court (i) enter judgment against RRSB, and in favor of each of Generations and Parkside individually, in a sum equal to the damages sustained each of Generations and Parkside on account of Mr. Aarestad's violation of Section 215 of Title 18 of the United States Code; and (ii) afford such other and further relief as may be just and proper.

### Count VII – Declaratory Relief (Entitlement to Accounting)

155.    The Debtors repeat and reallege each and every foregoing paragraph of this Complaint, as fully set forth herein.

156.    There exists an actual controversy between the Debtors and RRSB, with the Debtors believing they are entitled to receive an accounting of all payments made to RRSB— directly by the Debtors, from obligors on loans secured by the assets of one or more Debtors, from rents collected through an assignment of rents, through monies collected through receivership, or otherwise—so as to garner an understanding of the size and propriety of the obligation of each Debtor to RRSB.

157.    RRSB does not believe it must provide such an accounting to any or all of the Debtors, having now refused to do so for multiple years and having notably failed to furnish one as part of the proofs of claims filed in the Debtors' bankruptcy cases.

158.    Adjudication of this dispute will permit the Debtors to more efficiently manage their respective bankruptcy estates, will permit a clearer understanding of the obligations owed to RRSB, will permit a clearer understanding of the extent of equity in the Debtors' assets, and will permit a clearer understanding of the monies available for distribution to other creditors.

WHEREFORE, pursuant to the allowances of Section 2201 of Title 28 of the United States Code, the Debtors respectfully pray this Honorable Court (i) declare the Debtors to each be entitled to receive from RRSB a full accounting of all payments made on the aforesaid loans, together with an accounting of how each such payment was applied, together with all records of said receipt and application; (ii) direct RRSB to furnish such an accounting; and (iii) afford such other and further relief as may be just and proper.

*[Signature on Following Page]*

Respectfully Submitted,

Dated: February 26, 2025                By:    /s/ Maurice B. VerStandig
                                               Maurice B. VerStandig, Esq.
                                               The Dakota Bankruptcy Firm
                                               1630 1st Avenue N
                                               Suite B PMB 24
                                               Fargo, North Dakota 58102-4246
                                               Phone: (701) 394-3215
                                               mac@dakotabankruptcy.com

                                               Christianna A. Cathcart, Esq.
                                               The Dakota Bankruptcy Firm
                                               1630 1st Avenue N
                                               Suite B PMB 24
                                               Fargo, North Dakota 58102-4246
                                               Phone: (701) 970-2770
                                               christianna@dakotabankruptcy.com

                                               *Counsel for the Debtors*