IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 25-30002 |
| | ) | (Chapter 11) |
| GENERATIONS ON 1ST, LLC | ) | |
| | ) | |
| Debtor | ) | |
| _____ ) | | |
| | ) | Case No. 25-30003 |
| In re: | ) | (Chapter 11) |
| | ) | |
| PARKSIDE PLACE, LLC | ) | Jointly Administered |
| | ) | |
| Debtor | ) | |
| _____ ) | | |
| | ) | Adv. Case No. 25-07009 |
| GENERATIONS ON 1ST, LLC, *et al.* | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RED RIVER STATE BANK | ) | |
| | ) | |
| Defendant | ) | |
| _____ ) | | |

**<u>OPPOSITION TO MOTION TO DISMISS</u>**

Maurice B. VerStandig, Esq.
Christianna A. Cathcart, Esq.
The Dakota Bankruptcy Firm
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
Phone: (701) 394-3215
mac@dakotabankruptcy.com
christianna@dakotabankruptcy.com
*Counsel for the Debtors*

*Table of Contents*

I.      Introduction ..................................................................................................... 1

II.     Standard ........................................................................................................... 2

III.    Argument .......................................................................................................... 3

        a.  Federal Law, North Dakota Law and Minnesota Law Govern this
            Adversary Proceeding ........................................................................... 3

            i.   The Governing Standard .............................................................. 3

            ii.  Fraudulent Conveyance (Count II) ............................................. 5

            iii. Deceit and Fraud (Counts III and IV) ........................................ 7

            iv.  Negligence Per Se (Counts V and VI) ...................................... 11

        b.  Generations and Parkside Have Properly Stated a Claim Under
            Section 548 (Count I) ......................................................................... 14

            i.   Definitional Insolvency is Not a Condition Precedent to a
                 Fraudulent Conveyance .............................................................. 15

            ii.  Reasonably Equivalent Value is a Question of Fact ................. 17

        c.  Generations and Parkside Have Property Set Forth a State Law
            Fraudulent Conveyance Claim (Count II) ........................................... 20

        d.  The Putative Releases Are Not Grounds Upon Which to Dismiss
            this Adversary Proceeding (Counts III and IV) .................................. 25

        e.  The Complaint Sets Forth a Valid Claim for Deceit (Count III) ........ 27

        f.  The Complaint Validly Alleges Fraud (Count IV) ............................. 31

        g.  The Claims for Negligence Per Se (Counts V and VI) are Validly
            Stated ................................................................................................... 32

            i.   Count V (Lending Limits) ......................................................... 33

            ii.  Count VI (Solicitation of a Bribe) ............................................ 35

        h.  A Valid Claim for Declaratory Relief (Count VII) is Set Forth ........ 38

IV.     Request for Leave to Amend .......................................................................... 39

V.      Conclusion ..................................................................................................... 40

*Table of Authorities*

## Cases

*Ahlgren v. Dailey (In re Schnoor)*,
510 B.R. 868 (Bankr. D. Minn. 2014) ....................................................... 18

*Am. Fire & Cas. Co. v. Hegel*,
847 F.3d 956 (8th Cir. 2017) ..................................................................... 4

*Anderson v. Anoka Hennepin Ind. Sch. Dist. 11*,
678 N.W.2d 651 (Minn. 2004)................................................................... 33

*Anderson v. State*,
693 N.W.2d 181 (Minn. 2005).............................................................. 33, 34

*Anderson v. Sullivan*,
2007 U.S. Dist. LEXIS 24455 (D.N.D. Mar. 28, 2007) ............................ 5

*Apollo Sprinkler Co. v. Fire Sprinkler Suppliers & Design*,
382 N.W.2d 386 (N.D. 1986) ................................................................. 8, 12

*ASARCO LLC v. Ams. Mining Corp.*,
382 B.R. 49 (S.D. Tex. 2007) ..................................................................... 3

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................ 3, 19, 20, 36

*Askanase v. Fatjo*,
828 F. Supp. 465 (S.D. Tex. 1993) ........................................................... 25

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................ 3, 19, 20, 36

*BNSF Ry. Co. v. Seats, Inc.*,
900 F.3d 545 (8th Cir. 2018) ...................................................................... 2

*Clark v. N. Pac. Ry.*,
162 N.W. 406 (N.D. 1917) ........................................................................ 26

*Compliance Marine, Inc. v. Campbell (In re Merritt Dredging Co.)*,
839 F.2d 203 (4th Cir. 1988) ................................................................... 3, 4

*Daley v. Am. States Preferred Ins. Co.*,
587 N.W.2d 159 (N.D. 1998) ........................................................... 4, 8, 9, 12

*Davies United States Inc. v. Weston*,
2025 U.S. Dist. LEXIS 58533 (D. Del. Mar. 28, 2025) ............................ 21

*Delzer v. United Bank of Bismarck*,
559 N.W.2d 531 (N.D. 1997) ............................................. 27, 28

*Doeling v. O'Neill (In re O'Neill)*,
550 B.R. 482 (Bankr. D.N.D. 2016) ....................................... 18

*Du Bois v. Bd. of Regents of the Univ. of Minn.*,
987 F.3d 1199 (8th Cir. 2021) ............................................. 2

*Ebach v. Ralston*,
510 N.W.2d 604 (N.D. 1994) ............................................. 13

*Finstad v. Gord (In re Finstad)*,
2019 Bankr. LEXIS 4017 (Bankr. D.N.D. Oct. 21, 2019) ..................... 2

*Fisher v. MRM Grp. (In re Multi-Risk Mgmt.)*,
1998 Bankr. LEXIS 1122 (Bankr. N.D. Ill. Sep. 8, 1998) .................. 24, 25

*Florenzano v. Olson*,
387 N.W.2d 168 (Minn. 1986) ............................................. 10

*German-American Fin. Corp. v. Merchants' & Mfrs' State Bank*,
225 N.W. 891 (Minn. 1929) ............................................... 11

*Gronneberg v. Hoffart*,
466 N.W.2d 809 (N.D. 1991) ............................................. 13

*Hageman v. Barton*,
817 F.3d 611 (8th Cir. 2016) ............................................. 29

*Haider v. Finken*,
239 N.W.2d 508 (N.D. 1976) ............................................. 13

*Haller v. Borror Corp.*,
552 N.E.2d 207 (Ohio 1990) ............................................. 26

*Hometowne Builders v. Atl. Nat'l Bank*,
477 F. Supp. 717 (E.D. Va. 1979) ...................................... 35, 37

*Huffington v. T.C. Grp., LLC*,
2012 WL 1415930 (Del. Super. Ct. Apr. 18, 2012) ........................ 21

*In re Baker*,
2020 Bankr. LEXIS 1454 (Bankr. D. Kan. June 1, 2020) ........................................................ 24

*In re Brown*,
591 B.R. 587 (Bankr. M.D. Pa. 2018) ...................................................................................... 24

*In re Gaston & Snow*,
243 F.3d 599 (2d Cir. 2001)....................................................................................................... 4

*In re Leonard*,
125 F.3d 543 (7th Cir. 1997) .................................................................................................... 24

*In re Lewis*,
517 B.R. 615 (Bankr. E.D. Va. 2014) ........................................................................................ 3

*In re McDowell*,
87 B.R. 554 (Bankr. S.D. Ill. 1988) ......................................................................................... 24

*In re McElwee*,
161 B.R. 41 (Bankr. S.D. Ill. 1993) ......................................................................................... 24

*In re Southwest Equip. Rental, Inc.*,
1992 U.S. Dist. LEXIS 21396 (E.D. Tenn. July 9, 1992)........................................................... 4

*In re Trichilo*,
540 B.R. 547 (Bankr. M.D. Pa. 2015) ...................................................................................... 24

*In re Wright*,
2009 Bankr. LEXIS 3564 (Bankr. D.N.M. Oct. 30, 2009)....................................................... 24

*Issendorf v. Olson*,
194 N.W.2d 750, 756 (N.D. 1972) .............................................................................................. 5

*Jacobs v. Jacobs*,
2007 U.S. Dist. LEXIS 99913 (N.D. Ohio Dec. 6, 2007)......................................................... 26

*Jacoway v. Anderson (In re Ozark Rest. Equip. Co.)*,
850 F.2d 342 (8th Cir. 1988) .................................................................................................... 18

*JPMorgan Chase Bank, NA v. Martin*,
2006 U.S. Dist. LEXIS 113415 (N.D. Cal. Mar. 29, 2006)...................................................... 21

*Klaxon v. Stentor Elec. Mfg. Co.*,
313 U.S. 487 (1941).................................................................................................................... 3

*Knauer v. Kitchens (In re E. Livestock Co., LLC)*,
547 B.R. 277 (Bankr. S.D. Ind. 2016) ...................................................... 4

*Kunz v. City of Troy, (N. Y.)*,
10 N.E. 442 (N.Y. 1887)............................................................................ 14

*Lindquist v. JNG Corp. (In re Lindell)*,
334 B.R. 249 (Bankr. D. Minn. 2005) ...................................................... 18

*Mayo v. Pioneer Bank & Tr. Co.*,
270 F.2d 823 (5th Cir. 1959) .................................................................... 19

*Meeks v. Don Howard Charitable Remainder Trust (In re S. Health Care of Ark., Inc.)*,
309 B.R. 314 (B.A.P. 8th Cir. 2004).......................................................... 18

*Missouri P. R. Co. v. Goodholm*,
60 P. 1066 (Kan. 1900) .............................................................................. 26

*Mukamal v. Nat'l Christian Found., Inc. (In re Palm Beach Fin. Partners)*,
2014 Bankr. LEXIS 5418 (Bankr. S.D. Fla. Dec. 10, 2014) ....................... 4

*Nave v. Dovolos*,
395 N.W.2d 393 (Minn. Ct. App. 1986)..................................................... 10

*Neilson v. Union Bank of Cal., N.A.*,
290 F. Supp. 2d 1101 (C.D. Cal. 2003) ..................................................... 25

*Nodak Mut. Ins. Co. v. Wamsley*,
687 N.W.2d 226 (N.D. 2004) ............................................................ *passim*

*Paloian v. LaSalle Bank Nat'l Ass'n (In re Doctors Hosp. of Hyde Park, Inc.)*,
507 B.R. 558 (Bankr. N.D. Ill. 2013) ........................................................ 16

*Pardo v. Avanti Corp. Health Sys. (In re APF Co.)*,
274 B.R. 634 (Bankr. D. Del. 2001) .......................................................... 25

*Parizek v. Cty. of Ward N.D.*,
2019 U.S. Dist. LEXIS 251793 (D.N.D. Nov. 14, 2019) ........................... 29

*Peltz v. Hatten*,
279 B.R. 710 (D. Del. 2002)....................................................................... 16

*Pioneer Fuels, Inc. v. Montana-Dakota Utils. Co.*,
474 N.W.2d 706 (N.D. 1991) ..................................................................... 28

*Plante v. Columbia Paints*,
494 N.W.2d 140 (N.D. 1992) ............................................................... 8

*Quinn v. Elite Custom Transporters & Motorcoaches, LLC*,
2011 U.S. Dist. LEXIS 52362 (D. Minn. May 16, 2011) ......................... 18

*Richfield Bank & Tr. Co. v. Sjogren*,
244 N.W.2d 648 (Minn. 1976) .......................................................... 30, 31

*Robinson v. Cone*,
22 Vt. 213 (Vt. 1850) ......................................................................... 13

*Rothman v. Friedman Vartolo, LLP (In re Rothman)*,
2024 Bankr. LEXIS 423 (Bankr. D.N.J. Feb. 20, 2024) ......................... 24

*Ryan v. Ryan*,
889 F.3d 499 (8th Cir. 2018) ............................................................... 2

*State v. Flowers*,
245 N.W. 834 (Minn. 1932) ................................................................. 34

*State v. Voogd*,
212 N.W. 528 (Minn. 1927) ................................................................. 34

*Staub v. Myrtle Lake Resort, LLC*,
964 N.W.2d 613 (Minn. 2021) ............................................................. 13

*Stensland v. Harding Cty.*,
872 N.W.2d 92 (S.D. 2015) ................................................................. 13

*Stone v. Citizens Equity First Credit Union (In re Int'l Supply Co.)*,
2022 Bankr. LEXIS 865 (Bankr. C.D. Ill. Mar. 30, 2022) ....................... 16

*Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*,
781 F.3d 1003 (8th Cir. 2015) ............................................................. 39

*Tex. Truck Ins. Agency v. Cure (In re Dunham)*,
110 F.3d 286 (5th Cir. 1997) ............................................................... 18

*Trumer v. S. Side State Bank*,
166 N.W. 127 (Minn. 1918) ................................................................. 34

*UMB Bank, N.A. v. Guerin*,
89 F.4th 1047 (8th Cir. 2024) ............................................................. 39

*United States v. Spencer*,
2005 U.S. Dist. LEXIS 28257 (D. Minn. Oct. 17, 2005) ............................................. 18

*Velde v. Morrison (In re McMartin)*,
599 B.R. 622 (Bankr. D.N.D. 2019) ........................................................................ 16

*Velde v. Morrison*,
Case No. 18-07023 (Bankr. D.N.D. 2018) ............................................................... 16

*Wade Park Land Holdings, LLC v. Kalikow (In re Wade Park Land Holdings, LLC)*,
2024 U.S. App. LEXIS 14631 (2d Cir. June 17, 2024) ............................................. 19

*Warfield v. Carnie*,
2007 U.S. Dist. LEXIS 27610 (N.D.Tex. Apr. 13, 2007) ............................................. 4

*Whirlpool Corp. v. Ritter*,
929 F.2d 1318 (8th Cir. 1991) ................................................................................ 4

*Williams v. Tweed*,
520 N.W.2d 515 (Minn. Ct. App. 1994) ................................................................. 10

*Woods-Tucker Leasing Corp of Ga. v. Hutcheson-Ingram Dev. Co.*,
642 F.2d 744 (5th Cir. 1981) ................................................................................... 4

**Statutes**
11 U.S.C. § 101 ........................................................................................................ 16

11 U.S.C. § 544 .................................................................................................. 5, 23

11 U.S.C. § 548 .............................................................................................. 5, 14, 15

12 U.S.C. § 503 ................................................................................................. 12, 36

18 U.S.C. § 215 ............................................................................................ 35, 36, 37

22 U.S.C. § 2201 .................................................................................................... 39

28 U.S.C. § 2201 .................................................................................................... 38

Minn. Stat. § 48.24 .................................................................................................. 34

Minn. Stat. § 513.41 ................................................................................................. 5

Minn. Stat. § 513.44 ................................................................................................. 6

Minn. Stat. § 513.45 ................................................................................................. 6

Minn. Stat. § 513.485 .................................................................................................. 22

N.D. Cent. Code § 9-03-08 ....................................................................................... 9, 32

N.D. Cent. Code § 9-03-10 ......................................................................................... 26

N.D. Cent. Code § 9-09-02 ......................................................................................... 26

N.D. Cent. Code § 9-10-02 .................................................................................... 27, 31

N.D. Cent. Code § 9-10-03 ......................................................................................... 10

N.D. Cent. Code § 13-02.1-01 ...................................................................................... 5

N.D. Cent. Code § 13-02.1-02 .................................................................................... 23

N.D. Cent. Code § 13-02.1-04 ........................................................................... 6, 22, 23

N.D. Cent. Code § 13-02.1-05 ...................................................................................... 5

N.D. Cent. Code § 13-02.1-11 ...................................................................................... 6

S.D. Codified Laws § 54-8A-1 ..................................................................................... 5

S.D. Codified Laws § 54-8A-4 ..................................................................................... 6

S.D. Codified Laws § 54-8A-5 ..................................................................................... 6

**Other Authorities**

Collier's Bankruptcy Manual (Oglebay, Kelliher and Newkirk) (1948) ...................................... 19

Robert A. Leflar, *Choice-Influencing Considerations in Conflicts Law*,
41 N.Y.U.L. Rev. 267 (1966) ............................................................................... 5, 8, 9

**Rules**

Federal Rule of Bankruptcy Procedure 7012 ............................................................... 2

Federal Rule of Civil Procedure 8 ............................................................................. 33

Federal Rule of Civil Procedure 12 .............................................................. 2, 28, 29

Federal Rule of Civil Procedure 15 ........................................................................... 39

Federal Rule of Civil Procedure 56 ........................................................................... 29

Local Rule 7007-1 ....................................................................................................... 1

Come now Generations on 1st, LLC ("Generations"), Parkside Place, LLC ("Parkside") and The Ruins, LLC ("Ruins") (collectively, the "Debtors" or "Plaintiffs" and each a "Debtor" or "Plaintiff"), by and through undersigned counsel, pursuant to Local Rule 7007-1(A), and in opposition to the Motion to Dismiss (the "Motion," as found at DE #7) filed by Red River State Bank ("RRSB" or the "Defendant") state as follows:

## I.     Introduction

RRSB solicited the Debtors to borrow monies, lied to the Debtors about its ability to issue and fund a series of loans, proceeded to break multiple laws in servicing the loans, fraudulently induced the Debtors into executing a forbearance agreement, sabotaged the Debtors' respective operations through habitual violations of the implied covenant of good faith and fair dealing, and then refused to so much as give an accounting of how debt service payments have been applied to the various Debtors' loans. Now confronted with liability for this genuinely stunning spree of tortious conduct, the bank demurs and insists there is no valid claim for relief to be found *sub judice*. While this assertion is perhaps unsurprising, the Motion is assuredly meritorious of denial as to most—if not all—points.

The "most—if not all—points" caveat is attributable to the oddities of actionable conduct being carried out across state lines and the resultant eccentricities of the choice of law issues that govern this case. A community bank in Minnesota solicited a developer in North Dakota to borrow monies to undertake a trifecta of construction projects in South Dakota. Documents were executed in different states, monies were sent to—and from—account holders in different states, and torts were committed in different states. All of which, unfortunately, means that in assessing the Motion's attacks on the various state law claims (and, to be sure, not all claims sound in state law), this Honorable Court will likely have to first make a determination as to just which state's laws

apply. Complicating matters further, it is possible the answer is that different states' laws apply to different causes of action.

Regardless of the ultimate choice(s) of laws, though, there do exist valid causes of action in this case. Neither a chartered bank nor anyone else can do what RRSB has done and reasonably expect to escape civil liability. The Defendant's actions—ranging from the fraudulent swapping out of documents to the facial violation of federal bank bribery laws—have been, and continue to be, inequitable, financially deleterious, and egregiously contra to public policy in a manner that renders that conduct civilly actionable in nature.

## II.    Standard

Federal Rule of Civil Procedure 12 (b)(6)—made applicable by Federal Rule of Bankruptcy Procedure 7012—permits the defense of "failure to state a claim upon which relief can be granted" to be asserted through a preliminary motion. Fed. R. Civ. P. 12 (b)(6). In assessing such a motion, "the Court assumes all facts alleged in the complaint are true and makes reasonable inferences in favor of the nonmoving party." *Finstad v. Gord (In re Finstad)*, 2019 Bankr. LEXIS 4017, at *7 (Bankr. D.N.D. Oct. 21, 2019) (citing *Ryan v. Ryan*, 889 F.3d 499, 505 (8th Cir. 2018)).

However, while the allegations of a pleading are presumed true for purposes of a Rule 12(b)(6) motion, "[t]he complaint 'must show the plaintiff is entitled to relief, by alleging sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Du Bois v. Bd. of Regents of the Univ. of Minn.*, 987 F.3d 1199, 1202 (8th Cir. 2021) (quoting *BNSF Ry. Co. v. Seats, Inc.*, 900 F.3d 545, 546 (8th Cir. 2018)). And, in turn, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Du Bois*, 987 F.3d at 1202 (citing

2

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). *See also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

### III. Argument

#### a. Federal Law, North Dakota Law and Minnesota Law Govern this Adversary Proceeding

Two of the Plaintiffs' claims (Counts I and VII) sound in federal statutory law, three claims (Counts III through V) sound in state law, and two claims (Counts II and VI) sounds in both federal statutory law and state law. While resolution of a choice of laws analysis is simple for the first grouping (federal law governs federal statutory claims), the same analysis is markedly more complex for the latter two groupings. The Debtors, however, believe the ultimate resolution to be that (i) federal law governs Counts I and VII; (ii) North Dakota law governs Counts II (fraudulent conveyance), III (deceit), and IV (fraud); and (iii) Minnesota law generally governs Counts V and VI (both being for negligence per se), with Count VI (negligence per se for violation of a federal criminal statute) also being informed by federal law.

##### i. The Governing Standard

As a necessary starting point in undertaking a choice of law analysis, this Honorable Court should apply the conflict of law principles of North Dakota. There exists well-articulated precedent for the use of a forum state's choice of law standards in federal diversity cases, which bankruptcy courts traditionally adopt. *See, e.g.*, *In re Lewis*, 517 B.R. 615, 618 (Bankr. E.D. Va. 2014) ("The Supreme Court has established that a federal court sitting in diversity jurisdiction must apply the choice of law rules of the forum in which the court sits. In *Compliance Marine, Inc. v. Campbell (In re Merritt Dredging Co.)*, 839 F.2d 203, 206-07 (4th Cir. 1988), the Fourth Circuit extended that principle to bankruptcy cases. . .") (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)); *ASARCO LLC v. Ams. Mining Corp.*, 382 B.R. 49, 60-61 (S.D. Tex. 2007) ("Even though

not explicitly bound by *Klaxon*, bankruptcy courts also apply choice-of-law rules of the forum in which they sit over state-law claims that do not implicate federal policy.") (citing *Woods-Tucker Leasing Corp of Ga. v. Hutcheson-Ingram Dev. Co.*, 642 F.2d 744, 748 (5th Cir. 1981); *In re Gaston & Snow*, 243 F.3d 599, 605 (2d Cir. 2001); *Merritt Dredging*, 839 F.2d at 206; *In re Southwest Equip. Rental, Inc.*, 1992 U.S. Dist. LEXIS 21396, 1992 WL 684872, at *9 (E.D. Tenn. July 9, 1992); *Warfield v. Carnie*, 2007 U.S. Dist. LEXIS 27610, 2007 WL 1112591, at *7 (N.D.Tex. Apr. 13, 2007)); *Knauer v. Kitchens (In re E. Livestock Co., LLC)*, 547 B.R. 277, 285 (Bankr. S.D. Ind. 2016) (holding similarly); *Mukamal v. Nat'l Christian Found., Inc. (In re Palm Beach Fin. Partners)*, 2014 Bankr. LEXIS 5418, at *10 (Bankr. S.D. Fla. Dec. 10, 2014) (also holding similarly). *See also Am. Fire & Cas. Co. v. Hegel*, 847 F.3d 956, 959 (8th Cir. 2017) ("In determining which state's law applies, we look to the choice of law principles of the forum state — North Dakota.") (citing *Whirlpool Corp. v. Ritter*, 929 F.2d 1318, 1320 (8th Cir. 1991)).

North Dakota's choice of law analysis, in turn, is premised upon application of a two-prong test, first assessing "all of the relevant contacts which might logically influence the decision of which law to apply," and second assessing "which jurisdiction has the more significant interest in the issues." *Am. Fire & Cas.*, 847 F.3d at 959 (quoting *Daley v. Am. States Preferred Ins. Co.*, 587 N.W.2d 159, 162 (N.D. 1998); *Nodak Mut. Ins. Co. v. Wamsley*, 687 N.W.2d 226, 231 (N.D. 2004)).

In considering which jurisdiction has the more significant interest (the second prong of the test), five sub-prongs are considered: "predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law. . ." *Nodak*, 687 N.W.2d at 231 (citing *Issendorf*

*v. Olson*, 194 N.W.2d 750, 756 (N.D. 1972) (citing Robert A. Leflar, *Choice-Influencing Considerations in Conflicts Law*, 41 N.Y.U.L. Rev. 267, 282 (1966)).

Critically, in undertaking this analysis, "North Dakota conflicts law recognizes that sometimes it is appropriate to apply different state laws to different aspects of the controversy depending upon the issue involved." *Anderson v. Sullivan*, 2007 U.S. Dist. LEXIS 24455, at *73 (D.N.D. Mar. 28, 2007) (citing *Nodak Mut. Ins.*, 687 N.W.2d at 226).

### ii. Fraudulent Conveyance (Count II)

Fortunately, the first state law claim is one for which application of a choice of laws analysis makes almost no difference. Title 11 of the United States Code (the "Bankruptcy Code") permits a debtor-in-possession to avoid any transfers that are, in turn, voidable under applicable state law. 11 U.S.C. § 544(b). Here, the Debtors seek to do so through the state law analogue of Section 548 of the Bankruptcy Code, using the modern verbiage of the Statute of Elizabeth to avoid an unconscionably one-sided forbearance agreement (the "Forbearance Agreement"). Yet insofar as all three implicated states have roughly the same statutory provisions, the analysis is of minimal import. Equally, the analysis here is actually also the easiest to undertake, insofar as the relevant law precisely sets forth its own—rather simple—choice of law standard.

North Dakota has adopted the Uniform Voidable Transactions Act. *See* N.D. Cent. Code § 13-02.1-01, *et seq.* So has Minnesota. *See* Minn. Stat. § 513.41, *et seq*. And South Dakota, while yet to adopt the same model law, has enacted a predecessor iteration of the statutory scheme. *See* S.D. Codified Laws § 54-8A-1, *et seq*. Each legislative enactment provides for the avoidance of a transfer undertaken while a debtor is insolvent, if the transaction is for less than reasonably equivalent value. *Compare* N.D. Cent. Code § 13-02.1-05(1) ("A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without

receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor

was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.")

*and* Minn. Stat. § 513.45(a) ("A transfer made or obligation incurred by a debtor is voidable as to

a creditor whose claim arose before the transfer was made or the obligation was incurred if the

debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value

in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor

became insolvent as a result of the transfer or obligation.") *and* S.D. Codified Laws § 54-8A-5(a)

("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim

arose before the transfer was made or the obligation was incurred if the debtor made the transfer

or incurred the obligation without receiving a reasonably equivalent value in exchange for the

transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a

result of the transfer or obligation.").

Each of the three legislative schemes also provides for the avoidance of a transaction that

leaves a debtor with unreasonably small capital, if the transaction is for less than reasonably

equivalent value. *Compare* N.D. Cent. Code § 13-02.1-04(1)(b) *and* Minn. Stat. § 513.44(a)(2);

*and* S.D. Codified Laws § 54-8A-4(a)(2).

Resolution of the conflicts of law analysis on Count II of the Complaint is accordingly

somewhat academic. But the resolution is also found with ease. North Dakota's applicable

legislative enactment provides, *inter alia*, "[a] claim for relief in the nature of a claim for relief

under this chapter is governed by the local law of the jurisdiction in which the debtor is located

when the transfer is made or the obligation is incurred." N.D. Cent. Code § 13-02.1-11(2). And

where, as here, the debtors are legal entities with multiple places of business, such location is the

debtors' "chief executive office." N.D. Cent. Code § 13-02.1-11(1).

The chief executive office of Generations and Ruins was, at all times relevant, located in Fargo, North Dakota. And, not coincidentally, that is also where RRSB's agent traveled to present the Forbearance Agreement for execution, Complaint, DE #1, at ¶ 69. So, while ultimately of minimal relevance, it is apparent the North Dakota iteration of the Uniform Voidable Transactions Act governs Count II of the Complaint.

### iii.  Deceit and Fraud (Counts III and IV)

Counts III and IV of the Complaint are, respectively, for deceit and fraud. These are each premised upon false representations made by RRSB, to the Debtors, in connection with the solicitation of lending activity, as well as in connection with solicitation of the Forbearance Agreement. *See* Complaint, DE #1, at ¶¶ 120-137. The former representations concern the enticement of a North Dakota developer to undertake construction projects in another state; the latter representations concern the enticement of the Debtors to execute documents in North Dakota. Both of these counts are thusly to be assessed under the purview of North Dakota law.

Applying the first *Nodak* criterion, there are relevant contacts in three states for these causes of action. Plainly, a Minnesota bank (through the agency of its Minnesota-domiciled executives) enticed a North Dakota developer (residing in Fargo) to form three businesses (incorporated in South Dakota and having their principal offices in North Dakota) to undertake three construction projects in South Dakota. Accordingly, under *Nodak*, each of these three states merits consideration in the choice of laws analysis.

The second criterion, with its five sub-prongs, considers the state with the "most significant interest" in these two causes of action. In assessing the "predictability of results," *Nodak*, 687 N.W.2d at 231, there is a strong argument for application of North Dakota law. A Minnesota bank elected to leave the protective contours of its own state and venture into a neighboring state to solicit business and then, later, to solicit execution of a forbearance agreement. There was no

7

mistaking that the Defendant was approaching a prominent Fargo developer in so doing, nor was there any mistaking that the Defendant was crossing state lines in so doing. And it was accordingly rather predictable—to a bank that chose to venture into North Dakota and to a developer that accepted solicitations in North Dakota—that any correlative tortious conduct would be measured in accord with the laws of North Dakota.

The next sub-prong is "maintenance of interstate and international order," *id.*, which the *Nodak* Court instructs to be designed at the avoidance of "interstate friction" and, equally, the avoidance of "manifest disrespect" for the laws of a sister state, *id.* (citing *Apollo Sprinkler Co. v. Fire Sprinkler Suppliers & Design*, 382 N.W.2d 386, 390 (N.D. 1986); *Daley*, 587 N.W.2d at 159). Nothing about holding a Minnesota bank accountable for the actions it undertakes in North Dakota is likely to offend a neighboring state or evidence any disrespect for a neighboring state. It seems highly unlikely that hostilities between these two states will break out anytime soon and, based on the current political environment, even less likely that such hostilities would be in any way correlative to this Honorable Court's decision to hold that a North Dakota developer being actively solicited in North Dakota is, in turn, entitled to the protections of North Dakota law.

*Nodak* proceeds to assess "simplification of the judicial task," *Nodak*, 687 N.W.2d at 231. In making this assessment, "[i]t will usually be easier for the forum court to apply its own law than any other." *Plante v. Columbia Paints*, 494 N.W.2d 140, 143 (N.D. 1992) (citing Leflar, *Choice-Influencing Considerations in Conflicts Law*, at p. 294). While this consideration accordingly does weigh in favor of the application of North Dakota law, the Plaintiffs also recognize that little-to-no weight ought to be afforded to this element. This Honorable Court sits roughly one-half mile from the Minnesota state line, is periodically presided over by a Minnesota federal judge when conflicts arise, periodically hosts the services of a chapter 7 trustee in Minnesota when different

8

conflicts arise, and regularly considers the cases of persons and entities whose affairs straddle the states' border. The Plaintiffs have no doubt this Honorable Court can ably apply Minnesota law, even if North Dakota law might be fleetingly more familiar in nature, and accordingly urge this prong be generally disregarded *sub judice*.

Next is "advancement of the forum's governmental interests," *Nodak*, 687 N.W.2d at 231, with such being ". . . discoverable by (a) identifying the factual contacts which the litigated transaction had with that state, then (b) determining whether those contacts give rise to real reasons (socioeconomic or political justifications) for applying the state's law to litigated issues in the case," *Daley*, 587 N.W.2d at 165 (citing Leflar, *Choice-Influencing Considerations in Conflicts Law*, at p. 295). This factor, while no doubt relevant, is also likely something of a wash between the three states. North Dakota has a compelling interest in seeing its citizens not be deceived and defrauded by malevolent out-of-state actors venturing into Fargo in search of business. Minnesota, no doubt, has a compelling interest in not seeing one of its chartered banks fail under the weight of a civil judgment. And South Dakota, equally, has a compelling interest in not seeing housing developments stymied—and the lives of contractors of residents consequently disrupted—because an out-of-state lender decided to form a habit of making materially false representations. The harms correlative to RRSB's actions are, assuredly, being felt in all three states. And the Plaintiffs accordingly submit that while this prong is certainly meritorious of consideration, this prong is also one that does not meaningfully tip the proverbial scales.

The final consideration is "application of the better rule of law." *Nodak*, 687 N.W.2d at 231. In North Dakota, claims for deceit and fraud are codified, with their elements being plain in the statutory scheme and resonating with the policy interests of the citizenry. *See, e.g.*, N.D. Cent. Code § 9-03-08 ("Actual fraud within the meaning of this title consists in any of the following acts

9

committed by a party to the contract, or with the party's connivance, with intent to deceive another party thereto or to induce the other party to enter into the contract: 1. The suggestion as a fact of that which is not true by one who does not believe it to be true; 2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though that person believes it to be true; 3. The suppression of that which is true by one having knowledge or belief of the fact; 4. A promise made without any intention of performing it; or 5. Any other act fitted to deceive. "); N.D. Cent. Code § 9-10-03 ("One who willfully deceives another with intent to induce that person to alter that person's position to that person's injury or risk is liable for any damage which that person thereby suffers.").

In Minnesota, by contrast, such claims are subsumed within the greyscales of common law, with "deceit" merely being a subset of fraud. *See, e.g.*, *Williams v. Tweed*, 520 N.W.2d 515, 517 (Minn. Ct. App. 1994) ("Three types of misrepresentations fall under this broad category of fraud: reckless misrepresentation, negligent misrepresentation, and deceit.") (citing *Florenzano v. Olson*, 387 N.W.2d 168, 177 (Minn. 1986)). A showing of deceit and fraud, in turn, requires what the Defendant herein asserts to be a showing of no less than eleven separate elements. *See* Motion, DE #7, at § IV, p. 16 (citing *Nave v. Dovolos*, 395 N.W.2d 393, 397 (Minn. Ct. App. 1986)).

It is certainly difficult to weigh the merits of one state's legal scheme against that of another state without resorting to petty playground retorts unmoored to any consequential appreciation of the complexities of state law. Yet, to the extent *Nodak* commands such an assessment be undertaken, and with enormous respect for the State of Minnesota, the Plaintiffs urge the applicable legal schemes of North Dakota to be superior in nature. The application of clean, statute-based mandates invites a more predictable course of litigation than does the application of ever-evolving case law. Such, in turn, helps streamline discovery, focus briefing, and allow for more

10

efficient litigation. And so, yes, North Dakota has the "better rule of law," *Nodak*, 687 N.W.2d at 231, even if Minnesota remains a perfectly lovely place that ought not be degraded.

Taken together, the *Nodak* considerations all either weigh in favor of the application of North Dakota law or invite agnosticism. There is no criterion that militates in favor of Minnesota or South Dakota law being invoked for these two causes of action, while at least two of the prongs heavily favor application of North Dakota law. And it is thusly urged that, as to Counts III and IV of the Complaint, North Dakota law ought to govern.

### iv.   Negligence Per Se (Counts V and VI)

Analysis of the *Nodak* factors bodes quite differently for counts V and VI of the Complaint, each of which seek relief for negligence per se on account of RRSB's violation of various laws governing the operation of banks and the conduct of bank officers. Insofar as these claims directly impact the conduct of a state regulated bank, with one claim being tethered to a violation of Minnesota state law, it follows that each of these causes of action ought to be governed by Minnesota law.

The first *Nodak* consideration is identical here insofar as there remain relevant contacts with North Dakota, South Dakota and Minnesota. But the second factor comes out quite differently when examined in the prism of the five guiding sub-prongs.

Minnesota, no doubt, has the "most significant interest" in a state chartered bank violating both state and federal banking-centric laws. Yes, these violations begat harms in North Dakota and impacted the citizenry of South Dakota, but given the intimate nexus between a community bank and its state regulators, *German-American Fin. Corp. v. Merchants' & Mfrs' State Bank*, 225 N.W. 891, 893 (Minn. 1929), there is little doubt but that Minnesota has the most significant interest in these two causes of action. Such is especially true for Count V, which implicates violations of state banking laws (in contrast to Count VI, which concerns only a violation of federal banking laws).

11

Vis a vis "maintenance of interstate and international order," *Nodak*, 687 N.W.2d at 231, it still appears unlikely this case will invite "interstate friction" or the appearance of "manifest disrespect" for any of the implicated states, *id.* (citing *Apollo Sprinkler*, 382 N.W.2d at 390; *Daley*, 587 N.W.2d at 159). Again, it is difficult to fathom this litigation will occasion a strain of relations between Bismarck and St. Paul. And this consideration remains accordingly neutral in nature.

In terms of "simplification of the judicial task," *Nodak*, 687 N.W.2d at 231, such actually militates in favor of applying Minnesota law to these two causes of action. While this criterion is clearly designed to ordinarily weigh in favor of forum state law, the posture of this case is such that this Honorable Court will need to assess Minnesota banking laws in connection with Count V of the Complaint, since the claim is premised upon a violation of those laws. If part of that cause of action is going to turn on Minnesota law, simplification of the task would entail not fracturing consideration such that part of the claim turns on Minnesota law and part of the claim turns on North Dakota (or South Dakota) law.[1]

As to "advancement of the forum's governmental interests," *Nodak*, 687 N.W.2d at 231, such may actually weigh in favor of applying North Dakota or South Dakota law. The financial detriments occasioned by RRSB's tortious conduct are being felt most acutely in North Dakota and South Dakota. In fact, even if RRSB were to fail on account of the violative conduct, the financial repercussions of such would be most likely to be absorbed by the Federal Deposit Insurance Corporation—a national actor—and not any state government. Admittedly, if a failure of the bank emanates from this case, and there exist deposits above the insurable threshold, such

---

[1] As discussed *infra*, there actually exists a freestanding federal statutory cause of action for violation of the bribery laws alleged in Count VI. *See* 12 U.S.C. § 503. So, to the extent these two claims are to be differently regarded, application of state law to the latter cause of action may be a somewhat irrelevant consideration.

12

may have a disproportionate impact on Minnesota's government interests. Yet the Plaintiffs care not to speculate as to how many (if any) deposits in excess of the FDIC insurance threshold are being held by RRSB, and appreciate such a consideration to be likely too sensitive—and too far afield—to merit exploration *sub judice*. Accordingly, this element seems to tip marginally in favor of North Dakota or South Dakota.

Finally, in terms of the "better rule of law," this criterion is actually somewhat confounding. North Dakota does not recognize a cause of action for negligence per se, instead directing such claims be brought in the form of ordinary negligence causes of action. *Ebach v. Ralston*, 510 N.W.2d 604, 611 (N.D. 1994) ("The trial court's instruction that the violation of a statutory duty may be evidence of negligence is consistent with our well-established case law that the violation of a statutory duty is evidence of negligence and not negligence per se.") (citing *Gronneberg v. Hoffart*, 466 N.W.2d 809 (N.D. 1991); *Haider v. Finken*, 239 N.W.2d 508, 514 (N.D. 1976)). South Dakota and Minnesota, by contrast, do recognize such a cause of action. *See Stensland v. Harding Cty.*, 872 N.W.2d 92, 95-96 (S.D. 2015); *Staub v. Myrtle Lake Resort, LLC*, 964 N.W.2d 613, 635 (Minn. 2021). There is accordingly a policy debate, intrinsic in consideration of this prong, as to whether or not negligence per se ought to be acknowledged as a cause of action in the first instance. The Plaintiffs will forbear from engaging a fulsome analysis of this question other than to observe negligence per se has a rich history in the American jurisprudence, dating back to the 19th century. *See, e.g.*, *Robinson v. Cone*, 22 Vt. 213, 226 (Vt. 1850) ("It is not

13

negligence per se to permit children to play in the street.") (citing *Kunz v. City of Troy, (N. Y.)*, 10 N.E. 442 (N.Y. 1887)).[2]

Given that RRSB is a state-charted bank, and given that one of the two negligence per se counts implicates Minnesota's banking laws, it is respectfully submitted those two considerations outweigh the others. These causes of action should be construed in accord with Minnesota—not North Dakota—law.

### b. Generations and Parkside Have Properly Stated a Claim Under Section 548 (Count I)

The Defendant posits that insofar as the word "insolvent" does not appear in the Complaint, the Plaintiffs have necessarily failed to state a claim for relief under Section 548 of the Bankruptcy Code. Motion, DE #7, at § II(B)(1). In so doing, RRSB appears to both misapprehend the rigors of Section 548 and miss the core holding of *Iqbal* and *Twombly*, with the Supreme Court having stressed that it is the sum and substance of a pleading's allegations—and not the threadbare recitals of claim elements—that imbues a pleading with fodder sufficient to survive a motion to dismiss.

The Defendant asserts, additionally and/or alternatively, that Count I ought to be dismissed because there existed reasonably equivalent value for the Forbearance Agreement. Yet case law— including a relatively recent holding from this Honorable Court—is rather precise that such is a question of fact to be determined through the litigation process, and not something for which a defendant's self-serving word is to be sweepingly taken at the pleading stage of a lawsuit.

---

[2] This citation is something of a temporal impossibility, with *Robinson*—a case from 1850—citing to *Kunz*—a case from 1887. Insofar as the proposition supported by this citation (roughly that "negligence per se is a doctrine that has been around for a long time") is relatively uncontroversial, the Plaintiffs have elected to avoid expending too many resources investigating this oddity. But suffice it to posit something is awry with the manner in which *Robinson* is produced in LexisNexis.

As to whether or not it is negligence per se to allow children to play in the street, the Plaintiffs respectfully submit that times may have changed slightly between 1850 and 2025.

### i. Definitional Insolvency is Not a Condition Precedent to a Fraudulent Conveyance

RRSB is correct: the Complaint does not contain the word "insolvent" or any conjugated variant thereof. Yet RRSB is wrong in asserting balance sheet insolvency to be "an essential element for a claim under Section 548(a)(1)(B)," Motion, DE #7, at § II(B)(1), as the statutory text plainly allows for the avoidance of transactions in circumstances well broader than those informed by the sum of a debtor's liabilities surpassing the sum of a debtor's assets. Equally, RRSB is wrong in asserting that merely because the word "insolvent" appears nowhere in the Complaint, the pleading is accordingly missing an allegation of insolvency.

As a starting point, the Bankruptcy Code permits a transaction to be avoided as a fraudulent conveyance where the Debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation," 11 U.S.C. § 548(a)(1)(B)(i), and the Debtor:

> (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; ***or***
>
> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B)(ii) (emphasis added). The word "or" is dispositive, showing the four conditions requisite to a fraudulent conveyance to be disjunctive—and not conjunctive—in

15

nature.[3] And while the first sub-criterion is an express condition of insolvency (within the definition set forth in Section 101(32)), the succeeding two provide what are understood to be additional "insolvency tests." *Peltz v. Hatten*, 279 B.R. 710, 742 (D. Del. 2002). *See also Stone v. Citizens Equity First Credit Union (In re Int'l Supply Co.)*, 2022 Bankr. LEXIS 865, at *46-47 (Bankr. C.D. Ill. Mar. 30, 2022) ("Mr. Sargent and Mr. Gerber both prepared expert reports and testified using three different tests for insolvency: the balance sheet test, the cash flow test, and the adequate capital test. Each expert referenced the tests as being compelled by § 548 without reference to the IUFTA. The three tests are, however, regularly relied on by courts deciding issues of insolvency under both the Code and the IUFTA.") (citing *Paloian v. LaSalle Bank Nat'l Ass'n (In re Doctors Hosp. of Hyde Park, Inc.)*, 507 B.R. 558, 632 (Bankr. N.D. Ill. 2013)).

Here, at irreducible minimum, the Plaintiffs have alleged the second disjunctive criterion in connection with this claim. *See* Complaint, DE #1, at ¶ 119 ("The increased interest obligation set forth in the Forbearance Agreement left each Debtor with unreasonably small capital."). And such is well supported by the general gist of the Complaint, which describes the deleterious

---

[3] The Defendant has cited a case, from this Honorable Court, suggesting insolvency to be a compulsory element of a claim under Section 548(a)(1)(B). *See* Motion, DE #7, at § II(B)(1), n. 22 (citing *Velde v. Morrison (In re McMartin)*, 599 B.R. 622, 627 (Bankr. D.N.D. 2019)). *Velde* is a decision that stems from a trial on the merits, not a motion to dismiss. *Id.* at 625. Yet an examination of the complaint in *Velde* also makes clear that the plaintiff was therein proceeding on a theory of balance sheet insolvency (within the grasp of 11 U.S.C. § 101(32)—not one of unreasonably small capital or a failure to pay debts as they come due—as permitted by Section 548(a)(1)(B)(i)(II-III). *See Velde v. Morrison*, Case No. 18-07023 (Bankr. D.N.D. 2018) at DE #1, ¶ 12 ("Debtor's bankruptcy filing lists approximately $1,476,393.74 in assets and $52,234,104.60 in liabilities. BMO Harris Bank, alone, possesses a claim in excess of $43 million dollars. Debtor was insolvent in 2016."); ¶ 15 ("The Debtor was insolvent at the time of the Transfer.").

*Velde* may accordingly be best read as affirming the well-settled principal that definitional insolvency within the contours of Section 101(32) does satisfy one of the disjunctive rigors of Section 548(a)(1)(B)(ii), without opining on the applicability of the other disjunctive rigors that provide separate mechanisms for finding insolvency to be extant.

ramifications of a bank promising to provide long-term financing at a reasonable interest rate and then, instead, thrusting upon borrowers short term financing at markedly higher interest rates. *Id.* at ¶¶ 33-36; 53; 62-63; 73.

The Plaintiffs have, too, alleged facts giving rise to the third disjunctive criterion—an inability to pay the incurred debt as it came due. The Complaint stresses that the Forbearance Agreement gave the Debtors only an added two months and two weeks. Complaint, DE #1, at ¶ 77. This scant period of time was afforded despite the bank having originally promised long-term financing that would be payable *years* forthwith. *Id.* at ¶¶ 33-36; 53; 62-63; 73. It necessarily follows that two entities engaged in the business of operating apartment buildings would not be able to repay debt, in full, in a brief two months and two days, especially when their business operations have been designed in reliance upon RRSB's promises of long-term financing.

### ii.  Reasonably Equivalent Value is a Question of Fact

The Motion next contends that dismissal is appropriate because the Forbearance Agreement conferred reasonably equivalent value on the Plaintiffs. In so doing, the bank insists the Debtors have not identified the claims released by the Forbearance Agreement, Motion, DE #7, at § II(B)(1), while simultaneously posturing—in the same brief—that causes of action brought by the Plaintiffs have been released, *id.* at §§ IV(A); V(A). The intrinsic hypocrisy of that position bears notation: the Defendant alleges the released claims to be "neither specifically identified, nor valued, by Plaintiffs," *id.* at § II(B)(1), whilst separately asserting, *inter alia,* "[a]s a threshold matter, the deceit claims of Generations and Parkside fail because they released the same against

RRSB," *id.* at § IV(A), and "[a]s a threshold matter, the alleged fraud claims of Generations and Parkside fail because they released the same against RRSB," *id.* at § V(A).[4]

A second, more macroscopic, issue encompasses this contention of RRSB: whether or not an agreement confers reasonably equivalent value is a question of fact to be determined during the course of litigation. As observed by this Honorable Court, less than a decade ago: "Whether a transfer is made for reasonably equivalent value is a question of fact." *Doeling v. O'Neill (In re O'Neill)*, 550 B.R. 482, 509 (Bankr. D.N.D. 2016) (citing *Meeks v. Don Howard Charitable Remainder Trust (In re S. Health Care of Ark., Inc.)*, 309 B.R. 314, 319 (B.A.P. 8th Cir. 2004) (citing *Jacoway v. Anderson (In re Ozark Rest. Equip. Co.)*, 850 F.2d 342, 344 (8th Cir. 1988))). *See also Ahlgren v. Dailey (In re Schnoor)*, 510 B.R. 868, 874 (Bankr. D. Minn. 2014) ("Whether a transfer is made for reasonably equivalent value is a question of fact.") (citing *Lindquist v. JNG Corp. (In re Lindell)*, 334 B.R. 249, 253 (Bankr. D. Minn. 2005) (citing *Jacoway*, 850 F.2d at 344)); *Quinn v. Elite Custom Transporters & Motorcoaches, LLC*, 2011 U.S. Dist. LEXIS 52362, at *16 (D. Minn. May 16, 2011) ("Whether a party received reasonably equivalent value is a question of fact. 'The court must consider all aspects of the transaction and 'carefully measure the value of all benefits and burdens to the debtor.' '") (citing *Jacoway*, 850 F.2d at 344; quoting *United States v. Spencer*, 2005 U.S. Dist. LEXIS 28257, 2005 WL 2648688, at *3 (D. Minn. Oct. 17, 2005)); *Tex. Truck Ins. Agency v. Cure (In re Dunham)*, 110 F.3d 286, 289 (5th Cir. 1997) (". . . the question of 'whether fair consideration [now 'reasonably equivalent value'] has been given for a transfer is 'largely a question of fact, as to which considerable latitude must be allowed to

---

[4] RRSB does not affirmatively assert the negligence per se claims to have been released. The Plaintiffs are, candidly, unsure as to why the bank is not also taking such a position, but would note that an apparent release of those claims is part of what gives rise to the lack of reasonably equivalent value of the Forbearance Agreement.

the trier of the facts.' '") (quoting *Mayo v. Pioneer Bank & Tr. Co.*, 270 F.2d 823 (5th Cir. 1959)

(quoting Collier's Bankruptcy Manual (Oglebay, Kelliher and Newkirk) (1948), p. 845)).

The Defendants rely upon an unpublished Second Circuit opinion for the proposition that

the presence of reasonably equivalent value may be assessed in connection with a motion to

dismiss. Motion, DE #7, at § § II(B)(1) (citing *Wade Park Land Holdings, LLC v. Kalikow (In re

Wade Park Land Holdings, LLC)*, 2024 U.S. App. LEXIS 14631, at *1 (2d Cir. June 17, 2024)).

Yet that is a case where the trial court found appraisal figures in a complaint—aimed at bolstering

an absence of reasonably equivalent value—to lack plausibility under *Iqbal* and *Twombly*. *See

Wade Park*, 2024 U.S. App. LEXIS 14631, at *13 ("The history of the financing efforts for

Thomas's Wade Park development project renders implausible the notion that the property was

worth significantly more than what the Wade Park Entities owed Gamma in 2019."). In particular,

the *Wade Park* Court noted that a property only able to secure "$83 million in financing—on

lender-favorable terms," whilst "carrying approximately $93 million in debt," *id.*, could not

plausibly have been worth the $466.8 million being claimed by the plaintiff therein, *id.*

Here, the Plaintiffs are alleging that two months and two weeks of forbearance are not of a

value reasonably equivalent to (i) the release of all causes of action against RRSB (several of which

are pleaded in the Complaint); and (ii) a 2.25% increase on the applicable interest rates. These

contentions do, rather assuredly, meet the plausibility rigors of *Iqbal* and *Twombly*. And the

Debtors would go a step further, computing the amount of damages occasioned by the surreptitious

interest rate hike, but for the fact that they literally cannot do so since RRSB has refused to provide

payment histories for the at-issue loans. *See* Complaint, DE #1, at ¶¶ 156-158.

Yet even if one uses the principal figures alleged in the Complaint, the lack of reasonably

equivalent value on the interest hike alone—let alone the claim releases upon which the bank is

now relying—becomes apparent. Generations is alleged to have been promised $8,340,000.00 in financing, *id.* at ¶ 35, while Parkside is alleged to have been promised $3,862,148.00 in financing, *id.* at ¶ 33. Using those numbers (which is, no doubt, an imperfect election, insofar as payments had been made while, equally, interest had accrued), a 2.25% interest rate increase would amount to an added $187,650.00 per year for Generations and an added $86,898.33 for Parkside. The Forbearance Agreement, as appended to the Motion, bears a date of February 17, 2023. *See* Motion, DE #7, at Ex. 1. That is a date now more than two years in the past, with the added interest on the two loans having accordingly been now more than $550,000.00 (subject to adjustments for the payments made by—and for the benefit of—the Debtors, for which RRSB refuses to account).

So the question becomes, in the prism of *Iqbal* and *Twombly*, whether it is plausible that two months and two weeks of forbearance did not confer a value reasonably equivalent to $550,000.00 plus whatever may be recovered on the other claims in this litigation. Adjudication of those other claims will, of course, be necessary to assess their respective values. But the interest number alone is well sufficient to answer this question in the affirmative: a plausible claim for relief has been made by the Plaintiffs.[5]

### c. Generations and Parkside Have Property Set Forth a State Law Fraudulent Conveyance Claim (Count II)

The arguments set forth in Section III of the Motion, concerning the state law fraudulent conveyance claim, largely mirror those set forth in Section II of the Motion and which are addressed *supra*. Insofar as RRSB incorporates its foregoing arguments by reference, *see* Motion, DE #7, at § III(B)(1), the Plaintiffs do so as well. However, three issues do merit particularized

---

[5] The Defendant also seeks dismissal of Count I—as well as Count II—against Ruins, on the basis that Ruins is not a signatory to the Forbearance Agreement. So long as the Defendant acknowledges this means Ruins is not bound by the releases set forth therein, Ruins is certainly content to no longer be a party to these two causes of action.

attention: (i) the bank's assertion that the forum selection clause in the Forbearance Agreement governs the application of law; (ii) the allowances of North Dakota law concerning insolvency; and (iii) the existence of a creditor into whose proverbial shoes the Plaintiffs may step in bringing this claim.

Concerning the first point, the Forbearance Agreement actually contains a notably mild— and prohibitively narrow—choice of law provision, which allows, *en toto*, "[t]his Agreement shall be interpreted and construed in accord with the laws of the State of Minnesota." *See* Motion, DE #7, at Ex. A, § 12, p. 34. The clause does not contain the often-present language providing that "any disputes concerning this agreement or the subject matter hereof shall be governed by the laws of. . .," nor any verbiage of the like. So, even on a plain reading of the Forbearance Agreement, it does not appear that the subject clause would be of any moment to a fraudulent conveyance claim (or, for that matter, any claim other than one for breach of contract). *See, e.g.*, *Davies United States Inc. v. Weston*, 2025 U.S. Dist. LEXIS 58533, at *7 (D. Del. Mar. 28, 2025) ("The parties agreed that Delaware law covers disputes about the interpretation of the Note. Yet they made no agreement about how to govern disputes related to, but not directly arising from, the Note. So the choice-of-law provision does not cover a tort claim for fraudulent conveyance that exists outside the contract.") (citing *Huffington v. T.C. Grp., LLC*, 2012 WL 1415930 (Del. Super. Ct. Apr. 18, 2012)); *JPMorgan Chase Bank, NA v. Martin*, 2006 U.S. Dist. LEXIS 113415, at *17 (N.D. Cal. Mar. 29, 2006) ("The Court finds Plaintiff's contractual choice-of-law argument unavailing. Fraudulent transfer is a tort cause of action, and does not arise due to breach of contract. Plaintiff's arguments concerning contractual choice of law provisions are of no moment, as the alleged fraudulent transfer tort is independent and unrelated to the contract between Martin and JP Morgan.").

21

Yet even if, *arguendo*, the choice of law provision in the Forbearance Agreement were to govern a claim for fraudulent conveyance, and thusly implicate Minnesota law, the claim would still end up being subject to North Dakota law. This is because the Minnesota statutory scheme governing fraudulent transfers, much like the North Dakota language cited in § III(a)(ii), *supra*, provides that "[a] debtor that is an organization and has more than one place of business is located at its chief executive office," and a fraudulent conveyance claim "is governed by the local law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred." Minn. Stat. § 513.485.

As noted above, this is of little consequence—Minnesota and North Dakota (as well as South Dakota) all have substantively similar fraudulent conveyance statutes. But to the extent there is any dispute over which state's laws apply, the application of focus on the Forbearance Agreement's choice of law provision is a red herring, both because of the wantonly narrow scope of the provision and because Minnesota's statutory scheme points to the application of North Dakota law in any event.

In applying North Dakota law, the state's statutory provision—unsurprisingly—contains the same allowances as the Bankruptcy Code on the question of alternative forms of insolvency. N.D. Cent. Code § 13-02.1-04. So, just as with the Section 548 claim discussed *supra*, the Debtors do not need to show balance sheet insolvency to bring such a claim; they may, instead, simply allege that each Debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction or the debtor intended to incur," *id.*, or, alternatively, that each Debtor "believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due," *id.*

22

Importantly, though, the North Dakota fraudulent conveyance statute also utilizes a different definition of "insolvency" than the Bankruptcy Code. Under the state's statutory scheme, "[a] debtor that is generally not paying the debtor's debts as they become due other than as a result of a bona fide dispute is presumed to be insolvent." N.D. Cent. Code § 13-02.1-02(2). And insofar as the whole thrust of the Forbearance Agreement is that RRSB alleged the Debtors to not be paying their debts as they came due, it would seem the bank is now estopped from contending otherwise. To the bank's credit, the Motion appears to avoid making an insolvency-based argument in connection with Count II, except to the extent the Defendant incorporates the arguments made in connection with Count I.

Finally, there is a two-sentence argument contained in the Motion, challenging the existence, *vel non*, of a creditor with standing to pursue a state law claim against RRSB. *See* Motion, DE #7, at § III. It bears notation that the Complaint expressly points to Section 13-03.1-04 of the North Dakota Century Code in stating this claim for relief. *See* Complaint, DE #1, at p. 19. And that provision, in turn, is applicable "whether the creditor's claim arose before or after the transfer was made or the obligation was incurred. . ." N.D. Cent. Code § 13-02.1-04. So the question is not one of whether there existed other creditors at the time the Forbearance Agreement was entered into (even though there assuredly did); the question is, rather, whether or not there existed other creditors at the time the Debtors sought bankruptcy relief. 11 U.S.C. § 544(b)(1); N.D. Cent. Code § 13-02.1-04.

Generations and Parkside do, of course, have other creditors—as evidenced by the schedules in the bankruptcy cases from which this adversary proceeding emanates. And the Complaint does faithfully recite that both entities are debtors in bankruptcy. Complaint, DE #1, at ¶ 19. The creditors set forth in those schedules (and, now, in the claims register) include taxing

authorities, a municipal secured creditor with whom RRSB is in contractual privity, the Debtors' former (and now current) property management company, and the state court receiver handpicked by RRSB. All of which is fairly considered in connection with the Motion. *See, e.g.*, *Rothman v. Friedman Vartolo, LLP (In re Rothman)*, 2024 Bankr. LEXIS 423, at *22 n.9 (Bankr. D.N.J. Feb. 20, 2024) ("When deciding a motion to dismiss in an adversary proceeding, 'a bankruptcy court may take judicial notice of the docket entries in a case and the contents of the bankruptcy schedules to determine the timing and status of case events and other facts which are not reasonably in dispute.' This includes schedules.") (quoting *In re Brown*, 591 B.R. 587, 591 (Bankr. M.D. Pa. 2018); citing *In re Trichilo*, 540 B.R. 547, 549 (Bankr. M.D. Pa. 2015); *In re Baker*, 2020 Bankr. LEXIS 1454, 2020 WL 3815280, at *2 (Bankr. D. Kan. June 1, 2020); *In re Wright*, 2009 Bankr. LEXIS 3564, 2009 WL 3633811, at *3 (Bankr. D.N.M. Oct. 30, 2009)).

Yet even if the schedules in the main case were not available for purposes of showing the existence of general unsecured creditors, the Defendant's contention concerning the need to identify a single creditor in the Complaint appears to run contra to case law that imposes no such mandate at the pleading stage of an adversary proceeding: "While it is true that the Trustee must ultimately prove such a creditor actually exists, he need not plead by name the existence of such a creditor." *Fisher v. MRM Grp. (In re Multi-Risk Mgmt.)*, 1998 Bankr. LEXIS 1122, at *7 (Bankr. N.D. Ill. Sep. 8, 1998) (citing *In re McDowell*, 87 B.R. 554, 558 (Bankr. S.D. Ill. 1988); *In re McElwee*, 161 B.R. 41, 43 (Bankr. S.D. Ill. 1993); *In re Leonard*, 125 F.3d 543, 544 (7th Cir. 1997)). *See also Leonard*, 125 F.3d at 544 ("Barker and Lieblich complain that the Trustee has not articulated the specific creditor who could set aside Zach's gift, but a trustee need not do so. Thirteen unsecured claims have been filed; the Trustee can assume the position of any one of them."); *Pardo v. Avanti Corp. Health Sys. (In re APF Co.)*, 274 B.R. 634, 639 (Bankr. D. Del.

24

2001) ("When analyzing the sufficiency of a complaint for purposes of Rule 12(b)(6), courts do not generally require a trustee to plead the existence of an unsecured creditor by name, although the trustee must ultimately prove such a creditor exists.") (citing *Fisher*, 1998 Bankr. LEXIS 1122; *Askanase v. Fatjo*, 828 F. Supp. 465 (S.D. Tex. 1993)). *But see Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1148 (C.D. Cal. 2003) (citing a split in authorities and holding a trustee must identify a particular creditor in whose shoes the trustee seeks to stand).[6]

### d. The Putative Releases Are Not Grounds Upon Which to Dismiss this Adversary Proceeding (Counts III and IV)

RRSB asserts the claims of Generations and Parkside, for deceit and fraud, merit dismissal because such causes of action have been released by the two Debtors. Motion, DE #7, at §§ IV(A); V(A). In so doing, the bank relies—exclusively—upon the very Forbearance Agreement that the Debtors are seeking to avoid in Counts I and II. The Debtors also allege that, in addition to being avoidable under both state and federal law, the Forbearance Agreement is the byproduct of actual deceit and fraud, insofar as RRSB swapped out the bargained-for agreement with a different agreement between the time of presentation for review and the time of presentation for execution. Complaint, DE #1, at ¶¶ 67-72; 126-127; 135-136.

If the Debtors prevail on Count I or Count II, the Forbearance Agreement—inclusive of the releases set forth therein—will be avoided. Equally, however, if the Debtors prevail on Count IV, the Forbearance Agreement will be subject to rescission on grounds of fraud, N.D. Cent. Code

---

[6] Notably, part of the analysis in *Neilson* turned on the fact that absent a specific allegation, the defendants would not be able to assess the correlative strength of the trustee's claim. *Neilson*, 290 F. Supp. 2d. at 1148. This may be why, as noted above, notice of the main case docket is permitted in connection with a motion to dismiss—RRSB is most certainly able to assess the existence, *vel non*, of unsecured creditors in these bankruptcy proceedings.

25

§ 9-09-02(1), with such being a question of fact to be determined subsequently in these proceedings, N.D. Cent. Code § 9-03-10.

For more than 100 years, the law of North Dakota has been that a release procured by fraud need *not* be separately set aside before suit on the putatively-released claims is brought. *See, e.g.*, *Clark v. N. Pac. Ry.*, 162 N.W. 406, 407 (N.D. 1917) ("If the release was procured by misrepresentation and fraud, it may be ignored by Goodholm, and an action for the injuries actually suffered may be maintained. It is not necessary that it should be first set aside in a proceeding in equity.") (quoting *Missouri P. R. Co. v. Goodholm*, 60 P. 1066 (Kan. 1900)). Even in more modern times, this doctrine remains generally accepted in other forums as well. *See Jacobs v. Jacobs*, 2007 U.S. Dist. LEXIS 99913, at *10-11 n.3 (N.D. Ohio Dec. 6, 2007) ("Where a claim is based on 'fraud in the factum,' the claimant need not first rescind the agreement because the release is void *ab initio*. Fraud in the factum occurs when the misrepresentation precludes the releasor from understanding the 'nature or character of the purported agreement.' Fraud in the inducement occurs when a misrepresentation relates to the contents of the release and induces a party to execute the release.") (quoting *Haller v. Borror Corp.*, 552 N.E.2d 207 (Ohio 1990)).

The Plaintiffs recognize that if they fail to prevail upon either or the fraudulent conveyance claims or the fraud claim, their ability to pursue certain tort claims will be necessarily curtailed (though the right to seek a declaratory judgment, as to RRSB's obligation to provide an accounting of payments made, will survive). Unless and until such a failure occurs, however, it would be premature to dismiss any causes of action on account of a release that appears to be subject to avoidance under federal and state law as well as rescission under state law.

26

### e.  The Complaint Sets Forth a Valid Claim for Deceit (Count III)

In seeking dismissal of the claim for deceit, RRSB urges (i) a promise of funding cannot give rise to a claim for deceit; (ii) the Plaintiffs cannot have reasonably relied upon the bank's representations; and (iii) the Plaintiffs cannot complain that the Forbearance Agreement was swapped out between presentation for review and presentation for execution, since the Plaintiffs had a duty to re-review the document prior to signing. None of these contentions are availing under governing law. Though, in fairness to RRSB, the Motion assumes application of Minnesota law while, as discussed *supra*, the Plaintiffs believe this claim to be governed by North Dakota law.

That North Dakota law governs this claim is exceedingly relevant. Deceit is a statutory cause of action in this state, defined as:

> 1. The suggestion as a fact of that which is not true by one who does not believe it to be true;
>
> 2. The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;
>
> 3. The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or
>
> 4. A promise made without any intention of performing.

N.D. Cent. Code § 9-10-02.

This state's highest court has expressly held that a promise of funding, if unfulfilled, may give rise to a statutory claim for deceit. In *Delzer v. United Bank of Bismarck*, 559 N.W.2d 531 (N.D. 1997), a bank was alleged to have orally promised to loan $300,000.00 to the plaintiffs, in two tranches. *Id.* at 533. The bank honored its commitment as to the first tranche, with a promissory note being executed, but then failed to fund the second tranche. *Id.* This failure left the plaintiffs unable to pay their debts and susceptible to a loss of assets. *Id.* In overturning a grant of summary judgment, the Supreme Court of North Dakota held, *inter alia*, "United Bank's promise to loan

27

money for the purchase of cattle, made without any intention of performing it, was 'tortious conduct . . . existing independently of the breach of contract.'" *Id.* at 535 (quoting *Pioneer Fuels, Inc. v. Montana-Dakota Utils. Co.*, 474 N.W.2d 706, 710 (N.D. 1991)).

The facts of this case are markedly similar. The Debtors allege RRSB promised to extend construction loans followed by permanent financing, Complaint, DE #1, at ¶¶ 33-40, only to then fail to furnish permanent financing, *id.* at ¶¶ 62-63 and, in some instances, only to then fail to provide even the construction loans on the promised terms and in the promised form, *id.* at ¶¶ 46-53. The Plaintiffs' claim for deceit is, accordingly, premised upon (i) the falsity of RRSB's representation as to an ability to lawfully make the at-issue loans; (ii) the falsity of RRSB's representation that it actually had the funds to loan; (iii) RRSB's failure to disclose that the at-issue loans would violate various laws; and (iv) misrepresentations correlative to the presentation and execution of the Forbearance Agreement. *Id.* at ¶¶ 121-128.

If the plaintiffs in *Delzer* were permitted to sue a bank based upon false representations in connection with the forward-looking provision of credit, it necessarily follows that the Debtors here may, too, sue a bank for the same tortious activity.

The bank next urges that a claim for deceit ought not stand because the Debtors should not have relied upon the bank's representations when they were not incorporated into subsequent loan documents. Motion, DE #7, at § IV(B). In support of this contention, RRSB points to a declaration by Charles Aarestad ("Mr. Aarestad")—the same individual who fraudulently swapped out the Forbearance Agreement—and various documents referenced therein. *Id.* But two problems stem from this reliance: first, such is improper in the prism of a motion to dismiss brought under Rule 12(b)(6) and, second, even if the documents are to be considered, the documents do not actually say what the bank seems to think the documents say.

28

On the first point, consideration of documents outside the four corners of a complaint generally (albeit not always) transmutes a motion to dismiss into a motion for summary judgment. *See, e.g. Parizek v. Cty. of Ward N.D.*, 2019 U.S. Dist. LEXIS 251793, at *4 (D.N.D. Nov. 14, 2019) ("Consideration of the first ground would require the court to look beyond the four corners of the pleadings, which it turn would require the court to convert defendants' motion to dismiss to a motion for summary judgment.") (citing Fed. R. Civ. P. 12(d)). In such an eventuality, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

RRSB has not signaled that it wishes for the Motion to be regarded as one for summary judgment. And the Plaintiffs most certainly would respond quite differently if the Motion were to be so construed, appending appropriate exhibits and declarations to this brief (including, no doubt, a declaration under Rule 56(d), observing the need for discovery to be first undertaken on certain matters). So, in the current posture, while the arguments contained in the Motion are properly considered, the majority of documents appended thereto are not properly considered.[7]

Nonetheless, even if, *arguendo*, the documents appended to the Motion were to be properly considered, they do not contain the broad disclaimer the Defendant suggests to be present. Rather, the documents each provide that (i) "the written loan agreement represents the final agreement between the parties," and (ii) "there are no unwritten oral agreements between the parties." Motion, DE #7, at Ex. 2(A)-2(C) (emphasis removed for readability).

---

[7] The Plaintiffs have no objection to the Forbearance Agreement being considered, insofar as the document is referenced—repeatedly—in the Complaint. *See, e.g.*, *Hageman v. Barton*, 817 F.3d 611, 620 n.8 (8th Cir. 2016) ("Here, Hageman referenced the 'assignment document' in his complaint, and Barton supplied the 'assignment of claim' document with his motion to dismiss. Hageman does not challenge our ability to consider the assignment of claim document in general.").

The Plaintiffs do not dispute that each loan agreement was the final agreement—as to that specific loan—between the parties. The issue is not the form of loan agreements that were presented but, rather, the non-existence of the loan agreements that were not presented. And assuredly the Defendant is not suggesting each individual loan agreement to have been represented as the final agreement *of any variety* between the parties; as evidenced by the multitude of loan agreements themselves, it was always manifest the debt facilities were being provided in multiple tranches—what was not manifest was that this structure was attributable to the bank lacking the resources and the ability to lawfully fund the loans.

Nor are the Plaintiffs asserting the existence of any "unwritten oral agreements" between the parties. To the contrary, the Plaintiffs point to written term sheets as the basis for many of their contentions in this case. *See* Complaint, DE #1, at ¶¶ 33-41. Certainly written term sheets do not fall within the ambit of "unwritten oral agreements."

Finally, RRSB posits that the Plaintiffs cannot bemoan the Forbearance Agreement presented for review being materially different than the iteration presented for execution, because "absent special circumstances—circumstances that Plaintiffs have not pleaded—one party to a business transaction has no duty to disclose material facts to the other party." Motion, DE #7, at § IV(B) (citing *Richfield Bank & Tr. Co. v. Sjogren*, 244 N.W.2d 648, 649 (Minn. 1976)).

Putting aside that *Sjogren* is a case premised upon Minnesota law, the authority does not nearly stand for the proposition asserted by RRSB. In *Sjogren*, a loan officer at a bank allegedly knew a seller might not be able to fulfill an order for 50 air purification units, insofar as the seller's solvency was in question. *Sjogren*, 244 N.W.2d at 650. The bank did not, however, disclose this information to the purchaser of those units, which was borrowing money—from the same bank—to finance the acquisition. *Id.* And the purchaser thusly sued the bank for fraud. *Id.* at 652.

30

Yet, aside from being exceedingly distinguishable (withholding information about a third party's solvency is hardly the same thing as swapping out an agreement between presentation and execution), *Sjogren* also does not appear to actually stand for the proposition urged by RRSB. Indeed, in that case, Minnesota's highest court found that, given that the bank had "*actual knowledge* of the fraudulent activities of one of its depositors, it had an affirmative duty to disclose those facts to the respondents. . ." *Id.* at 652 (emphasis in original).,

Here, RRSB has actual knowledge the Forbearance Agreement had been swapped insofar as it was RRSB that swapped the Forbearance Agreement in the first place. And failing to disclose this exceedingly salient fact most certainly constituted, at minimum, "[t]he suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact. . ." N.D. Cent. Code § 9-10-02.

### f.   The Complaint Validly Alleges Fraud (Count IV)

The bank's attack on Count IV of the Complaint, for fraud, largely resembles the attack on Count III, discussed *supra*. In both instances, RRSB (i) asserts the Forbearance Agreement to constitute a wholesale release of the claim; (ii) urges representations as to future lending activity are not actionable in nature; (iii) suggests reasonable reliance to be absent in light of the "final agreement" notices appended to the Motion; and (iv) posits there was no duty to disclose that the Forbearance Agreement was materially changed between the time it was presented for review and the time it was presented for execution.

The Debtors incorporate, by reference, their arguments in response to the Motion's provisions concerning the claim for deceit. In addition, they observe that fraud is a codified cause of action in North Dakota, being defined as the commission of any of the following acts "by a

party to a contract . . . with intent to deceive another party thereto or to induce the other party to

enter into the contract." N.D. Cent. Code § 9-03-08.

> 1. The suggestion as a fact of that which is not true by one who does not believe it
> to be true;
>
> 2. The positive assertion, in a manner not warranted by the information of the
> person making it, of that which is not true though that person believes it to be true;
>
> 3. The suppression of that which is true by one having knowledge or belief of the
> fact;
>
> 4. A promise made without any intention of performing it; or
>
> 5. Any other act fitted to deceive.

*Id.*

Here, the bank clearly suggested that it had the resources to loan the promised funds and

could lawfully do so, when the bank had no reason to believe either contention was true—or, at

minimum, made the promises "in a manner not warranted by the information" available to the bank

at the time. And, similarly, the swapping out of the Forbearance Agreement well constituted "[t]he

suppression of that which is true by one having knowledge or belief of the fact," while also falling

within the prophylactic ambit of "[a]ny other act fitted to deceive."

### g.  The Claims for Negligence Per Se (Counts V and VI) are Validly Stated

The Defendant seeks dismissal of the two negligence per se claims, arguing (i) the Debtors

do not fall within the class protected by lending limits; (ii) the Complaint does not state exactly

which lending limit statute is being relied upon; (iii) borrowers are not within the class of persons

intended to be protected by the federal anti-bribery banking statute; and (iv) there is no locatable

precedent for bringing a private claim pegged to violation of that federal statute. Motion, DE #7,

at §§ VI-VII. The first three contentions are errant as a matter of law; the fourth contention is both

32

errant and, additionally, would not be reason to dismiss an otherwise-valid cause of action even if accurate.

Under Minnesota law, a claim for negligence per se is a hybrid variant of a claim for ordinary negligence, with a statutory violation serving to establish the existence of a duty and a breach thereof. *Anderson v. State*, 693 N.W.2d 181, 189 (Minn. 2005). In relying on such a statutory violation, ". . . the person harmed by the violation must be among those the legislature intended to protect, and the harm must be of the type the legislature intended to prevent by enacting the statute." *Id.* at 190 (citing *Anderson v. Anoka Hennepin Ind. Sch. Dist. 11*, 678 N.W.2d 651, 662-63 (Minn. 2004)).

### i. Count V (Lending Limits)

Initially, it bears notation that the bank's second contention—a failure to specify the applicable lending limit laws—is odd insofar as the Complaint specifically alleges Mr. Aarestad to have openly acknowledged violating the lending limit laws and to have also acknowledged his criminal liability for so doing. *See* Complaint, DE #1, at ¶ 43. Since this claim does not sound in fraud or misrepresentation, the ordinary rigors of Rule 8 are applicable, and it would seem that notifying the bank of the precise statute(s) being referenced by its own officer, in his own e-mail, would be something well beyond the furnishing of a "short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2).

Discovery will be needed to ascertain just which statute(s) were being referenced by Mr. Aarestad in his e-mail. And, as a result thereof, discovery may also be needed to fully identify the subject statutory violations and the scope of persons within the anticipated protective realm of those statutes. However, assuming Mr. Aarestad was making reference to Section 48.24 of the

Minnesota Statutes, which provides for certain lending limits, case law instructs the provision to be traceable to an act originally passed in 1895. *State v. Voogd*, 212 N.W. 528, 529 (Minn. 1927).

Authorities on legislative intent, circa 1895, are scanter than those on legislative intent in the modern era. And there is thusly some difficulty in precisely pinpointing the exact class of persons "the legislature intended to protect." *Anderson v. State*, 693 N.W.2d at 189.[8] Such efforts are, too, relatively unaided by the fact that the most recent case to address the statute appears to be from 1932. *State v. Flowers*, 245 N.W. 834, 834 (Minn. 1932). But a case from 1918 does speak to the apparent intent of the statute:

> The purpose of the limitation of the statute is clear. It is well known that many banks have met disaster through large loans to a single individual, copartnership, or corporation, whose business officers of the bank were often closely connected with. The object of the legislature plainly was to prevent disaster to or embarrassment of the bank by loaning a large portion of its funds to any one business concern, whether an individual, corporation or copartnership.

*Trumer v. S. Side State Bank*, 166 N.W. 127, 127 (Minn. 1918).

What is alleged in the Complaint is the precise variety of harm that would flow from the "disaster" of "loaning a large portion of its funds to any one business concern." As noted in the pleading, lending limits aim, among other things, "to ensure regulated lenders always have the ability to operate—and service loans—in good faith and without undue financial pressure." Complaint, DE #1, at ¶ 141.

In a modern context—and Section 48.24 has been amended as recently as 2024—exploration of the intended protected class necessarily touches borrowers who otherwise risk the ramifications of bad faith tactics. And, in the prism of a civil claim for relief, courts may observe

---

[8] Since *Anderson v. State* cites to a separate case in which the plaintiff's name is "Anderson," and since a short citation to "State" would be exceedingly confusing, the full caption of the case is used here to prevent confusion.

that there exist persons intended to be protected by a criminal statute outside the original—or even primary—ring of those with the most direct vulnerabilities. *Hometowne Builders v. Atl. Nat'l Bank*, 477 F. Supp. 717, 722 (E.D. Va. 1979). After all, while the FDIC may not have existed at the time of the statute's original enactment, the FDIC has now been in existence for nearly a century. So any risk to depositors is largely—if not entirely—mitigated by the existence of federal insurance.

The risk to borrowers, however, is not mitigated by the modern FDIC framework. It is borrowers who risk the irrationality of senior bank officers who "do not so much *want* to collect debts for healthy performance metrics as they *need* to collect debts to avoid regulatory seizure." Complaint, DE #1, at ¶ 4. And it is borrowers who—as here—risk the wild inequities and irrationality of desperate bank officers when loans are made in sums beyond a lender's ability to service in good faith.

### ii.  Count VI (Solicitation of a Bribe)

The class of persons intended to be protected by the federal anti-bribery banking laws is far more readily apparent. RRSB asserts the Complaint's allegation of the Debtors falling within this class to be "entirely conclusory," Motion, DE #7, at § VII, yet a plain reading of the Complaint reveals otherwise. And while the bank posits there is no precedent for Section 215 of Title 18 of the United States Code being utilized in connection with a negligence per se claim, the bank also points to no case law prohibiting such an application.

The relevant statute prohibits, *inter alia*, any "officer, director, employee, [or] agent . . . of a financial institution" from "corruptly solicit[ing] or demand[ing] for the benefit of any person . . . anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution." 18 U.S.C. § 215.

35

Here, RRSB does not suggest the Complaint fails to allege that Mr. Aarestad solicited one such bribe in contravention of Section 215. Nor does the bank posit that the details of such solicitation are not pleaded in a manner sufficient to survive scrutiny under *Iqbal* and *Twombly*. The Defendant, rather, simply posits that it is unclear if borrowers are meant to be protected by the statute forbidding the solicitation of bribes from borrowers, while also asserting a lack of precedent for civil application of the statute. Motion, DE #7, at § VII. This leads the Defendant to announce, *ipso facto*, "[t]he alleged violation of Section 215 does not give rise to a private cause of action for Plaintiffs." Motion, DE #7, at § VII.

Critically, however, there does exist a private cause of action for violation of Section 215—one enshrined in the United States Code, no less. *See, e.g.*, 12 U.S.C. § 503 ("If the directors or officers of any member bank shall knowingly violate or permit any of the agents, officers, or directors of any member bank to violate . . . any of the provisions of sections 217, 218, 219, 220 [212–215], 655, 1005, 1014, 1906, or 1909 of Title 18, United States Code, every director and officer participating in or assenting to such violation shall be held liable in his personal and individual capacity for all damages which the member bank, its shareholders, or any other persons shall have sustained in consequence of such violation.").[9]

Nor is this the first time a private cause of action has been maintained for a violation of Section 215. The United States District Court for the Eastern District of Virginia had occasion to entertain one such suit in 1979, with the defendant therein urging—just as RRSB urges *sub judice*—that the plaintiff was outside the class of persons intended to be protected by Section 215.

---

[9] The bracketed reference to "[212–215]" is set forth in the statute itself, with an explanatory note observing that "[t]he reference in this section to 18 USC §§ 217–220 was inserted in 1954 prior to the redesignation of said sections as 18 USC §§ 212–215 by Act Oct. 23, 1962, P. L. 87-849, § 1(d), 76 Stat. 1125." 12 U.S.C. § 503 (Notes). So, and of some obvious import to this case, Section 215 of Title 18 is embraced within this enumeration of actionable statutes.

*See Hometowne Builders*, 477 F. Supp. at 721-22 ("Defendants further argue that plaintiffs are not among the group of persons whom 18 U.S.C. § 215 was designed to protect."). Yet, as that court observed:

> . . . because the statute protects depositors in one situation does not necessarily mean that this is the only class of persons protected by the statute. First, the statute is a criminal one and in and of itself protects the public in general. Moreover, both cases relied upon by defendants involved situations in which the United States brought a criminal action against the bank officer who had violated § 215; such a suit by the United States thereby protects the deposits of the bank. Plaintiffs, however, have alleged that defendants violated 18 U.S.C. § 215, and then they base their civil cause of action on 12 U.S.C. § 503, which gives a cause of action to "the member bank, its shareholders, or Any other persons" damaged by the violation by bank officers of 18 U.S.C. § 215. (emphasis added).[10]

> There is no indication in the legislative history, or any other authority to the contrary, that "any other persons" may only be the bank's depositors. Rather, a better interpretation would be that since the civil cause of action in § 503 is based upon a violation of a criminal statute, the phrase "any other person" permits plaintiff, or any member of the general public, whether a depositor of the bank or not, to bring an action under § 503, if they allegedly suffered the requisite damage under that section. In the present case, plaintiffs have made sufficient allegations of violations of 18 U.S.C. § 215 by the defendants, and such allegations bring them within the language of 12 U.S.C. § 503 granting a cause of action to "any other persons."

*Hometowne Builders*, 477 F. Supp. at 722.

While topical case law post-1979 is admittedly scarce, the provisions of Section 503 remain in the United States Code, expressly creating a private cause of action for anyone harmed by a violation of Section 215 of Title 18. The Plaintiffs, in this case, have been harmed. And their claim for relief should accordingly be permitted to proceed.

---

[10] The words "emphasis added" appear in *Hometowne Builders* where quoted. It appears the "emphasis" is the capitalization of the letter "a" in "Any."

### h.   A Valid Claim for Declaratory Relief (Count VII) is Set Forth

The final cause of action attacked in the Motion is one for declaratory relief, though the Defendant recharacterizes such as one for "an equitable accounting." In so doing, RRSB applies Minnesota law to the doctrine of equitable accounting and asserts the Complaint to come shy of alleging the rigors requisite to such an entitlement. Motion, DE #7, at § VIII. Yet this is not a claim for equitable accounting and Minnesota law does not govern a declaratory judgment claim—especially one openly tied to federal bankruptcy law.

The United States Code permits that "[i]n a case of actual controversy within its jurisdiction," any federal court, "upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.

Here, the Plaintiffs have directly made numerous payments on the loans at issue in this litigation. Payments have also been made through RRSB's imposition of an assignment of rents and, later, through a state court receivership. Yet, somehow, and somewhat astonishingly, RRSB has refused to provide a payment history so the Plaintiffs can actually figure out which payments have been applied to which debt obligations. Complaint, DE #1, at ¶ 61.

The Plaintiffs are now each debtors in bankruptcy and must assess—for their own benefit as well as that of other creditors—the veracity, *vel non*, of RRSB's proofs of claim. The Plaintiffs must also be able to garner an understanding of how RRSB's claims have been diminished, through historic payments, so as to fashion plans of reorganization that provide for the proper retirement of those claims. Yet, stunningly, RRSB is still unwilling (if not unable) to provide a payment history—and now affirmatively asserts that the Plaintiffs are not entitled to one.

All Count VIII does is seek a declaration as to whether or not the Plaintiffs are, indeed, entitled to a payment history, showing when funds were received and how funds were applied. If so, the claim goes on to ask this Honorable Court to direct such an accounting be furnished. And, under just about any standard, such surely suffices as a request to "declare the rights and other legal relations of" the Plaintiffs and Defendant, 22 U.S.C. § 2201, with the request assuredly being well within the jurisdiction of a bankruptcy court overseeing the Plaintiffs' reorganizations.

### IV.     Request for Leave to Amend

To the extent this Honorable Court finds laws other than those suggested *supra* to govern the various causes of action in the Complaint, or that one or more claims for relief are inadequately pleaded, the Plaintiffs respectfully seek leave to amend. Such leave is to be afforded freely "when justice so requires," Fed. R. Civ. P. 15(a)(2), and justice would well support such leave if dismissal is occasioned by either (i) a misapprehension of how a relatively complex conflict of law analysis may be ultimately resolved; or (ii) an inadvertent failure to plead sufficiently detailed facts to support one or more causes of action.

The Plaintiffs are acutely aware that, in the Eighth Circuit, leave to amend must be affirmatively requested prior to dismissal so as to avoid confrontation with a palpably higher barrier to amendment. *See, e.g., UMB Bank, N.A. v. Guerin*, 89 F.4th 1047, 1057 (8th Cir. 2024) ("When a party moves to amend a complaint after dismissal, a more restrictive standard reflecting interests of finality applies.") (quoting *Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1010 (8th Cir. 2015)). Accordingly, the Plaintiffs elect to expressly make the subject request in this filing, even if the request is necessarily conditional upon one or more causes of action being dismissed (a fate against which the Plaintiffs, of course, vehemently urge).

## V.    Conclusion

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) deny the Motion; (ii) in the alternative, afford leave to amend any cause of action that may be dismissed; and (iii) afford such other and further relief as may be just and proper.

Respectfully Submitted,

Dated: March 31, 2025          By:    /s/ Maurice B. VerStandig
                                      Maurice B. VerStandig, Esq.
                                      The Dakota Bankruptcy Firm
                                      1630 1st Avenue N
                                      Suite B PMB 24
                                      Fargo, North Dakota 58102-4246
                                      Phone: (701) 394-3215
                                      mac@dakotabankruptcy.com

                                      Christianna A. Cathcart, Esq.
                                      The Dakota Bankruptcy Firm
                                      1630 1st Avenue N
                                      Suite B PMB 24
                                      Fargo, North Dakota 58102-4246
                                      Phone: (701) 970-2770
                                      christianna@dakotabankruptcy.com

                                      *Counsel for the Debtors*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of March, 2025, a copy of the foregoing was served electronically upon filing via the ECF system.

                                      /s/ Maurice B. VerStandig
                                      Maurice B. VerStandig