

✛ Positive
As of: April 2, 2025 8:29 PM Z

# In re Southwest Equip. Rental

United States District Court for the Eastern District of Tennessee, Chattanooga Division

July 9, 1992, Filed

CIV-1-90-62

**Reporter**

1992 U.S. Dist. LEXIS 21396 *; 1992 WL 684872

In Re: SOUTHWEST EQUIPMENT RENTAL, INC., d/b/a SOUTHWEST MOTOR FREIGHT, Debtor, C. KENNETH STILL, Trustee for Southwest Rental, Inc., d/b/a Southwest Motor Freight, Plaintiff v. CLYDE FULLER and ELIZABETH FULLER; LASALLE NATIONAL BANK OF CHICAGO; JAMES TALCOTT, INC.; and CONGRESS FINANCIAL CORPORATION (SOUTHERN), Defendants.

**Prior History: [\*1]** Bankr. No. 1-88-00033 (Chapter 7) Adv. Pro. No. 1-89-00486

## LexisNexis® Headnotes

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Judgments

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Appellate Review > General Overview

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN1*[⬇] **Adversary Proceedings, Judgments**

Fed. R. Bankr. P. 7056 incorporates Fed. R. Civ. P. 56, which provides that summary judgment is appropriate when, after viewing the facts and all inferences to be drawn from the evidence in a light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Under that standard, material facts are identified by reference to the substantive law, and an issue of fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. The court's function in that situation is limited to determining whether sufficient evidence has been presented to make an issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter.

Bankruptcy Law > Claims > Allowance of Claims
Business & Corporate Compliance > Bankruptcy > Claims > Allowance of Claims

Civil Procedure > ... > Capacity of

Case 25-07009 Doc 9-6 Filed 04/02/25 Entered 04/02/25 16:06:58 Desc In re Southwest Equip. Rental Page 2 of 38

Page 2 of 38

Parties > Representative Capacity > Trustees

Governments > Legislation > Statute of Limitations > General Overview

Bankruptcy Law > ... > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles

Bankruptcy Law > ... > Prepetition Transfers > Voidable Transfers > General Overview

Bankruptcy Law > ... > Prepetition Transfers > Voidable Transfers > Unsecured Creditors

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > General Overview

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > General Overview

Civil Procedure > ... > Affirmative Defenses > Statute of Limitations > Borrowing Statutes

Civil Procedure > ... > Preclusion of Judgments > Full Faith & Credit > General Overview

Estate, Gift & Trust Law > Trusts > General Overview

## *HN2*[⬇] Claims, Allowance of Claims

11 U.S.C.S. § 544(b) provides that a bankruptcy trustee may avoid any transfer of an interest of a debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding a unsecured claim that is allowable under 11 U.S.C.S. § 502 or that is not allowable only under 11 U.S.C.S. § 502(e). Whether or not a particular transfer or obligation may be avoided, and under what circumstances, is determined by the appropriate state law incorporated by 11 U.S.C.S. §

544(b). In order to determine what "applicable law" governs a party's claims, the court must first identify the applicable choice of law rule under § 544(b). The court must decide whether it is bound to treat a core adversary proceeding in bankruptcy as a diversity case for choice of law purposes, or whether it is free to make an independent determination in choosing the applicable law that would most fairly advance the equitable policies of the Bankruptcy Code.

Bankruptcy Law > Case Administration > General Overview

Civil Procedure > ... > Jurisdiction > Jurisdictional Sources > General Overview

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > General Overview

## *HN3*[⬇] Bankruptcy Law, Case Administration

A federal court exercising bankruptcy jurisdiction must follow the choice-of-law rules of the forum state.

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > General Overview

Real Property Law > Purchase & Sale > Fraudulent Transfers

Tax Law > ... > Personal Property Taxes > Intangible Personal Property > General Overview

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > General Overview

## *HN4*[⬇] Federal & State Interrelationships, Choice of Law

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc In re
Southwest Equip. Rental   Page 3 of 38

Page 3 of 38

In connection with a fraudulent conveyance of assets other than real property, such as accounts, intangibles, or equipment, either the law of the situs of the property or the domicile of the debtor supplies the rule of decision.

Civil Procedure > ... > Affirmative Defenses > Statute of Limitations > Borrowing Statutes

Governments > Legislation > Statute of Limitations > Time Limitations

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > General Overview

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > Forum & Place

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Governments > Legislation > Statute of Limitations > General Overview

### HN5[⬇] Statute of Limitations, Borrowing Statutes

With regard to a statute of limitations defense, Tennessee's choice of law rules follow the lex fori where the relevant statute is procedural, unless the particular claim is one encompassed by the state borrowing statute, or is one in which the foreign state's limitation is not merely upon the remedy but upon the underlying substantive right. A statute of limitation is substantive only when it is built into the same statute that creates the cause of action in question or when the limitation, though appearing in a different statute, is directed to the newly created liability so specifically as to warrant saying that it qualified the right.

Bankruptcy Law > ... > Prepetition Transfers > Preferential Transfers > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

Bankruptcy Law > ... > Prepetition Transfers > Voidable Transfers > Unsecured Creditors

Governments > Legislation > Statute of Limitations > General Overview

### HN6[⬇] Prepetition Transfers, Preferential Transfers

In an adversary proceeding, a bankruptcy trustee's ability to avoid a particular transfer is subject to two separate statutes of limitations. One is jurisdictional and is set forth in 11 U.S.C.S. § 546 which provides, in essence, for a two-year statute of limitations. The other type of limitations period is derived from the "applicable law" incorporated by 11 U.S.C.S. § 544(b). Because § 544(b) authorizes the trustee to stand in the shoes of the debtor's actual unsecured creditors, the trustee is subject to the same procedural limitations affecting their right to avoid a particular transfer under the applicable law.

Governments > Legislation > Statute of Limitations > Time Limitations

Governments > Legislation > Statute of Limitations > General Overview

### HN7[⬇] Statute of Limitations, Time Limitations

Under Tennessee law, unless otherwise expressly provided by statute, all civil actions other than those dealing with the adverse possession of real property are governed by Tenn. Code Ann. §§ 28-3-102 - 205. Tenn. Code Ann. § 28-3-101.

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc In re
Southwest Equip. Rental   Page 4 of 38

Page 4 of 38

Business & Corporate Compliance > ... > Sales of Goods > Remedies > General Overview
Contracts Law > ... > Sales of Goods > Remedies > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

Torts > Intentional
Torts > Conversion > Defenses

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > General Overview

Governments > Legislation > Statute of Limitations > General Overview

### *HN8*[⬇] **Sales of Goods, Remedies**

At least for statute of limitations purposes, Tennessee treats a fraudulent conveyance claim as one for conversion of a chattel or other personalty. Depending on the relief sought, the aggrieved creditor's right to recovery is subject to two separate state law limitation periods. Where the creditor is seeking to recover the specific property which has been fraudulently conveyed, its right to recovery must generally be asserted within three years of the alleged conveyance. On the other hand, where the creditor is seeking to recover the value of the property fraudulently conveyed, its right to recovery must be asserted within six years of the alleged conveyance.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview

Governments > Fiduciaries

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

### *HN9*[⬇] **Directors & Officers, Management Duties & Liabilities**

See Tenn. Code Ann. § 48-18-601.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview

### *HN10*[⬇] **Directors & Officers, Management Duties & Liabilities**

See Tenn. Code Ann. § 48-18-304 (1988).

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Causes of Action

Torts > ... > Multiple Defendants > Contribution > General Overview

Business & Corporate Law > ... > Shareholders > Shareholder Duties & Liabilities > General Overview

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > General Overview

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Duties

Governments > Fiduciaries

### *HN11*[⬇] **Controlling Shareholders, Causes of Action**

Although the controlling shareholder of a corporation maintains a fiduciary obligation to the creditors of the corporation, liability for a breach of that duty is determined as a matter of Tennessee common law, not the unlawful distribution provision of the Tennessee Business Corporations Act (TBCA), Tenn. Code Ann. § 48-16-401(c).

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc In re
Southwest Equip. Rental    Page 5 of 38

Page 5 of 38

That is because the only shareholder liability created by the TBCA in connection with unlawful distributions is one of contribution owed to a culpable director. Tenn. Code Ann. § 48-18-201(b)(2).

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > General Overview

### HN12[⬇] Avoidance, Fraudulent Transfers

See Tenn. Code Ann. § 66-3-305.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > General Overview

### HN13[⬇] Avoidance, Fraudulent Transfers

See Tenn. Code Ann. § 66-3-304.

Bankruptcy Law > Claims > Allowance of Claims
Business & Corporate Compliance > Bankruptcy > Claims > Allowance of Claims

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > General Overview

Bankruptcy Law > ... > Prepetition Transfers > Voidable Transfers > Unsecured Creditors

### HN14[⬇] Claims, Allowance of Claims

To avoid or recover a particular conveyance under Tenn. Code Ann. § 66-3-305, a bankruptcy trustee must allege and ultimately prove that transfers of the debtor's property were made when the debtor was insolvent, and that the debtor did not receive, in good faith, a fair equivalent of the property transferred or the obligation assumed. Before a trustee is able to utilize the applicable law referred to in 11 U.S.C.S. § 544(b), he must allege and

ultimately prove that at the time of a leveraged buyout there was, in fact, a creditor in existence holding an allowable unsecured claim under 11 U.S.C.S. § 502. The trustee must also prove that the transaction could have been avoided by such a creditor, and that on the date the debtor filed for bankruptcy that creditor could still bring the same avoidance action the trustee seeks to bring under the applicable law.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > General Overview

Civil Procedure > Judgments > Summary Judgment > Partial Summary Judgment

### HN15[⬇] Avoidance, Fraudulent Transfers

A trustee has the burden of proof on the issue of fair consideration under Tenn. Code Ann. § 66-3-304, as lack of fair consideration is a material element under both Tenn. Code Ann. § 66-3-306 and Tenn. Code Ann. § 66-3-307. By definition, "fair consideration" is made up of two components, (1) an exchange of a fair equivalent (2) made in good faith. Consideration that fails to satisfy either component, will not satisfy the definitional test for fair consideration. The good faith requirement has been equated with lack of knowledge of insolvency. Several other factors, however, are relevant to the determination of good faith: (1) whether the transferee possessed an honest belief in the propriety of the activities in question, (2) whether there was any intent to take unconscionable advantage of others, and (3) whether there was any intent to, or knowledge of the fact that: the activities in question will, hinder, delay, or defraud others.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > General Overview

Real Property Law > Purchase & Sale > Fraudulent Transfers

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc In re
Southwest Equip. Rental   Page 6 of 38

Page 6 of 38

## HN16[⬇] Avoidance, Fraudulent Transfers

In the context of determining fair equivalence as an alternative to fair consideration under Tenn. Code Ann. § 66-3-304 in a bankruptcy proceeding, the court's inquiry must be directed at what the debtor surrendered and what the debtor received. Generally, the evidence must show some economic benefit to the debtor as a result of the transfer. Therefore, a transfer that is solely for the benefit of a third party is not a reasonable or fair equivalent under the Uniform Fraudulent Conveyance Act. The transactions benefit to the debtor, however, need not be a direct one. Instead, the benefit may come to the debtor indirectly through benefit to a third party.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > General Overview

Commercial Law (UCC) > Negotiable Instruments (Article 3) > General Overview

Real Property Law > Purchase & Sale > Fraudulent Transfers

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > General Overview

## HN17[⬇] Shareholder Duties & Liabilities, Controlling Shareholders

Where a corporate debtor is insolvent, stock in the hands of a controlling shareholder is virtually worthless. In that situation, an exchange of shares for either a well secured note of the debtor, or cash would not constitute a fair equivalent under the Tennessee Uniform Fraudulent Conveyance Act, Tenn. Code Ann. §§ 66-3-101 - 314. The effect of a corporation's insolvency on the value of its stock, however, is a question of material fact.

Bankruptcy Law > ... > Preferential

Transfers > Elements > Antecedent Debt

Bankruptcy Law > ... > Prepetition Transfers > Preferential Transfers > General Overview

Bankruptcy Law > ... > Preferential Transfers > Elements > General Overview

Bankruptcy Law > ... > Preferential Transfers > Elements > Benefit of Creditor

Bankruptcy Law > ... > Preferential Transfers > Elements > Debtor Insolvency

Bankruptcy Law > ... > Prepetition Transfers > Preferential Transfers > Evidence & Procedural Matters

## HN18[⬇] Elements, Antecedent Debt

Pursuant to 11 U.S.C.S. § 547(g), a trustee has the burden of proving that a transfer is voidable as a preference under 11 U.S.C.S. § 547(b). The latter subsection allows the trustee to avoid certain transfers made prior to commencement of the debtor's bankruptcy case. Unless the trustee proves each and every one of the elements listed in 11 U.S.C.S. § 547(b)(1)-(5), the transfer will not be avoidable as a preference under 11 U.S.C.S. § 547(b), or recoverable against the transferee under 11 U.S.C.S. § 550(a).

Bankruptcy Law > ... > Preferential Transfers > Elements > Antecedent Debt

Contracts Law > Standards of Performance > Creditors & Debtors Business & Corporate Compliance > Contracts > Standards of Performance > Creditors & Debtors

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > General Overview

Contracts Law > Types of

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc In re Southwest Equip. Rental   Page 7 of 38

Page 7 of 38

Contracts > Executory Contracts

Business & Corporate Compliance > Contracts > Types of Contracts > Executory Contracts

### HN19[⬇] Elements, Antecedent Debt

While the Bankruptcy Code does not define the term "antecedent debt," the term includes a debt incurred before the transfer. A debt is not incurred until a debtor has a legal obligation to pay.

Bankruptcy Law > ... > Prepetition Transfers > Preferential Transfers > Evidence & Procedural Matters

Civil Procedure > Pleading & Practice > Motion Practice > Time Limitations

Bankruptcy Law > ... > Avoidance > Prepetition Transfers > Preferential Transfers

Bankruptcy Law > ... > Avoidance > Exemptions From Avoidance > Ordinary Course Payments

Civil Procedure > Pleading & Practice > Motion Practice > General Overview

### HN20[⬇] Preferential Transfers, Evidence & Procedural Matters

Pursuant to 11 U.S.C.S. § 547(g), the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the non-avoidability of a transfer under 11 U.S.C.S. § 547(c)(2).

Bankruptcy Law > ... > Avoidance > Exemptions From Avoidance > Ordinary Course Payments

Bankruptcy Law > ... > Prepetition Transfers > Preferential Transfers > General Overview

### HN21[⬇] Exemptions From Avoidance, Ordinary Course Payments

See 11 U.S.C.S. § 547(c)(2).

Bankruptcy Law > Procedural Matters > Adversary Proceedings > General Overview

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

### HN22[⬇] Procedural Matters, Adversary Proceedings

In applying 11 U.S.C.S. § 510, the courts have adopted a three-part test for determining whether equitable subordination is appropriate: (1) The claimant must have engaged in some type of inequitable conduct; (2) The misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; (3) Subordination must not be inconsistent with the provisions of the Bankruptcy Code. Equitable subordination is an extraordinary remedy. The misconduct which warrants the imposition of the remedy must be substantial. Gross or egregious misconduct must be established before a claim can be equitably subordinated in non-insider cases.

**Judges:** EDGAR

**Opinion by:** R. ALLAN EDGAR

## Opinion

MEMORANDUM OPINION

This is an adversary proceeding under Fed. R. Bankr. P. 7001(1) which was filed by Chapter 7 Trustee C. Kenneth Still to inter alia void certain alleged fraudulent conveyances arising in

Case 25-07009    Doc 9-6    Filed 04/02/25    Entered 04/02/25 16:06:58    Desc In re
Southwest Equip. Rental    Page 8 of 38

Page 8 of 38

connection with the 1984 leveraged buyout of the debtor. Having been withdrawn from the bankruptcy court; this matter is now before the Court on the parties' cross motions for summary judgment. In this memorandum opinion the Court shall consider the following:

1. Motion of Congress Financial Corporation and James Talcott, Inc., for summary judgment (Court File Nos. 65-68);

2. LaSalle National Bank's motion for summary judgment (Court File Nos. 79, 80);

3. Motion of Congress Financial Corporation and James Talcott, Inc., joining in summary judgment motion of LaSalle National Bank (Court File No. 98);

4. Motion of C. Kenneth Still, Trustee for Southwest Equipment Rental, Inc., d/b/a Southwest Motor Freight for partial summary judgment (Court File Nos. 109, 110);

5. Motion of Clyde and Elizabeth Fuller for summary judgment (Court File Nos. 111, 112).

As a preliminary observation, the **[*2]** Court notes that these dispositive motions were filed prior to U.S. Magistrate Judge John Y. Powers' February 27, 1992 order granting the trustee's motion to amend his complaint and allowing him to bring additional claims alleging breach of fiduciary duty and violations of Tenn. Code Ann. §§ 66-3-306 and 307.

## I. Factual Background

This case presents the Court with a morass of legal issues, some of which have not been fully addressed by the parties. Several issues are questions of first impression for the Eastern District of Tennessee, and in many respects for the Sixth Circuit. Consequently, and given both the complexity of the transactions involved and the novelty of the plaintiff's main theory of recovery, an extensive review of the facts is warranted.

The debtor, Southwest Equipment Rental, Inc., d/b/a Southwest Motor Freight ("Southwest"), is a trucking company incorporated under the laws of

the State of California [1] which maintained its principal place of business in Chattanooga, Tennessee. On January 8, 1988, Southwest filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Eastern District of Tennessee at Chattanooga, and on January 19, **[*3]** 1988, C. Kenneth Still was appointed Chapter 11 Trustee. On March 8, 1988, the debtor's petition was converted to a Chapter 7 liquidation case.

On December 27, 1989, the plaintiff instituted this adversary proceeding seeking to recover money received by the defendants from Southwest and to void obligations assumed **[*4]** by Southwest, all in connection With a leveraged buy-out of the debtor's stock in 1984 and a related non-compete/consulting agreement entered into by defendants Clyde and Elizabeth Fuller and Southwest. [2] The defendants' respective relationships with the debtor and their alleged liability to the debtor's bankruptcy estate have been defined by the following transactions.

## A. The 1984 Leveraged Buy Out ("LBO")

Clyde and Elizabeth Fuller ("the Fullers") [3] **[*5]** are the former owners of Southwest who acquired the trucking company's stock in 1974 and who remained its principal shareholders until November 1984. [4] During May 1984, the Fullers were

---

[1] Southwest Equipment Rental ("SER") was incorporated, inter alia, "to engage in the business of purchasing, acquiring, owning, leasing, selling, transferring, encumbering, generally dealing in, repairing, renovating, servicing and operating types of new and used automotive trucking tractors and equipment for intra and interstate commerce." (Art. III, Articles of Incorporation filed with the California Secretary of State on April 28, 1972, Ex. K, Appx. to Fullers' Sum. Judg. Mo.). SER was authorized to issue 4000 shares of one class of stock, common shares, with an aggregate par value of $ 200,000, and a par value per share of $ 50.00 (Art. VI, Ex. K, Appx. to Fullers' Sum. Judg. Mo.).

[2] District Court File No. 7.

[3] The Fullers are Tennessee domiciliaries who reside in Chattanooga, Tennessee.

[4] Southwest's original Articles of Incorporation were filed with the California Secretary of State on April 28, 1972. Pursuant to these Articles, Southwest was incorporated under California law and was

Case 25-07009    Doc 9-6    Filed 04/02/25    Entered 04/02/25 16:06:58    Desc In re
Southwest Equip. Rental    Page 9 of 38

Page 9 of 38

approached by William R. Thiele ("Thiele"), a New Jersey businessman, about acquiring a controlling interest in Southwest. Thiele represented the New Jersey partnership, Thiele-Morash, a group of venture capital investors which later came to be known as Thiele-Morash, Incorporated, and then Thiele-Rogers, Incorporated.

[**\*6**] Although the Fullers were receptive to Thiele's initial proposals, [5] [**\*7**] they wanted $

---

to maintain its principal place of business in Los Angeles County, California.

While the record does not indicate the extent of Clyde fuller's involvement prior to 1974, the Certificate of Merger filed with the California Secretary of State on May 15, 1975 indicates that Clyde's son, Max Fuller, owned all of the 40 shares of outstanding Southwest stock and had become Southwest's president at some time prior to May 17, 1974. On that date Southwest acquired Wilkerson Trucking Company, Inc., a Tennessee corporation incorporated on June 26, 1972, in a stock for stock exchange where Southwest agreed to swap 102 shares of its common stock for all of Wilkerson's common stock. The 510 outstanding shares of Wilkerson's common stock were owned by Clyde Fuller.

As further indicated by the Plan and Agreement of Merger filed with the California Secretary of State on June 18, 1981, by November 6, 1980 Clyde Fuller owned all of the 142 outstanding shares of Southwest's common stock. On that date, Southwest merged with Chattanooga Leasing, Inc., a Tennessee corporation incorporated on January 30, 1967, which was owned by Elizabeth Fuller. This merger was also a stock for stock exchange with the swap ratio of Southwest to Chattanooga shares set at 1 to 14.8.

The 1980 merger effectively completed the consolidation of several trucking concerns into Southwest, which was wholly owned by the Fuller family. By the time William R. Thiele approached the Fullers, 284 of the 4000 common shares authorized were outstanding (see aforementioned documents filed chronologically in Ex. A, LaSalle Nat'l Bank's Mem. in Supp. of its Motion for Sum. Judg., Court File No. 80).

[5] Thiele's initial concept was to simply acquire a controlling interest in Southwest, i.e. no more than 70%, with the remainder of the company owned by three individuals who were either relatives of Clyde Fuller or long time employees of Southwest. These individuals, Clyde's son, Max Fuller, Clyde's stepson, David Parker, and Patrick Quinn, Southwest's General Counsel, were already involved in a managerial capacity at Southwest. The Fuller's interest in selling Southwest stemmed from the fact that Clyde Fuller had two sons and six daughters, with none of the latter actively involved in the business. Therefore, from an estate planning perspective, this type of deal offered an opportunity to provide for all of them equitably. Because the three men did not want to put up any capital, however, the deal was arranged so that they would own "shadow stock" until a time they built up enough "sweat" equity through

---

15,000,000 for their stock. During preliminary negotiations the Fullers' insistence on that asking price threatened to break any potential deal, at least until Thiele suggested restructuring the sale by incorporating a separate non-compete/consulting agreement. Instead of paying $ 15,000,000 for control of the trucking company, Thiele proposed paying $ 10,000,000 for the Fullers' stock, then paying the Fullers $ 5,000,000 over ten years under the non-competition/consulting agreement. [6] The parties eventually agreed on this cash-for-stock and-services exchange, and executed the initial stock purchase agreement on July 25, 1984. [7]

On July 13, 1984, Thiele incorporated Southwest Acquisition, Inc. ("SAI"), a Delaware corporation, for the sole purpose of acquiring the outstanding Southwest stock. SAI, in turn, was wholly owned by Thiele-Morash, Inc., which contributed $ 2,000,000 to capitalize SAI. [8]

---

services to acquire full shares. Consequently, the final deal would result in Southwest Acquisition, Inc. (SAI) actually purchasing a 100% interest in Southwest, with Thiele-Rogers later owning around 80% once SAI was merged into Southwest and the three individuals retaining the right to obtain a 20% interest later. This arrangement did not continue very long after Southwest's acquisition, however, and in July 1985 Southwest bought out the shadow stockholders' interests. Subsequently Pat Quinn and Ma Fuller formed U.X.Xpress, a Georgia trucking concern, and David Parker formed Covenant Transport, a similar concern headquartered in Chattanooga, Tennessee. 2004 Examination of Thiele, Ex. A. Brief in Supp. of Defts' Jt. Mo. in Limine, Court File No. 56.

[6] Lines 16-25, p. 60; lines 1-25, p. 61, 2004 Examination of Thiele, Ex. B., Brief of Trustee C. Kenneth Still in Opp. to Fullers' Mo. for Sum. Judg., Court File No. 125.

[7] While the initial draft of the stock purchase agreement was executed July 25, 1984, it was later amended on August 16, 1984. See Ex. A & B, Appx. to Fuller Sum. Judg. Mo., Accomp. Court File No. 112. It was the amended sales contract which controlled the final sale on the November 2, 1984 closing date.

[8] SAI's Articles of Incorporation authorized 10,000 no par value shares of common stock, of which 10,000 were issued, outstanding, and owned by Thiele-Rogers, Inc., formerly Thiele-Morash, Inc., on December 31, 1984. On November 2, 1984, the closing date of the Southwest stock purchase, owned a 53% interest in Thiele-Rogers, Inc. The $ 2,000,000 used to capitalize SAI was a combination of borrowed funds and cash contributed by the other partners in Thiele-Rogers. See 2004 Examination of Thiele, Ex. A., Brief in Supp. of Defts' Jt. Mo. in Limine, Court File No. 56; Agreement and Plan of

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc In re Southwest Equip. Rental   Page 10 of 38

Page 10 of 38

[*8]  **1. Payments Under the Stock Purchase Agreement**

At the November 2, 1984 closing, the Fullers sold their Southwest stock for $ 10,000,000. In exchange for the stock, the Fullers received $ 7,000,000 in cash and a $ 3,000,000 promissory note from SAI.

The cash portion of the sales price consisted of $ 1,800,000 from SAI's capital account [9] [*9] and a $ 5,200,000 direct payment from Exchange National Bank of Chicago ("Exchange"), defendant LaSalle National Bank's predecessor in interest. [10] The $ 5,200,000 direct payment from Exchange National Bank represented loan proceeds disbursed under a loan commitment obtained by Southwest on or about November 2, 1984. [11] [*10] This

commitment was for a $ 7,000,000 revolving line of credit which authorized advances of up to 80 percent of the eligible accounts receivables securing the loan and $ 2,415,275.00, the agreed upon value of certain Southwest tractors and trailers also securing the loan. [12] These loan proceeds were knowingly disbursed by Exchange National Bank as partial payment under the stock-purchase agreement between the Fullers and SAI. [13]

The debt portion of the sales price consisted of a $ 3,000,000 [*11] promissory note issued by SAI, which was payable in thirty-six (36) equal monthly installments of principal plus all accrued interest to the date of each installment payment. [14] [*12]

---

Merger Between Southwest Acquisition, Inc., and Southwest Equipment Rental, Inc., Ex. A, LaSalle National Bank's Mem. in Supp. of its Mo. for Sum. Judg., Court File No. 80.

[9]  Theile testified during his Rule 2004 Examination that there was an understanding with Clyde fuller that the $ 1,800,000 portion from SAI's capital account would be paid back to SAI by Southwest in the form of management fees. There is, however, no other documentary evidence in the record supporting this statement. In addition, while early in this litigation the parties contended that the cash payment from SAI was $ 2,000,000, Clyde Fuller has given deposition testimony to the effect that he "gave two hundred thousand back to Theile Morash." The parties have only submitted excerpts of this deposition, however, and the record contains no evidence explaining why the $ 200,000 difference existed or why this amount was returned to the buyer (p. 98, Fuller Depo, Ex. A, Brief of Trustee C. Kenneth Still in Opp. to Fullers' Mo. for Sum. Judg., Court File No. 125). In disposing of the defendants motions, the Court shall base all relevant calculations on the lower $ 1,800,000 figure.

[10]  P. 209, Fuller Depo., Ex. A & p. 147, Macur Depo., Ex. D, Brief of Trustee C. Kenneth Still in Opp. to Fullers' Mo. for Sum. Judg., Court File No. 125.

[11]  Although the stock purchase agreement was signed during the summer of 1984, its validity was contingent upon Thiele and SAI obtaining the necessary financing. Theile approached several lenders regarding the deal, only to be repeatedly turned down as the closing date approached. Because the agreement provided that the Fullers would be entitled to keep any earnest money in the event the sale fell through, the buying group came under considerable pressure to find a lender willing to finance the deal. What complicated matters was a concern first raised by Security Pacific Credit out of New York that the transaction would constitute a fraudulent conveyance. SecPac rejected the deal on this basis. Later, Exchange National Bank

expressed similar concerns. Consequently, after considerable review by Exchange and the Fullers' attorneys, Exchange required the Fullers to subordinate that portion of the sales price evidenced by the $ 3,000,000 note to the $ 5,200,000 loan from Exchange. As the Fullers and Theile agreed to this arrangement, Exchange eventually agreed to the asset-based loan commitment which was secured by Southwest's receivables and certain equipment.  See 2004 Examination of Theile, Ex. A, Brief in Supp. of Defts' Jt. Mo. in Limine, Court File No. 56.

[12]  The revolving credit line was subject to a lock box arrangement where by customers mailed payments which Exchange collected and credited against Southwest's account (Exchange National Security Agreement, Ex. E., Brief of Trustee C. Kenneth Still in Opp. to Defendants Clyde and Elizabeth Fullers Mo. for Sum. Judg., Court File No. 125).

[13]  There is some discrepancy in the record as to how these funds were actually obtained and disbursed. The Fullers claim Southwest's new board of directors, headed by Theile, voted to authorize a loan from Southwest to SAI, which in turn directed Exchange to pay the loan proceeds directly to the Fullers. Nothing in the record, besides the assertion itself in the Fullers supporting memorandum, supports this version of the facts. The Trustee, on the other hand, characterizes the transaction as a direct payment of proceeds from the loan of Exchange to Southwest. There seems to be little doubt, however, that Exchange was aware that the proceeds were going toward the purchase of the Fullers' stock.

[14]  Interest on the note was set at one percentage point above the prime lending rate charged by Commerce Union Bank of Chattanooga, Tennessee, and monthly payments on the note were to begin on December 1, 1984. Such payments were to continue on the first day of each following month and consisted of $ 83,333.33 principal installments plus accrued interest. Final payment was due by December 1, 1987. The note, however, did allow prepayment in whole or in part at any time without premium, penalty or discount upon 10 days prior written notice. See SAI Promissory Note, Ex. E, Appx. to Fullers' Sum. Judg. Mo., Accomp. Court File No. 112.

Although the note expressly stated that it represented an obligation of the "Buyer," SAI, it was secured by certain equipment owned by Southwest. [15] Further, under P 7(A) of the Security Agreement, Southwest was also liable for any deficiencies should, in the event of default, subsequent sale of the collateral fail to cover the amount of the note. [16] **[\*13]** The note, however, was subordinated to clams of other Southwest creditors. [17]

Under the direction of Thiele during 1985, and less than a year after the November 2, 1984 closing, Southwest sold the collateral securing the $ 3,000,000 note issued by SAI in connection with the purchase of the Fullers' stock. Immediately thereafter, Southwest paid the cash proceeds from that sale over to the Fullers in full satisfaction of the $ 3,000,000 note, thereby extinguishing any further obligation of Southwest to the Fullers on the debt. [18]

---

[15] August 16, 1984 Amendment to the July 25, 1984 Stock Purchase Agreement "By and Between SAI ('Buyer') and Clyde Fuller and Elizabeth Fuller ('Sellers')," Ex. B, Appx. to Fullers' Sum. Judg. Mo., Accomp. Court File No. 112 As indicated by P 1(c) on page four of the August 16 amendment, the collateral securing the note was also subject to several preexisting purchase money security interests:

⊞ Go to table1

See also p. 131, Fuller Depo., Ex. A., brief of Trustee C. Kenneth Still in Opp. to Defendants Fullers' Mo. for Sum. Judg., Court File No. 125.

[16] A. Covenant to Pay Deficiency. Upon default, if the sale or other disposition of the Collateral fails to satisfy the Liabilities secured by this Agreement in full, and the reasonable expenses of retaking, holding, preparing for sale, selling and the like, including reasonable attorneys' fees and legal expenses incurred by the Secured Party in connection with this Agreement or the obligations it secures, the Debtor and the Obligor shall be liable for any deficiency.

[17] Paragraph 7(B), which was initialed "C.F." and "W.R.T.," and typed in the margin of the Security Agreement stated: "Notwithstanding anything contained hereto the contrary, the security interest created hereby in favor of the Secured Party is hereby subordinate to the claims of creditors of the Debtor." See supra footnote 15.

[18] While the full amount of the note was paid with interest, it was not in one payment. Fuller received the amount in at least two or

**[\*14] 2. The Consulting and Non-Competition Agreement**

In addition to the stock purchase agreement the Fullers entered into a separate consulting and non-competition agreement with the debtor on November 2, 1984. [19] Under P 1 of this document, the Fullers agreed

> to pride the Company and Southwest with consulting services in which, at the request of Southwest and its officers, employees and agents, as the Consultants in their sole discretion deem appropriate in order to aid and assist Southwest in the pursuit of its business, each Seller shall offer consulting services and advice to Southwest including without limitation, the introduction of Southwest's officers, employees and agents to customers of Southwest or potential customers thereof. Any such services shall be performed within the time frame and time availability of Consultants, in their absolute discretion, and nothing herein shall be construed to place a obligation on the Consultants or either of them to provide any specific number of hours, weeks or days in the performance of such service which shall be rendered, as available, and no reduction of the compensation set forth herein shall occur in the event of **[\*15]** the nonavailability of the Consultants or either of them to render such service at any specific time during the term hereof.

---

three separate payments. C. Fuller Depo, pp. 165-65, 210, Ex. A., Brief in Opp. to Fullers' Sum. Judg. Mo., Court File No. 125. Note that at the time Clyde Fuller accepted the $ 3.0 million note, he had already been informed by Thiele that the collateral securing the note would be sold during 1985, and he was satisfied that there was sufficient equity in the tractors to pay off the $ 3.0 million note which was already subordinated to creditors holding first mortgages on the collateral. Pp. 132-32, Fuller Depo, Ex. A, Trustee's Brief in Opp. to Fullers' Sum. Judg. Mo., Court File No. 125. Fuller, therefore has admitted knowing that the tractor sale proceeds would be used to prepay the note, or that through his second lien on the collateral he would be able to repossess the tractors and sell them himself. Id.

[19] Ex. C, Trustee's Brief in Opp. to Fullers' Sum. Judg. Mo., Court File No. 125.

(Emphasis supplied). Paragraph 2 of the Agreement, on the other hand, obligated the Fullers to refrain from actively participating or owning stock in any business substantially similar to or in competition with Southwest. The only exception to the non-competition portion of the agreement was set out in P 7, which stated that the Fullers would not be precluded from operating their other trucking company, Countrywide Truck Service, Inc., and its subsidiary, R.F. Box, Inc. [20] [*16] In exchange, the agreement provided that each of the Fullers would receive $ 250,000 a year for ten years from Southwest for a total amount of $ 5,000,000. [21]

## [*17]  B. Effect of the LBO on Southwest's Financial Condition

On December 31, 1984, SAI and Southwest executed an "Agreement and Plan of Merger." This agreement was first filed with the Delaware

---

[20] This exception was qualified, however, with the condition that the Fullers agreed not to take an active role in the management and operation of Countrywide without first consulting and obtaining the agreement of Southwest. Paragraph 7, p.10, Ex. C, Trustee's Brief in Opp. to Fullers' Sum. Judg. Mo., Court File No. 125.

[21] Paragraph 6 of the agreement set forth the method of payment as follows:

a) Southwest shall pay . . . the amount of $ 62,000 . . . to each Consultant on November 30, 1984; $ 125,000 . . . to each Consultant on each semi-annum anniversary date thereof through May 31, 1994, and a final payment of $ 62,000 . . . to each Seller on August 31, 1994, provided, however, that should either of the Consultants die during the term hereof such amount which would have been paid to the deceased Consultant will be paid to the surviving Consultant in accordance with the term contained herein since the Consultants and Southwest recognize that the special knowledge which is the subject of this Agreement resides in both Consultants collectively and each Consultant individually.

b) The parties hereto recognize and agree that the payments made to Consultants pursuant hereto represent the fair market value of both the restrictive covenant and the consulting agreement on an annual basis as it relates to each Consultant and the following allocation shall apply:

Go to table2

Consulting and Non-Competitive Agreement, Ex. C., Trustee's Brief in Opp. to Fullers' Sum. Judg. Mo., Court File No. 125.

---

Secretary of State on May 20, 1985, and then subsequently with the California Secretary of State on June 18, 1985, the merger's effective date. The surviving California corporation retained the name Southwest Equipment Rental, Inc., and was to be governed by Southwest's original Articles of Incorporation. [22]

In connection with both the November 2, 1984 stock purchase and subsequent [*18] merger, the accounting firm of Peat, Marwick, Mitchell & Company in Nashville, Tennessee generated two sets of audited financial statements from Southwest's October 31, 1984 and December 31, 1984 balance sheets. The Court has consolidated the relevant portions of these statements as follows:

Go to table3

Go to table4

### [*19]

Go to table5

Go to table6

Note 7 on the last page of the October 31, 1984 financial statement was the only portion of that document which mentioned the leveraged buyout:

### Subsequent Event

As of  [*20]  November 1, 1984, the Company was acquired by a subsidiary of Thiele Rogers, Inc. in a transaction treated as a "purchase" for accounting purposes. A pro forma summary of the consolidated balance sheet of the acquired company and the subsidiary of Thiele Rogers, Inc. on the date of acquisition is as follows:

---

[22] The only substantive organic change in the surviving entity's charter concerned the corporation's capitalization. Specifically, Art. IV was amended to provide "the corporation is authorized to issue 4,000 shares of capital stock, no par value." See Ex. A, LaSalle National Bank's Mem. in Supp. of its Mo. for Sum. Judg., Court File No. 80; Certificate of Merger, Ex. 1, Fullers' Reply to Plaintiff's Motion to Amend Complaint, Court File No. 97.

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc  In re
Southwest Equip. Rental    Page 13 of 38

Page 13 of 38

⊞ Go to table7

Note 3 of this financial statement, however, contained a schedule bring down Southwest's pre-LBO long-term debts. It consisted of $ 17,216,000 in equipment obligations, and $ 432,000 in other obligations for a total of $ 17,648,000 on October 31, 1984. Thus the $ 5,200,000 Exchange National loan was reflected in the pro forma calculations of Southwest's long-term debt (17,648 + 5,200 = 22,848), as was the subordinated $ 3,000,000 SAI note. What was clearly not mentioned in the October 31, 1984 financial statement, however, was **[*21]** the $ 5,000,000 obligation to the Fullers under the non-competition/consulting agreement.

The December 31, 1984 balance sheet, on the other hand, included a line "Commitments" below the stockholder's equity section of that document. This entry was not assigned any dollar amount. Instead, this portion of the balance sheet referenced three endnotes. A review of the endnotes reveals that Southwest's overall equipment obligations actually decreased by almost $ 1,000,000, in just two months, to $ 16,726,000, while the debtor had assumed $ 8,854,000 in long-term debt due to the Exchange National loan and the Fullers' note. Further, note (7) of the December 31, 1984 financial provided:

> Consultation and Noncompete Agreement
> In connection with the acquisition, the Company entered into consultation and noncompetition agreements with the former owners. The aggregate commitment for future payments is approximately $ 4,875,000, in equal semiannual payments of $ 250,000 through August, 1994.

Other than the endnote, however, the amount of this "commitment" was not included as a long-term debt in liability calculations for Southwest's December 31, 1984 balance sheet. For this reason, the **[*22]** Court has adjusted the relevant figures to include this amount as indicated by the three asterisked entries contained <u>supra</u> in the balance

sheet summary. [23]

As a result of the LBO, Southwest's aggregate annual long-term debt service requirements increased by roughly $ 9,000,000:

⊞ Go to table8

Further, due to changes in capital structure resulting from the merger of SAI and Southwest, the surviving corporations' stockholders' equity and retained earnings were reduced from $ 6,460,000 to $ 2,036,000 and $ 4,975,000 to $ 36,000 respectively, with the majority of the $ 2,036,000 capitalization consisting of borrowed funds. Finally, using the adjusted figures from the balance **[*23]** sheet summary, the 1984 stock purchase quadrupled Southwest's debt to equity ratio from 4.1 to 17.87.

## C. <u>The 1985 Loan by James Talcott, Inc.</u>

During the first quarter of 1985, Southwest began experiencing cash flow problems. [24] Under its new ownership Southwest bounced several checks on the Exchange National bank account. [25] **[*24]** As a result, Exchange eventually advised Thiele to find another bank to fund Southwest's short term

---

[23]  <u>See</u> Ex. D & G, Appx. to Mem. in Supp. of Fullers' Sum. Judg. Mo., Accomp. Court File No. 112.

[24]  For example on December 10, 1984, Southwest was overdrawn at the Rossville Bank of Georgia, where it maintained its primary operating and payroll accounts, in the amount of $ 138,330.54. As of January 10, 1985, Southwest remained overdrawn on its Rossville Bank accounts in the amount of $ 80,000. Ex. B, Fitch Aff. Trustee's Brief in Resp. to Talcott/Southern's Sum. Judg. Mo., Court File No. 94.

[25]  In fact, Southwest was overdrawn at Exchange on each bank working day during January of 1985. When Southwest's overdraft reached $ 412,000, Exchange was asked to advance an additional $ 400,000 to cover it. Exchange agreed to the advance, however, by January 31, 1985, Southwest was still overdrawn in the amount of $ 461,000. By February 28, 1985, Southwest was in the red on the Exchange account to the tune of $ 491,707.79, and by June of 1985, Exchange classified Southwest's account as a substandard loan. Ex. B, Fitch Aff., Trustee's Brief in Resp. to Talcott/Southern's Sum. Judg. Mo., Court File No. 94.

working capital needs. [26] These developments induced Thiele to approach a number of other lenders, including defendant James Talcott, Inc. ("Talcott"), a Georgia financing corporation maintaining its principal place of business in Atlanta, Georgia. [27]

Thiele was seeking $ 7,000,000 to $ 8,000,000 of five to seven year financing to provide working capital and replace the asset based credit arrangement with Exchange National Bank. [28] With this knowledge Talcott performed a due diligence investigation of Southwest and its financial condition, relying primarily upon audited financial statements and internal reports provided by Southwest, which included copies of the original Southwest acquisition documents [*25] and the non-competition/consulting agreement. Through this investigation, Talcott claims to have determined that Southwest was solvent. [29]

Subsequently, on September 16, 1985, Southwest and Talcott executed a security agreement which resulted in Talcott making advances which were used to pay off the $ 5,200,000 loan from Exchange. [30] [*26] As security for these advances

Talcott accepted the unconditional guarantees of both Thiele and Thiele-Rogers Inc. [31] Further, in substance, Southwest granted Talcott a security interest in all of its property. [32] In conjunction with the payment to Exchange, however, the Exchange Loan Agreement was terminated, and Exchange released its security interests in Southwest's assets. Consequently, the Exchange loan agreement was never assigned to or purchased by Talcott. [33]

Shortly after the parties entered into the Talcott Security Agreement, Congress Financial Corporation ("Congress"), the parent company of defendant Congress Financial Corporation ("Southern"), obtained through a portfolio acquisition of Talcott's stock an assignment of the loan made by Talcott to the debtor. Thereafter Southern, which is a Georgia subsidiary of Congress having its principal place of business in Marietta, Georgia, continued to make periodic working capital loans to Southwest. [34]

[*27]  By 1987 Southwest was in contractual default under the 1985 Talcott/Southern Financing Agreement by its failure to deliver to Southern its 1986 interim and year-end audited financial statements. To induce Southern to continue making loans under the original loan documents, therefore, Southwest granted Southern a security interest in substantially all of its assets pursuant to a second security agreement executed March 26, 1987. In order to induce Southern to also delay initiating foreclosure proceedings, Southwest entered into a separate forbearance agreement with Southern on

---

[26] Exchange was not the only lender desiring to sever its relations with Southwest. In August of 1985 Rossville Bank called its loan to Southwest after two months of contractual defaults due to late payments. Rossville also requested that Southwest transfer its banking relationship and all other accounts to another bank. Ex. C, Excerpts of Macur Depo., Trustee's Brief in Desp. to Talcott/Southern's Sum. Judg. Mo., Court File No. 94.

[27] Theile approached Talcott through a broker as Talcott had not been involved in the 1984 leveraged buyout of Southwest, and had never had any prior dealings with Thiele. McCarthy Aff., Court File No. 66.

[28] 2004 Examination of Thiele, Ex. A, Brief in Support of Defts' Jt. Mot. in Limine, Court File No. 56.

[29] Paragraphs 9 and 10, McCarthy Aff., Court File No. 66.

[30] The total amount of the proceeds advanced was $ 6,455,738.81, the amount owed Exchange by Southwest for both the direct payment to the Fullers and other commercial borrowing on the revolving credit line. Pursuant to a pay proceeds letter dated September 16, 1985, Southwest authorized Talcott to pay this amount to Exchange. By letter dated September 19, 1985, Talcott confirmed that it had remitted to Exchange funds equal to the

---

balance of Southwest's indebtedness. See PP 11-13 and Exs.B and C, McCarthy Aff., Court File No. 66.

[31] Paragraphs 11 and 12, Conditions Precedent Agreement, Ex. A, McCarthy Aff., Court File No. 66.

[32] The Security Agreement consisted of at least five separate documents. The relevant collateralization clauses, however, were contained in PP 1, 2 and 9 of the Financing Agreement and PP 1(b) and 6 of the Rider to the Financing Agreement. See Ex. A, McCarthy Aff., Court File No. 66.

[33] Paragraphs 6-8, 11-13, McCarthy Aff., Court File No. 66.

[34] McCarthy Aff., Court File No. 66.

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc In re
Southwest Equip. Rental   Page 15 of 38

Page 15 of 38

November 24, 1987. [35]

On this date, Southwest acknowledged that it owed Southern $ 7,703,249.35 "without any defense, deduction, offset or counterclaim." [36] Under the agreement Southern would delay foreclosure in order to allow Southwest an opportunity to obtain contributions of equity [*28] capital and "to pay the indebtedness owing to Lender through an orderly process. . . ." Southern's forbearance, however, was conditioned on Southwest producing its 1986 financial statement, and contributing no less than $ 2,500,000 to its equity capital position by January 18, 1988.

While the record does not contain specific details, what evidence is available indicates that from 1985 through 1987 Thiele effectively plundered most of Southwest's assets. As a result, Thiele ultimately plead guilty to criminal charges of fraudulent misappropriation and Southwest filed for Chapter 11 bankruptcy. Southwest's petition was filed on January 8, 1988, just ten days before $ 2,500,000 equity capital contribution was due under the forbearance agreement's January 18 deadline.

## D. Relevant Post-petition Developments

On January 8, 1988, Bankruptcy Judge John C. Cook entered an [*29] order authorizing Southwest, as debtor-in-possession, to obtain postpetition financing from and grant post-petition security interests to Talcott/Southern. [37] [*30] In P B of the order, Southwest conceded owing pre-petition debts to Talcott/Southern in the amount of $ 6,693,074.74, without defense, offset, or deduction of any kind. The order was entered pending a final hearing on the debtor's motion for post-petition financing in accordance with Fed. R. Bankr. P. 4001(c)(2), and granted Talcott/Southern § 363(c)(1) priority for all post-petition advances made to Southwest. Pursuant to the related DIP Accounts Financing Agreement accompanying the January 8, 1988 order, all post-petition financing was secured by Southwest's post-petition accounts receivables, general intangibles, and any rights or proceeds derived therefrom. [38] Further, pursuant to a separate Inventory and Equipment Security Agreement, such financing was secured by all of Southwest's post-petition inventory and equipment, [39] and the personal guarantees of Thiele and Thiele-Rogers, Inc. [40]

On January 21, 1988, the Chapter 7 trustee agreed by a letter sent to Talcott/Southern that the terms of the bankruptcy court's January 8, 1988 order and financing agreements would be binding on the bankruptcy estate with respect to all future advances made to Southwest. [41]

On January 22, 1988, Judge Cook granted a motion by the Chapter 7 trustee for the continuation of Southwest's post-petition financing, based on a personal guaranty of Clyde Fuller, and for approval of a letter agreement with Clyde Fuller concerning the purchase of certain assets in Southwest's bankruptcy estate. [42] On January 28, 1988, Chapter 7 Trustee C. [*31] Kenneth Still and Clyde Fuller executed a document styled "Agreement To Purchase," which effectively memorialized the agreement authorized by the bankruptcy court's January 22, 1988 order, [43] and allowed Clyde Fuller

---

[35] Pages 2-4, Forbearance Agreement, Ex. D., Brief of Congress Financial Corporation (Southern) and Talcott In Supp. of Mo. for sum. Judg., Court File No. 68.

[36] Ex. D, McCarthy Aff., Court File No. 66.; excerpts of Fuller Depo., Ex. H, Appx. to Fullers' Mo. for sum. Judg. Accomp. Court File No. 112.

[37] Ex.E, Brief in Supp. of Talcott/Southern's Sum. Judg. Mo. Court File No. 68.

[38] Paragraph 4.1, DIP AFA, Ex. E, Brief in Supp. of Talcott/Southern's Sum. Judg. Mo., Court File No. 68.

[39] Section 1, Ex.E.

[40] Ex. F, Brief in Supp. of Talcott/Southern's Sum Judg., Mo., Court File No. 68.

[41] Ex. G, Brief in Supp. of Talcott/Southern's Sum Judg., Mo., Court File No. 68.

[42] Ex. H, Brief in Supp. of Talcott/Southern's Sum Judg., Mo., Court File No. 68.

[43] Ex.N, Brief in Supp. of Talcott/Southern's Sum Judg., Mo., Court File No. 112.

to acquire the corporate name "Southwest Motor. Freight;" the right to use the logo associated with the name; the right to operate the trucking company; and the right to negotiate with the trustee to purchase any unencumbered assets or those having equity for the estate. [44] In exchange, after representing that the Fullers' potential claims against Southwest totalled $ 3,800,000, Clyde Fuller agreed inter alia that he and his wife would relinquish any claims against Southwest's bankruptcy estate, and would not file any proof of claim in Southwest's bankruptcy case. [45] Paragraph 13 of the Agreement made it effective at noon on January 28, 1988.

[*32] On February 2, 1988, Bankruptcy Judge Ralph H. Kelley conducted a hearing regarding final approval of the original January 8, 1988 order. During the course of this hearing, Judge Kelley heard arguments regarding the trustee's objections to the post-petition financing order, which concerned the priority between administrative expenses and Talcott/Southern's post-petition security interests, and the cross-collateralization of Talcott/Southern's pre-petition and post-petition claims. Judge Kelley also noted the trustee's objection to the amount of Southwest's pre-petition indebtedness to Talcott/Southern, which the trustee claimed it could not verify at that time. Although Judge Kelley approved the terms of the January 8, 1988 order, the bankruptcy court reserved a right for the trustee to dispute the level of Southwest's indebtedness, noting that Talcott/Southern's super priority claims would be limited to only the post-petition monies advanced. [46]

## [*33] II. Standard of Review

This is an adversary proceeding as defined by Bankruptcy Rule 7001 and a core proceeding as defined by 28 U.S.C. §§ 157(b)(2)(F) and (H). Subject matter jurisdiction is predicated upon claims arising under the Bankruptcy Code. 28 U.S.C. § 1334(a); In re White, 851 F.2d 170 (6th Cir. 1988); Matter of Wood, 825 F.2d 90 (5th Cir. 1987). As set forth in his eleven count amended complaint (Court File Nos. 7, 124), the plaintiff has sought to avoid certain transfers based on theories arising under the Bankruptcy Code and state law.

Because procedural matters in this case shall be governed by part VII of the Bankruptcy Rules see Diamond Mortgage Corporation of Illinois v. Sugar, 913 F.2d 1233, 1239-42 (7th Cir. 1990), Fed. R. Bankr. P. 7056 supplies the applicable standard of review. *HN1*[⬆] Bankruptcy Rule 7056 incorporates Fed. R. Civ. P. 56, which provides that summary judgment is appropriate when, after viewing the facts and all inferences to be drawn from the evidence in a light most favorable to [*34] the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See White v. Turfway Racing Ass'n, Inc., 909 F.2d 941, 943 (6th Cir. 1990); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1477 (6th Cir. 1989); 60 Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir. 1987); Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.), 124 Bankr. 984, 991-93 (S.D.Ohio 1990).

Under this standard, material facts are identified by reference to the substantive law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1987), and an issue of fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. The court's function in this situation is limited to determining whether sufficient evidence has been presented to make an issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson, 477 U.S. at 249. [*35]

---

[44] Ex.N, PP 1-4.

[45] Paragraph 7, Ex.N.

[46] Ex. H, Trustee's Resp. To Talcott/Southern's Sum. Judg. Mo., Court File No. 94.

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc In re
Southwest Equip. Rental   Page 17 of 38

Page 17 of 38

## III. Decision on Pending Motions

### A. Choice of Law

By basing Counts I, II, III, and VII of his original complaint upon certain provisions of the Tennessee Uniform Fraudulent Conveyances Act ("TUFCA"), Tenn. Code Ann. §§ 66-3-101 - 66-3-314, and the Tennessee Business Corporations Act ("TBCA"), Tenn. Code Ann. §§ 48-11-101 - 48-27-103, the trustee has implicitly relied upon 11 U.S.C. § 544(b). Read in conjunction with 11 U.S.C. § 323 and Fed. R. Bankr. P. 6009, [47] this statute gives the trustee the power to avoid any transfer that would be voidable under "applicable law" by a creditor holding an allowable unsecured claim at the time of the debtor's bankruptcy. Specifically, **HN2[⬆]** § 544(b) provides that

> the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding a unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

As written, this section of the Bankruptcy Code contains no substantive provisions **[*36]** describing when a transfer by the debtor is voidable. Instead, whether or not a particular transfer or obligation may be avoided, and under what circumstances, is determined by the appropriate state law incorporated by § 544(b). See McLemore v. Olson (In re B & L Laboratories, Inc.), 62 Bankr. 494, 502 n. 23 (Bkrtcy.M.D.Tenn. 1986); L. King, 4 Collier on Bankruptcy P 544.03[1], p. 544-16 (15th ed.); 28 U.S.C. § 1652.

In order to determine what "applicable law" governs either the trustee's fraudulent conveyance and unlawful distribution claims, or the defendants' respective statute of limitations defenses, the Court must first identify the applicable choice of law rule under § 544(b). The Court must decide whether it is bound to treat a core adversary proceeding in bankruptcy as a diversity case for choice of law purposes, or whether it **[*37]** is free to make an independent determination in choosing the applicable law that would most fairly advance the equitable policies of the Bankruptcy Code. [48]

---

[47] Subsection (b) of § 323 and Rule 6009 create the case trustee's capacity to sue or be sued under Title 11.

[48] Some courts, following Erie Railroad Co. v. Tompkins, 304 U.S. 64, 82 L. Ed. 1188, 58 S. Ct. 817 (1938)("there is no federal general common law," id. at 78, 58 S. Ct. at 822; "except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State," id.) and Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941) (A federal court sitting in diversity must follow the conflict-of-laws rules of the state in which it sits.), hold that **HN3[⬆]** a federal court exercising bankruptcy jurisdiction must follow the choice-of-law rules of the forum state. See, e.g., Bird v. Crown Convenience (In re NWFX, Inc.), 881 F.2d 530, 535 (8th Cir. 1989) (citing Union Nat'l Bank v. FNMA, 860 F.2d 847, 853 n.13 (8th Cir. 1988)); In re Merritt Dredging Co., Inc., 839 F.2d 203, 205-206 (4th Cir. 1988), cert. denied sub. nom. Compliance Marine, Inc. v. Campbell, 487 U.S. 1236, 101 L. Ed. 2d 936, 108 S. Ct. 2904 (1988); Jacobs v. Shields, 116 Bankr. 134, 137 (D.Minn. 1990); In re Miller, 113 Bankr. 98, 101 (Bkrtcy.D.Mass. 1990); Wooten v. Vickburg Refining, Inc. (In re Hill Petroleum Co.), 95 Bankr. 404, 407 (Bkrtcy.W.D.La. 1988) (citing cases); Hassett v. Far West Federal Sav. & L. Ass'n (In re O.P.M. Leasing Services, Inc.), 40 Bankr. 380, 391 (Bkrtcy.S.D.N.Y. 1984); Fisher v. Smith (In re Medico Associates, Inc.), 23 Bankr. 295, 301-302 (Bkrtcy.D.Mass. 1980); In re Bagley, 6 Bankr. 387, 389 (Bkrtcy.N.D.Ga. 1980). See also In re Revco D.S., Inc., 118 Bankr. 468, 500-504 (Bkrtcy.N.D.Ohio 1990) (Preliminary Report of Examiner rendered in connection with Revco LBO).

In In re Merritt Dredging Co., Inc., Circuit Judge Wilson offered the following explanation for this rule:

A uniform rule under which federal bankruptcy courts apply their forum state's choice of law principles will enhance predictability in an area where predictability is critical. Most important, such a rule would accord with the model established by Erie and Klaxon. Both those cases make clear that federal law may not be applied to questions which arise in federal court but whose determination is not a matter of federal law: . . . . Such is the case with questions regarding the extent of a bankruptcy debtor's property interests. "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." (citations) It would be anomalous to have the same property interest governed by the laws of one state in federal diversity proceedings and by the laws of another state where a federal court is sitting in bankruptcy.

839 F.2d at 206.

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc  In re Southwest Equip. Rental   Page 18 of 38

Page 18 of 38

**[\*38]** Having carefully considered this threshold issue, the Court is inclined to agree with Judge

_____

Other courts, following dicta in <u>Vanston Bondholders Protective Committee v. Green.</u> 329 U.S. 156, 91 L. Ed. 162, 67 S. Ct. 237 (1946) (A bankruptcy court should determine which state's law to apply in claims litigation by exercising "an informed judgment in the balancing of the interest of all the states with the most significant contacts in order to best accommodate the equities among the parties to the policies of those states," <u>id.</u> at 162, 67 S. Ct. at 237, 91 L. Ed. at 165), hold that a bankruptcy court is not bound to mechanically follow <u>Klaxon</u>, but may freely apply federal common law choice of law rules. Critical commentary supports this latter view. <u>See</u> 4 <u>Collier on Bankruptcy</u> P 544.02, p. 544-13 n.16; 1A <u>Moore's Federal Practice</u> (2d ed), Civil, P 0.322[1].

<u>See, e.g., Danning v. Pacific Propeller, Inc. (In re Holiday Airlines Corp.),</u> 620 F.2d 731, 733-734 (9th Cir. 1980); <u>In re Fulghum Construction Co.,</u> 14 Bankr. 293, 296 (M.D.Tenn. 1981), <u>aff'd in part, vacated in part,</u> 706 F.2d 171 (6th Cir.), <u>cert. denied sub nom. Ranier & Associates v. Waldschmidt,</u> 464 U.S. 935, 78 L. Ed. 2d 310, 104 S. Ct. 342, 104 S. Ct. 343, and <u>cert. denied sub nom. Waldschmidt v. Ranier & Associates,</u> 464 U.S. 935, 78 L. Ed. 2d 310, 104 S. Ct. 342, 104 S. Ct. 343 (1983) (Independent judgment to follow <u>Restatement (Second) of Conflicts</u> § 302 as to which state's law applied to piercing the corporate veil and the validity of a related sale); <u>Wheels, Inc. v. Otasco, Inc. (In re Otasco),</u> 111 Bankr. 976, 980-981 (Bkrtcy.N.D.Okla. 1990)(§ 544(a)); <u>McCorhill Publishing, Inc. v. Greater New York Savings Bank (In re McCorhill Pub., Inc.),</u> 86 Bankr. 783, 791-792 (Bkrtcy.S.D.N.Y. 1988); <u>Roemelmeyer v. Capital Bank (In re L.M.S. Associates, Inc.),</u> 18 Bankr. 425, 427-430 (Bkrtcy.S.D.Fla. 1982)(§ 544(a); <u>Matter of Barney Schogel,</u> 12 Bankr. 697, 699-700 (Bkrtcy.S.D.N.Y. 1981)(a Bankruptcy Act case).

Still other courts have avoided taking a position on the issue. Instead, they have compared the forum state's choice of law rules with the relevant federal rule, and then concluded either (1) that the federal and forum choice of law rules are the same, or (2) that differences in the rules create a false conflict because they result in the application of the same substantive law. This has occurred most frequently in cases where the forum state follows the <u>Restatement (Second) of Conflicts</u>' significant contacts analysis, which is in substance the applicable federal choice of law rule.

<u>See, e.g., Merrill v. Abbott (In re Independent Clearing House Co.),</u> 77 Bankr. 843, 862-863 n. 31 (D.Utah 1987); <u>Hayes v. Quincy (In re WPMK Corp.),</u> 59 Bankr. 991, 993-995 (D.Hawaii 1986); <u>Murphy v. Meritor Savings Bank,</u> 126 Bankr. 370, 390-391 (Bkrtcy.D.Mass. 1991); <u>In re Presque Isle Apartments, L.P.,</u> 118 Bankr. 332, 334 (Bkrtcy.W.D.Pa. 1990); <u>In re Morse Tool, Inc.,</u> 108 Bankr. 384 (Bkrtcy.D.Mass. 1989); <u>Kaiser Steel Corp. v. Jacobs (In re Kaiser Steel Corp.),</u> 87 Bankr. 154, 157-160 (Bkrtcy.D.Colo. 1988); <u>Seidle v. Carpenter (In re Janis),</u> 60 Bankr. 349, 351 (Bkrtcy.S.D.Fla. 1986); <u>Fox v. Peck Iron & Metal Co., Inc.,</u> 25 Bankr. 674, 684-687 (Bkrtcy.S.D.Cal. 1982).

Wilson's analysis in <u>Merritt,</u> 839 F.2d at 206. For this reason, it is concluded that this Court is bound by <u>Klaxon</u> to apply Tennessee's choice of law rules in this case. <u>See supra</u> footnote 48.

Turning to Tennessee's choice of law rules, it appears that **HN4**[⬆] in connection with a fraudulent conveyance of assets other than real property, such as accounts, intangibles, or equipment, either the law of the situs of the property or the domicile of the debtor would supply the rule of decision. <u>See, e.g., C & S Nat. Bank v. Auer,</u> 514 F. Supp. 638 (E.D.Tenn. 1977), <u>rev'd and remanded on other grounds,</u> 640 F.2d 837 (6th Cir. 1981); <u>United States v. Kerr,</u> 470 F. Supp. 278 (E.D.Tenn. 1978); 6 Tenn. Juris., <u>Conflict of Laws Domicile and Residence,</u> §§ 4, 5, 10-12 and 19 (1992). On the other hand, the Court must apply the local law of the state of incorporation with regard to the trustee's unlawful distribution claims, <u>except</u> where some other state has a more significant **[\*39]** relationship to the parties and the transaction at issue, in which case the local law of the other state would be applied. <u>Bayberry Associates v. Jones,</u> 1988 Tenn. App. LEXIS 708, No. 87-261-11 (Tenn.Ct.App. Nov. 9, 1988), 1988 WL 137181, <u>rev'd on other grounds,</u> 783 S.W.2d 553 (Tenn. 1990).

**HN5**[⬆] With regard to statute of limitations defenses, Tennessee's choice of law rules follow the <u>lex fori</u> where the relevant statute is procedural, unless the particular claim "is one encompassed by the state borrowing statute, . . . or . . . is one in which the foreign state's limitation is not merely upon the remedy but upon the underlying substantive right." <u>Mackey v. Judy's Foods, Inc.,</u> 654 F. Supp. 1465, 1469 (M.D.Tenn. 1987), <u>aff'd,</u> 867 F.2d 325 (6th Cir. 1989). <u>See</u> 18 Tenn. Juris., <u>Limitation of Actions,</u> § 2, p. 25 (1984). [49]

_____

[49] A statute of limitation is substantive only when it is built into the same statute that creates the cause of action in question or when the limitation, though appearing in a different statute, is directed to the newly created liability so specifically as to warrant saying that it qualified the right. <u>Id.; P & E Elec., Inc. v. Utility Supply of America, Inc.,</u> 655 F. Supp. 89, 93-95 (M.D. Tenn. 1986); <u>Myers v.</u>

Case 25-07009    Doc 9-6    Filed 04/02/25    Entered 04/02/25 16:06:58    Desc  In re
Southwest Equip. Rental    Page 19 of 38

Page 19 of 38

**[\*40]**  Applying these rules to the facts in the record, the Court concludes that Tennessee substantive law shall supply the rule of decision on the claims in Counts I, II, III, and VII of the trustee's complaint. In addition, the Court shall apply the relevant Tennessee statute of limitations, where applicable, in determining the timeliness of the trustee's claims.

## B. Statutes of Limitations

### 1. Under 11 U.S.C. § 546(a)

*HN6*[⬆]  In an adversary proceeding the trustee's ability to avoid a particular transfer is subject to two separate statutes of limitations. One is jurisdictional and is set forth in 11 U.S.C. § 546 which provides:

> **Limitations on avoiding powers**
> (a) An action or proceeding under section 544, . . . of this title may not be commenced after the earlier of -
> (1) two years after the appointment of a trustee under section 702, 1104, . . . of this title; or
> (2) the time the case is closed or dismissed.

Here the plaintiff's right to pursue the remedies available under § 544(b) is not barred by § 546(a) because this action was filed on December 27, 1989, less than two years after he was appointed **[\*41]** as case trustee on January 19, 1988. [50]

---

Hayes Int'l Corp., 701 F. Supp. 618, 620 (M.D.Tenn. 1986) (citations omitted); Sigler v. Youngblood Truck Lines, 149 F. Supp. 61, 65 (E.D.Tenn. 1957); Cauley v. S.E. Massengill Co., 35 F. Supp. 371, 372-373 (D.Tenn. 1940); 6 Tenn. Juris., Conflict of Laws, Domicile and Residence, §§ 34 & 35 (1992).

[50]  The majority view in the bankruptcy courts is that the two year limitations period does not begin to run until the election or qualification of a permanent trustee at the § 341 meeting of creditors. Martin v. First Nat'l Bank of Louisville (In re Butcher), 829 F.2d 596, 598-601 (6th Cir. 1987, cert. denied, 484 U.S. 1078, 98 L. Ed. 2d 1020, 108 S. Ct. 1058 (1988)) (§ 546(a) statute of limitation is technically jurisdictional, therefore not subject to Fed. R. Bankr. P. 9006(a); the period runs as of the date of the trustee's appointment, rather than the day after the trustee's appointment, and expires 24 months later); Hunter v. Hansen (In re Hansen), 114 Bankr. 927, 929 (Bkrtcy.W.D.Ohio 1990). This limitation period is, however, subject

**[\*42]**  The other type of limitations period is derived from the "applicable law" incorporated by § 544(b). Because § 544(b) authorizes the trustee to stand in the shoes of the debtor's actual unsecured creditors, he is subject to the same procedural limitations affecting their right to avoid a particular transfer under the applicable law. This means that to withstand the defendants' motions for summary judgment, the relevant Tennessee statute of limitations must not have run before the debtor filed its bankruptcy petition, the event which triggers the superseding federal two year statute under § 546(a). 4 Collier on Bankruptcy P 546.01, p. 546-4; P 546.02, pp. 546-8-546-546-11 (15th ed. 1991). *HN7*[⬆]  Under Tennessee law, unless otherwise expressly provided by statute, all civil actions other than those dealing with the adverse possession of real property are governed by chapter 3 in Title 28 of the Tennessee Code Annotated, Tenn. Code Ann. §§ 28-3-102 through 205. See Tenn. Code Ann. § 28-3-101.

### 2. In Fraudulent Conveyance Actions

*HN8*[⬆]  At least for statute of limitations purposes, Tennessee treats a fraudulent conveyance claim as one for conversion of a chattel or other personalty. **[\*43]**  Depending on the relief sought, the aggrieved creditor's right to recovery is subject to two separate state law limitation periods. Where the creditor is seeking to recover the specific property which has been fraudulently conveyed, its right to recovery must generally be asserted within three years of the alleged conveyance. On the other hand, where the creditor is seeking to recover the value of the property fraudulently conveyed, its right to recovery must be asserted within six years of the alleged conveyance. See German Bank v. Haller,

---

to equitable tolling, a doctrine which was first applied by the United States Supreme Court in a 1875 bankruptcy case. Hunter, supra, 114 Bankr. at 930-934;Martin v. Butcher ( In re Butcher., 72 Bankr. 247, 249-251 (Bkrtcy.E.D.Tenn. 1987); Martin v. First Security Nat'l Bank & T. Co., 67 Bankr. 102, 103 (Bkrtcy.E.D.Tenn. 1986); McLemore v. Olson (In re B & L Laboratories, Inc.), 62 Bankr. 494, 496 n.1 (Bkrtcy.M.D.Tenn. 1986). See Bailey v. Glover, 88 U.S. (21 Wall.) 342, 349-350, 22 L. Ed. 636 (1875); 4 Collier on Bankruptcy P 546.02[1] & [2], pp. 546-8 - 546-9.

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc In re
Southwest Equip. Rental   Page 20 of 38

Page 20 of 38

101 Tenn. 83, 85-87, 52 S.W. 807 (1898) (applying Shannon's Code § 4470 in connection with a transfer of goods, the statutory forerunner of Tenn. Code Ann. §§ 28-3-105 and 28-3-109).

In the present case, the subject matter of the November 2, 1984 and September 16, 1985 conveyances was either (1) cash and a security interest in Southwest's equipment which was promptly reduced to proceeds, at least with respect to the Fullers' $ 3,000,000 note, or (2) a security interest in the debtor's accounts receivables, general intangibles, and certain equipment, with regard to LaSalle's and Talcott/Southern's [*44] "working capital" loans. Despite the fact that the trustee has first sought to avoid the 1984 and 1985 conveyances under 11 U.S.C. § 544(b), the Court concludes that in substance the trustee is attempting to recover the value of the property fraudulently conveyed, most of which was intangible, and therefore the trustee's fraudulent conveyance claims were subject to Tennessee's six year statute of limitations, Tenn. Code Ann. § 28-3-109, up to the date Southwest filed for bankruptcy. Consequently, the fraudulent conveyance claims in Counts I, II, and III of the trustee's complaint would not be time barred under Tennessee law. See Dillard & Coffin Co. v. Smith, 105 Tenn. 371, 382-383 (1900) (discussing creditor's election of remedies regarding recovery of specific goods or value of goods from grantee); Howell v. Thompson, 95 Tenn. 396, 401-405, 32 S.W. 309 (1895) (applying Code (M. & V.)) § 3470 (which ran from the time of the alleged fraudulent conveyance of bank stock or the time the creditor was in a position to enforce its rights by legal proceeding); Ramsey v. Quillen, 73 Tenn. 184, 188-191 (1880).

### [*45]  3. In Actions for Unlawful Distributions or Breach of Fiduciary Duty

Although there is no express statutory or precedental authority specifically defining the relevant limitation period for an unlawful distribution under Tenn. Code Ann. § 48-16-401, the Court concludes that the one year statute of limitation set forth in Tenn. Code Ann. § 48-18-601 applies to the trustee's claims in Count VII of the complaint HN9[↑] Section 48-18-601 provides:

**Limitation of actions for breach of fiduciary duty.** Any action alleging breach of fiduciary duties by directors or officers, including alleged violations of the standards established in § 48-18-301, § 48-18-302, or § 48-18-403, must be brought within one (1) year of the date of such breach or violation; provided, however, that in the event the alleged breach or violation is not discovered nor reasonably should have been discovered within the one (1) year period, the period of limitation shall be one (1) year from the date such was discovered or reasonably should have been discovered. In no event shall any such action be brought more than three (3) years after the date on which the breach or violation occurred, except where there [*46] is fraudulent concealment on the part of the defendant, in which case the action shall be commenced within one (1) year after the alleged breach or violation is, or should have been discovered.

Like Tenn. Code Ann. § 48-16-304, which defines a director's liability for an unlawful distribution, see infra Part III, C, § 48-18-601 incorporates the standards for director conduct set forth in Tenn. Code Ann. § 48-18-301. Given that a director's participation in an unlawful distribution would also result in a breach of fiduciary duty, and given the Tennessee Court of Appeals' recent ruling that the six-year limitation period under Tenn. Code Ann. § 28-3-109 no longer applies to actions for a director's breach of fiduciary duty, American Network Group, Inc. v. Kostyk, 804 S.W.2d. 447, 450 (Tenn.Ct.App. 1991), it is reasonable to apply § 48-18-601 in this case. Because of the prospective application of § 48-18-601, however, and because Southwest filed for bankruptcy on January 8, 1988, within one year of the January 1, 1988 effective date of § 48-18-601, see Kostyk, 804 S.W.2d. at 450, the Court concludes that the trustee's [*47] claims in Count VII of the

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc In re Southwest Equip. Rental   Page 21 of 38

Page 21 of 38

complaint are not barred by the applicable statute of limitations.

## C. <u>Unlawful Distributions Under Tenn. Code Ann. § 48-16-401(c)</u>

In Count VII, the trustee claims that damages should be awarded against all of the defendants for their respective participation in an unlawful distribution under T.C.A. § 46-16-401, which rendered the debtor insolvent and unable to pay its debts when they became due in the usual course of business.

In their respective motions for summary judgment the defendants make exhaustive arguments on the applicability of California substantive and procedural law, and whether under California law equitable tolling should apply.

Having determined that Tennessee substantive law shall govern this case, the relevant portions of the Tennessee Business Corporations Act ("TBCA") dealing with unlawful distributions provide as follows:

**Distributions to shareholders.** - (a) A board of directors may authorize and the corporation may make distributions to its shareholders subject to restriction by the charter and the limitation in subsection (c). . . . .
(c) No distribution may be made if, after giving it effect:

(1) The corporation **[*48]** would not be able to pay its debts as they become due in the usual course of business; or
(2) The corporation's total assets would be less than the sum of its total liabilities plus (unless the charter permits otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution. . . . .
(e) The effect of a distribution under subsection

(c) is measured:
(1) In the case of distribution by purchase, redemption or other acquisition of the corporation's shares, as of the earlier of:
(A) The date money or other property is transferred or debt incurred by the corporation; or
(B) The date the shareholder cases to be a shareholder with respect to the acquired shares;

(2) In the case of any other distribution of indebtedness or distribution through the incurrence of indebtedness, as of the date the indebtedness is distributed or incurred. In a case in which the incurrence of indebtedness is the granting of a mortgage, security interest, lien, or other encumbrance of the corporation's assets, **[*49]** the indebtedness shall be deemed to be incurred on the date of the execution and delivery of the security instrument granting such mortgage, security interest, lien, or other encumbrance; . . . .
Tenn. Code Ann. § 48-16-401 (1991 Supp.).
(7) "Distribution" means a direct or indirect transfer of money or other property (except its own shares) or incurrence of indebtedness (whether directly or indirectly, including through a guaranty) by a corporation to or for the benefit of its shareholders in respect of any of its shares. A distribution may be in the form of a declaration or payment of a dividend; a purchase, redemption, or other acquisition of shares; a distribution of indebtedness (which includes the incurrence of indebtedness for the benefit of the shareholders); or otherwise; . . . .
Tenn. Code Ann. § 48-18-201 (1991 Supp.).

*HN10*[↑] **Liability for unlawful distribution.** - (a) Unless he complies with the applicable standards of conduct described in § 48-18-301, a director who votes for or assents to a distribution made in violation of chapters 11-27 of this title or the charter is personally liable to the corporation for the amount of the distribution that exceeds **[*50]** what could have been distributed without violating

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc In re Southwest Equip. Rental   Page 22 of 38

Page 22 of 38

chapters 11-27 of this title or the charter.

(b) A director held liable for an unlawful distribution under subsection (a) is entitled to contribution: . . .

(2) From each shareholder for the amount the shareholder accepted, knowing the distribution was made in violation of chapters 11-27 of this title or the charter.

Tenn. Code Ann. § 48-18-304 (1988).

(1) "Corporation" includes any domestic or foreign predecessor entity of a corporation in a merger or other transaction in which the predecessor's existence ceased upon consummation of the transaction;

(2) "Director" means an individual who is or was a director of a corporation, including individuals acting pursuant to § 48-18-101, or an individual who, while a director of a corporation, is or was serving at the corporation's request as a director, officer, partner, trustee, employee, or agent of another foreign or domestic corporation, partnership, joint venture, trust, employee benefit plan, or other enterprise. A director is considered to be serving an employee benefit plan at the corporation's request if his duties to the corporation also impose duties on, or otherwise **[*51]** involve services by him to the plan or to participants in or beneficiaries of the plan. "Director" includes, unless the context requires otherwise, the estate or personal representative of a director.

Tenn. Code Ann. § 48-18-501 (1988).

While the transfers in question easily fall within the story definition of a distribution, the Court concludes that neither LaSalle nor Talcott/Southern can be held liable, as creditors of the corporate debtor, for an unlawful distribution under the TBCA. The express language of the Act speaks only to director liability and the attendant right to contribution from each culpable shareholder participating in the unlawful distribution. While there are no Tennessee cases on point, in those bankruptcy cases considering the question of an

unlawful distribution in connection with a leveraged buyout or stock redemption, only directors and controlling shareholders have been found liable for such transfers under corporations statutes similar to the TBCA. [51]

**[*52]** Based upon the language and structure of Tennessee's statute, therefore, and given this Court's perception of the proper relationship between Tennessee corporations and debtor/creditor law, it is concluded that the TUFCA is the proper avenue for the plaintiff to attack Southwest's conveyances to LaSalle and Talcott/Southern not the provisions of the TBCA. See Credit Managers Asso. of S. Calif. v. Federal Co. 629 F. Supp. 175, 188 (C.D.Calif. 1986). For this reason, LaSalle and Talcott/Southern's motions for summary judgment shall be **GRANTED** with regard to Count VII of the trustee's complaint.

With regard to the Fullers' liability under Tenn. Code Ann. § 48-16-401, **HN11**[↑] although it is well settled that the controlling shareholder of a corporation maintains a fiduciary obligation to the creditors of the corporation, In re Fulghum Constr. Co., 14 Bankr. 293 (Bkrtcy. M.D.Tenn. 1981), liability for a breach of this duty is determined as a matter of Tennessee common law, not the unlawful distribution provision of the TBCA. Again, this is

---

[51] See, e.g., Lippi v. City Bank, 955 F.2d 599 (9th Cir. 1992)(Haw.UFCA); Crowthers McCall Pattern, Inc. v. Lewis, 129 Bankr. 992, 1000-1001 (S.D.N.Y. 1991)(NYUFCA); Moody v. Security Pacific Bus. Cred., Inc., 127 Bankr. 958, 999-1000 (D.Mass. 1991)(Mass.UFCA); C-T of Virginia, Inc. v. Barrett (In re C-T of Virginia), 124 Bankr. 694, 698-699 (W.D.Va. 1990); Wieboldt Stores, Inc. v. Schottenstein, 94 Bankr. 488, 507-512 (N.D.Ill. 1988)(applying the Ill. UFCA and BCA); In re Revco D.S., Inc., 118 Bankr. 468, 506 (Bkrtcy.N.D.Ohio 1990)(Ohio UFCA and BCA); Webster v. Barbara (In re Otis & Edwards, P.C.), 115 Bankr. 900, 907-914 (Bkrtcy.E.D.Mich. 1990)(Mich.UFCA); Iannacone v. Foothill Capital Corp (In re Hancock-Nelson), 95 Bankr. 982, 988 (Bkrtcy.D.Minn. 1989)(applying Minn.UFCA and BCA); Credit Managers Asso. v. Federal Company, 629 F. Supp. 175, 188 (C.D.Calif. 1986); McLemore v. Olson (In re B & L Laboratories), 62 Bankr. 494, 502-508 (Bkrtcy.M.D.Tenn. 1986). See also Fuld, Recovery of Illegal and Partial Liquidating Dividends from Stockholders, 28 Va.L.Rev. 50, 51 (1941); Rev. Model Bus. Corp. Act § 8.33(b).

because the only shareholder liability created by the TBCA in connection with unlawful distributions [*53] is one of contribution owed to a culpable director. Tenn. Code Ann. § 48-18-201(b)(2). See also Mancuso v. Champion (In re Dondi Financial Corp.), 119 Bankr. 106, 110 (Bkrtcy.N.D.Tex 1990). As Count XI of the trustee's amended complaint properly addresses the Fullers' fiduciary duty, summary judgment shall be **GRANTED** in favor of the Fullers on Count VII.

### D. Fraudulent Conveyances

### 1. Applicability of § 548 and the Uniform Fraudulent Conveyance Act to Leveraged Buyouts

Pursuant to Tenn. Code Ann. § 66-3-314, the Court must construe and interpret the relevant provisions of the TUFCA consistent with the decisions of other courts in states which have adopted the Uniform Fraudulent Conveyance Act ("UFCA"). Further, because the fraudulent conveyance provisions of the Bankruptcy Code are modeled after the UFCA, where Tennessee's state courts have not addressed a particular issue, this Court will be guided by authorities interpreting 11 U.S.C. § 548. See United States v. Tabor Court Realty Corp., 803 F.2d 1288, 1299 (3rd Cir. 1986) (Pa.UFCA); Moody v. Security Pacific Bus. Cred., Inc., 127 Bankr. 958, 993 (W.D.Pa. 1991). [*54]

Whether a leveraged buy out is properly within the scope of 11 U.S.C. § 548 or the UFCA, and whether the 1984 and 1985 transfer at issue may be considered together for purposes of analyzing the trustee's § 548 or UFCA claims are significant questions in this case. [52] The Court follows the majority rule by concluding that the transfers making up a leveraged buy out may be avoided as fraudulent conveyances under both 11 U.S.C. § 548 and the UFCA. [53] [*56] The Court further

concludes that for purposes of determining whether Southwest received fair consideration or was rendered insolvent by a particular series of transactions it shall consider the 1984 stock purchase and non-compete/consulting agreements as one transaction. Despite the Fullers' arguments to the contrary, [54] this Court may properly look through form to the substance of these transactions. It is concluded on the facts contained in the record that the 1984 transfers were in substance part of the same transaction - the sale of Clyde Fullers' controlling interest in Southwest. Ohio v. Collins (In re Madeline Marie Nursing Homes), 694 F.2d

---

(3rd Cir. 1986)(Pa.UFCA), cert. denied sub nom. McClellan Realty Co. v. United States (1987); Crowthers McCall Pattern, Inc. v. Lewis, 129 Bankr. 992, 997-998 (S.D.N.Y. 1991)(NYUFCA); Moody v. Security Pacific Bus. Cred., Inc., 127 Bankr. 958, 989 n. 7 (W.D.Pa. 1991)(Pa.UFCA); Wieboldt Stores, Inc. v. Schottenstein, 94 Bankr. 488, 499 (N.D.Ill. 1988) (Ill. UFCA and BCA); Aluminum Mills Corp. v. Citicorp North America, Inc. (In re Aluminum Mills Corp.), 132 Bankr. 869, 885 (Bkrtry.N.D.Ill. 1989)(Ill.UFCA); In re Revco D.S., Inc., 118 Bankr. 468, 510-524 (Bkrtcy.N.D.Ohio 1990)(Ohio UFCA); Ferrari v. Barclays Bus. Cred., Inc. (In re Morse Tool, Inc.), 108 Bankr. 389, 390-392 (Mass.UFCA); Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply), 100 Bankr. 127, 134 (Bkrtry.D.Mass. 1989); Ohio Corrugating Co. v. DPAC, Inc. (In re Ohio Corrugating Co.), 91 Bankr. 430, 433 (Bkrtcy.N.D.Ohio 1988)(Ohio UFCA); Kaiser Steel Corp. v. Jacobs (In re Kaiser Steel), 87 Bankr. 154, 160-161 (Bkrtcy.D.Colo. 1988) (Calif.UFCA); Ohio Corrugating Co. v. Security Pacific Bus. Cred., Inc. (In re Ohio Corrugating Co.), 70 Bankr. 920, 925-926 (Bkrtcy.N.D.Ohio 1987)(Ohio UFCA); Anderson Industries, Inc. v. Anderson (In re Anderson Indus.), 55 Bankr. 922, 926 (Bkrtcy.W.D.Mich. 1985) (Mich.UFCA).

54  The Fullers have disputed both the inclusion of the non-compete/consulting agreement as part of the trustee's assessment of Southwest's insolvency and the fair consideration exchanged, and the trustee's characterization of that agreement as a long-term obligation of Southwest. Instead, the Fullers assert that the agreement was a separate and independent transaction completed between the Fullers and Southwest, not SAI, and that the agreement was executory with the Fullers' right to payment conditioned on their future performance. The Fullers further contend that the $ 5,200,000 cash proceeds received Exchange was the only "conveyance" bearing on the issue of insolvency in the fraudulent conveyance context, as the $ 3,000,000 SAI note was fully subordinated to the claims of other Southwest creditors, and the $ 1,800,000 portion of the cash purchase price was paid out of SAI's capital account. Using the trustee's method of determining insolvency, the Fullers assert that Southwest had a positive net worth of $ 1,260,000 immediately following the 1984 stock purchase, pp. 5-15, Fullers' Mem. in Supp. of Sum. Judg. Mo., Court File No. 112.

---

52  Pp. 7-19, Congress/Talcott Brief in Support of Sum. Judg. Motion, Court File No. 68; pp. 5-15, Fullers' Brief in Support of Sum. Judg. Mo., Court File No. 112.

53  United States v. Tabor Court Realty Corp., 803 F.2d 1288, 1297

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc In re
Southwest Equip. Rental   Page 24 of 38

Page 24 of 38

433, 436-437 (6th Cir. 1982). **[\*55]** [55] The Court, however, shall not "collapse" Talcott/Southern's 1985 working capital loans as a step transaction in the 1984 LBO, because Talcott/Southern did not participate in the 1984 transactions and there is no evidence in the record that would suggest the 1985 loans were contemplated by the culpable parties as part of the 1984 transactions.

**[\*57]** Contrary to Talcott/Southern's arguments, [56] these conclusions do not relieve Talcott/Southern from potential liability under the TUFCA. Liability under the TUFCA is not dependent upon Talcott/Southern's participation in the LBO. Instead, if the 1985 loan to Southwest was made without fair consideration, while Southwest was insolvent or operating with unreasonably small capital, then Talcott/Southern may be liable to the trustee independent of its involvement in the 1984 LBO. Tenn. Code Ann. §§ 66-3-305 and 306.

## 2. Tenn. Code Ann. § 66-3-305

In Counts I and II of the original complaint the trustee contends that $ 13,000,000 of the $ 15,000,000 paid to the Fullers in the form of cash or obligations was paid or incurred as a liability of Southwest rather than the corporation purchasing the Fullers' stock, SAI. The trustee claims that at October 31, 1984 Southwest had a book-value net worth of $ 6,460,000, therefore these **[\*58]** conveyances violated Tennessee's insolvency constructive fraudulent conveyance statute, Tenn.

Code Ann. § 66-3-305, because (i) neither the Fullers nor Exchange provided fair consideration in return for the cash conveyed or obligations assumed by Southwest under the 1984 stock purchase, non-compete/consulting, or Exchange loan agreements, and (ii) these obligations prejudiced Southwest's creditors by rendering the debtor insolvent.

*HN12*[⬆️] Section 66-3-305 of TUFCA provides as follows:

> **Conveyances by insolvent without fair consideration declare fraudulent.** - Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without fair consideration.

Fair consideration, in turn, is defined by § 66-3-304 as follows:

> *HN13*[⬆️] Fair consideration is given for property, or obligation:
> (1) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith property is conveyed or an antecedent debt is satisfied; or
>
> (2) When such property or obligation is received in good faith to secure **[\*59]** a present advance or antecedent debt in amount not disproportionately small as compared with value of the property or obligation obtained.

*HN14*[⬆️] To avoid or recover a particular conveyance under Tenn. Code Ann. § 66-3-305 the trustee must allege and ultimately prove that transfers of the debtor's property were made when the debtor was insolvent, and that the debtor did not receive, in good faith, a fair equivalent of the property transferred or the obligation assumed.

It is well established, however, that before a trustee is able to utilize the applicable law referred to in § 544(b), he must allege and ultimately prove that at

---

[55] See also Lippi v. City Bank, 955 F.2d 599, 610 (9th Cir. 1992); Kupetz v. Wolf, 845 F.2d 842, 846 (9th Cir. 1988)(Calif.UFCA); Crowthers McCall Pattern, Inc. v. Lewis, 129 Bankr. at 997-998; C-T of Virginia, Inc. v. Barrett (In re C-T of Virginia), 124 Bankr. 694, 698-699 (W.D.Va. 1990); Wieboldt Stores, Inc., 94 Bankr. at 500-504; Murphy v. Meritor Savings Bank (In re O'Day Corp.), 126 Bankr. 370, 393 (Bkrtcy.D.Mass. 1991); Yoder v. T.E.L. Leasing (In re Suburban Motor Freight, Inc.), 124 Bankr. 984, 998 (Bkrtcy.S.D.Ohio 1990); In re Revco D.S., Inc., 118 Bankr. at 520 (Bkrtcy.N.D.Ohio 1990); Webster v. Barbara (In re Otis & Edwards, P.C.), 115 Bankr. 900, 918 (Bkrtcy.E.D.Mich. 1990); In re Vadnais Lumber Supply, 100 Bankr. at 134-135.

[56] Pp. 7-19, Congress/Talcott Brief in Supp. of Sum. Judg. Mo., Court File No. 68.

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc  In re
Southwest Equip. Rental    Page 25 of 38

Page 25 of 38

the time of the 1984 LBO there was, in fact, a creditor in existence holding an allowable unsecured claim under 11 U.S.C. § 502. The trustee must also prove that the transaction could have been avoided by such a creditor, and that on the date the debtor filed for bankruptcy that creditor could still bring the same avoidance action the trustee seeks to bring under the applicable law. Parlon v. Claiborne (In re Kaylor Equipment & Rental, Inc.), 56 Bankr. 58, 60 (Bkrtcy.E.D.Tenn. 1985). [57]

 [*60] Having reviewed the record, the Court concludes that the trustee has not come forward with sufficient probative evidence to oppose the defendants' Rule 56 motions for summary judgment as they pertain to the existence of an actual unsecured creditor at the time the relevant transfers occurred. By simply arguing in a supporting memorandum of law that the existence of such a creditor will be established by the evidence produced at trial does not preclude entry of a summary judgment on this issue. The trustee has not presented any probative proof in support of his conclusory allegations. Consequently, the Court shall **GRANT** the defendants' motions for summary judgment with regard to Counts I and II of the complaint.

### 3. Validity of Talcott/Southern's Priority Status Under Tenn. Code Ann. §§ 66-3-310 and 311

In Count III of the complaint, the trustee seeks to avoid the $ 5,200,000 in secured obligations conveyed to Talcott/Southern by Southwest in exchange for the loan proceeds that were used to repay the 1984 Exchange National Bank/LaSalle National Bank loan. Allegedly, Talcott/Southern

---

[57] Accord Hunter v. Hansen (In re Hansen), 114 Bankr. 927, 933 (Bkrtcy.W.D.Ohio 1990); Ferrari v. Barclays Business Credit Inc. (In re Morse Tool, Inc.) 108 Bankr. 389, 391 (Bkrtcy.D.Mass. 1989); In re Turner, 78 Bankr. 166, 170 (Bkrtcy.E.D.Tenn. 1987); compare Anderson Industries v. Anderson (In re Anderson Industries), 55 Bankr. 922, 925-928 (Bkrtcy.W.D.Mich. 1985)(factually analogous to the present case and holding that § 544(b) provides the requisite creditor, and that the number of actual creditors, or the amount and validity of their claims are all irrelevant).

obtained this conveyance by either purchasing or accepting an assignment of the Exchange [*61] loan with the knowledge that Southwest had been rendered insolvent by the LBO. Therefore, by perpetuating the fraudulent conveyance initially made to Exchange, Talcott/Southern allegedly violated the good faith requirement of Tenn. Code Ann. § 66-3-304, which would void any protection afforded their security interest under Tenn. Code Ann. §§ 66-3-310 and 311 (Count III, Court File No. 7):

> Remedies of creditor on matured debt.- Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person accept a purchaser for fair consideration without knowledge of fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser:
>
> (1) Have the conveyance set aide or obligation annulled to the extent necessary to satisfy his claim; or
>
> (2) Disregard the conveyance and attach or levy execution upon the property conveyed.

Tenn. Code Ann. § 66-3-310 (1988);

> **Retention of property by good faith purchaser.** - A purchaser who, without actual fraudulent intent, has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation [*62] as security for repayment.

Tenn. Code Ann. § 66-3-311 (1988).

Talcott/Southern has produced affidavits indicating that there was no purchase or assignment of the 1984 Exchange working capital loan. The bona fide purchaser exceptions in Tenn. Code Ann. §§ 66-3-310 and 311, therefore, are inapplicable. This does not mean, however, the Talcott/Southern's motion for summary judgment on Count III should be denied, but only the Talcott/Southern is not entitled to the bona fide purchaser protection made available by §§ 66-3-310 and 311.

The trustee claims that he may void

Case 25-07009    Doc 9-6    Filed 04/02/25    Entered 04/02/25 16:06:58    Desc In re
Southwest Equip. Rental    Page 26 of 38

Page 26 of 38

Talcott/Southern's security interests under Tenn. Code Ann. § 66-3-305. Although Exchange was an actual creditor at the time of Talcott/Southern's 1985 loan to Southwest, Exchange was in no way prejudiced by the latter transaction. In fact, Exchange directly benefitted from it. For this reason, the trustee has failed to satisfy the 11 U.S.C. § 544(b) standing requirement of identifying an actual creditor which could attack the 1985 loan as a fraudulent conveyance under Tenn. Code Ann. § 66-3-305. Further, because the trustee has essentially asserted that Talcott/Southern's liability **[*63]** is derived from the 1984 LBO and because the Court shall grant summary judgments in favor of the defendants on Counts I and II, there is no longer any legal basis to support Count III of the original complaint. Consequently, summary judgment shall be **GRANTED** in favor of Talcott/Southern on Count III.

## 4. Fair Consideration Under Tenn. Code Ann. § 66-3-304

The trustee has moved for partial summary judgment on the issue of "fair consideration" as defined by Tenn. Code Ann. § 66-3-304, and as it relates to what the Fullers and Exchange conveyed in return for either cash or obligations secured by Southwest's property. *HN15*[⬆] The trustee has the burden of proof on this issue, as lack of fair consideration is a material element under both Tenn. Code Ann. §§ 66-3-306 & 307. See Webster v. Barbara (In re Otis & Edwards, P.C.), 115 Bankr. 900, 907 (Bkrtcy.E.D.Mich. 1990)(Mich. UFCA). Despite the Fullers arguments to the contrary, the Court is free to determine whether the debtor received fair consideration under the UFCA before it considers the issues of insolvency or capitalization. If Southwest did receive fair consideration, then the Court's inquiry under **[*64]** Tenn. Code Ann. §§ 66-3-306 & 307 is at an end, and the issue of the debtor's resulting financial condition is rendered moot. Murphy v. Meritor Savings Bank (In re O'Day Corp.), 126 Bankr. 370, 393 (Bkrtcy.D.Mass.1991).

By definition, "fair consideration" is made up of two components, (1) an exchange of a fair equivalent (2) made in good faith. Tabor Realty, 803 F.2d at 1296-97. Consideration that fails to satisfy either component, will not satisfy the definitional test for fair consideration.

The good faith requirement has been equated with lack of knowledge of insolvency. Id. Several other factors, however, are relevant to the determination of good faith: (1) whether the transferee possessed an honest belief in the propriety of the activities in question, (2) whether there was any intent to take unconscionable advantage of others, and (3) whether there was any intent to, or knowledge of the fact that: the activities in question will, hinder, delay, or defraud others. In re Otis & Edwards, P.C., 115 Bankr. at 910. Here, however, good faith in the context of fair consideration is a disputed **[*65]** issue of material fact, which will preclude entering summary judgment on this basis. In re Chicago, Missouri & Western Ry. Co., 124 Bankr. at 772; Kaiser Steel Corp. v. Jacobs (In re Kaiser Steel), 87 Bankr. 154, 162 (Bkrtcy.D.Colo. 1988); Parlon v. Claiborne (In re Kaylor Equipment Rental, Inc.), 56 Bankr. 58, 61 (Bkrtcy.E.D.Tenn. 1985); Anderson Industries v. Anderson (In re Anderson Industries), 55 Bankr. 922, 925-928 (Bkrtcy.W.D.Mich. 1985).

Turning to the alternative determination of "fair equivalence," *HN16*[⬆] the Courts inquiry must be directed at what the debtor surrendered and what the debtor received. Murphy v. Meritor Savings Bank (In re O'Day Corp.), 126 Bankr. 370, 393 (Bkrcy.D.Mass. 1991); Ohio Corrugating Co. v. DPAC, Inc. (In re Ohio Corrugating Co.), 91 Bankr. 430, 436 (Bkrtcy.N.D.Ohio 1988). Generally, the evidence must show some economic benefit to the debtor as a result of the transfer. Therefore, a transfer that is solely for the benefit of a third party is not a reasonable or fair equivalent under **[*66]** the UFCA. Murray v. Prescott, Ball & Turben, Inc. (In re Chicago, Missouri & Western Ry. Co.), 124 Bankr. 769, 772-773 (Bkrtcy.N.D.Ill. 1991);. Pembroke Development Corp. v.

Commonwealth S. & L Asso., 124 Bankr. 398, 400-401 (Bkrtcy.S.D.Fla. 1991). The transactions benefit to the debtor, however, need not be a direct one. Ohio Corrugating Co. v. Security Pacific Bus. Cred. Inc. (In re Ohio Corrugating Co.), 70 Bankr. 920, 927 (Bkrtcy.N.D.Ohio 1987)(Ohio UFCA). Instead, the benefit may come to the debtor indirectly through benefit to a third party. Id.

Although Southwest received no benefit for the $ 3,000,000 of security interests conveyed as collateral for the Fullers' note, and the entire transaction reduced, rather than increased Southwest's ability to borrow additional working capital, the parties do not dispute what was actually exchanged in the 1984 LBO. The benefits received by Southwest, however, consisted of no more than the additional credit provided by that portion of the $ 7,000,000 working capital credit line that exceeded the $ 5,200,000 security interest conveyed to Exchange for **[\*67]** the loan proceeds paid to the Fullers, and whatever indirect benefit could have been derived from new ownership, management and the Fullers' "consulting services." The LBO participants, on the other hand, did directly benefit from these transfers, with SAI receiving title to all of Clyde Fuller's Southwest stock and the accompanying controlling interest in the debtor.

Assuming arguendo that Southwest indirectly benefitted from SAI's acquisition of the Fullers' stock, *HN17*[🔼] where the corporate debtor is insolvent, stock in the hands of a controlling shareholder is virtually worthless. In this situation, an exchange of such shares for either a well secured note of the debtor, or cash would not constitute a fair equivalent under the TUFCA Brown v. Riley (In re Omni Mechanical Contractors, Inc.), 114 Bankr. 518, 531 (Bkrtcy.E.D.Tenn. 1990) (citing Hyde Properties v. McCoy, 507 F.2d 301, 307 (8th Cir. 1974)). The effect of a corporation's insolvency on the value of its stock, however, is a question of material fact, Anderson Industries, Inc. v. Anderson (In re Anderson Indus.), 55 Bankr. 922, 927 (Bkrtcy.W.D.Mich. 1985), **[\*68]** and the record in

its current form could not support such a valuation finding at this time. For these reasons, therefore, the trustee's motion for partial summary judgment on the question of fair consideration will be **DENIED.**

## E.  Voidable Preferences Under 11 U.S.C. § 547(b) and the Ordinary Course of Business Exception Under 11 U.S.C. § 547(c)(2)

In P 37 of Count V in his complaint, the trustee seeks to avoid and recover as preferences under 11 U.S.C. §§ 547(b) and 550(a) the $ 89,123.56 received by the Fullers in two payments, $ 30,000 on December 10, 1987 and $ 59,123.56 on December 29, 1987, for reimbursement of taxes previously paid by the Fullers on behalf of the debtor.

In P 38 of Count V in his complaint, the trustee also seeks to avoid and recover as a preference under 11 U.S.C. §§ 547(b) and 550(a) the $ 105,770.94 received by the Fullers within 90 days of the debtor's bankruptcy filing as payment under the non-compete and consulting agreement.

*HN18*[🔼] Pursuant to 11 U.S.C. § 547(g), the **[\*69]** trustee has the burden of proving that all three transfers are voidable as preferences under 11 U.S.C. § 547(b). The latter subsection allows the trustee to avoid certain transfers made prior to commencement of the debtor's bankruptcy case:

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property -
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made -

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc In re Southwest Equip. Rental   Page 28 of 38

Page 28 of 38

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if-

(A) the case were a case under chapter 7 of this title; [58]

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the event provided by the provisions of this title.

Unless the trustee proves each and every one of the elements [*70] listed in § 547(b)(1)-(5), the transfer at issue will not be avoidable as a preference under § 547(b), or recoverable against the transferee under § 550(a). In re Fulghum Constr. Corp., 706 F.2d 171, 172, (6th Cir.), cert. denied sub. nom. Ranier & Associates v. Waldschmidt, 464 U.S. 935, 78 L. Ed. 2d 310, 104 S. Ct. 342, 104 S. Ct. 343, and cert. denied sub nom. Waldschmidt v. Ranier & Associates, 464 U.S. 935, 78 L. Ed. 2d 310, 104 S. Ct. 342, 104 S. Ct. 343 (1983). See generally DuVoisin v. Kennerly, Montgomery, Howard, & Finley (In re SIBC), 126 Bankr. 294, 298-300 (E.D.Tenn. 1991)(regarding the scope of § 550(a)).

[*71] In their motion for summary judgment the Fullers attack the trustee's preference claims from two angles. First, the Fullers challenge the trustee's ability to successfully prove the existence of all of the requisite elements listed in § 547(b) by arguing that none of the 1987 transfers listed in Count V of the complaint was for an antecedent debt alternately, the Fullers attempt to utilize 11 U.S.C. § 547(c)(2), the ordinary course of business exception to § 547(b), in connection with the 1987 payment under the noncompete/consulting agreement

With regard to the alleged 1987 tax reimbursements, the Fullers have introduced Clyde Fuller's deposition testimony in support of the contention that Southwest, through Thiele, placed matching funds in the Fullers' bank account prior to the Fullers paying any amount on behalf of Southwest. [59] In response the trustee has only questioned the credibility of Clyde Fuller's testimony, without providing any other evidence to support his claim that a genuine issue of material fact exists as to whether the payments were, in fact, for antecedent debts. As the trustee has the burden of proof regarding the antecedent [*72] nature of the debts paid, and this question is a critical element of his claim to recover the money transferred as preferences, the Court concludes that his response is insufficient to preclude entry of a summary judgment in the Fullers favor. Therefore, the Fullers' motion for summary judgment shall be **GRANTED** as to the transfers described in P 37 in Count V of the complaint.

With regard to the 1987 payment received by the Fullers under the noncompete/consulting agreement, the Court concludes this transfer was for an antecedent debt *HN19*[⬆] while the Bankruptcy Code does not define the term "antecedent debt," the term includes a debt incurred before the transfer. Whittier v. BancOhio Nat'l Bank (In re Lamons), 121 Bankr. 748, 750 (Bkrtcy.S.D.Ohio 1990) (citing 4 Collier on Bankruptcy P 547.05 at 547-33). A debt is not

---

[58] See Emerson v. Marty (In re Mark Benskin & Co., Inc.), 135 Bankr. 825 (Bkrtcy.W.D.Tenn. 1991), holding that where the debtor is insolvent, the transferee creditor would have received more under the preferential transfer because there would be insufficient assets to pay all debts in full under Chapter 7 due to the debtor's insolvency. This test was said to satisfy the statutory requirement under 11 U.S.C. § 547(b)(5).

[59] Ex. H, Appx. to Fullers' Sum. Judg. Mo., Accomp. Court File No. 112.

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc In re Southwest Equip. Rental   Page 29 of 38

Page 29 of 38

incurred until a debtor has a legal obligation to pay. Id. at 751. **[\*73]** Despite the Fullers' argument that the noncompete/consulting agreement was executory, the Court interprets the plain language of the agreement a sufficient to impose a legal obligation for Southwest to pay each of them $ 250,000 year. Consequently, the Fullers' motion for summary judgment with respect to P 38 in Count V of the complaint shall be **DENIED.**

Finally, the Court concludes that while the Fullers' attempt to utilize the affirmative defense of 11 U.S.C. § 547(c)(2) is premature because the trustee has not yet proved that the 1987 payment under the noncompete/consulting agreement is a preferential transfer, were their motion timely on this issue it would still be denied. *HN20*[⬆] Pursuant to 11 U.S.C. § 547(g), the Fullers have the burden of proving the nonavoidability of a transfer under § 547(c)(2). In re Fred Hawes Organization, Inc., 957 F.2d 239, 242-44 (6th Cir. 1992); Scott v. Almiro Fur Fashion Design (In re Fisher), 100 Bankr. 351, 356 (Bkrtcy.S.D.Ohio 1989) (citing Waldschmidt v. Ranier (In re Fulghum), 14 Bankr. 293, 306 (M.D.Tenn. 1981), **[\*74]** aff'd in part and vacated and remanded on other grounds, 706 F.2d 171 (6th Cir. 1983)).

*HN21*[⬆] 11 U.S.C. § 547(c)(2) states:

(c) The trustee may not avoid under this section a transfer-

(2) to the extent that such transfer was-

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs for the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

The purpose of this exception is to leave undisturbed normal financing relations with the debtor's trade creditors, because such do not detract from the general policy to discourage unusual action by either the debtor or his creditors during the debtor's decline into bankruptcy. As the

provision is written in the conjunctive, a creditor attempting to satisfy § 547(c)(2) must prove all three elements of that subsection. In re Fred Hawes, 957 F.2d at 243.

Subsections (B) and (C) of § 547(c)(2) respectively comprise a subjective and objective component. The subjective prong, **[\*75]** § 547(c)(2)(B), requires proof that the suspect transfer was ordinary in relation to the business dealings between that creditor and that debtor. The objective prong, § 547(c)(2)(C), on the other hand, requires proof that the relevant transfer was ordinary under industry wide standards and practices, rather than just the creditor's interaction with other similarly situated debtors. Acknowledging that a long term debt obligation may fall within the ordinary course of business exception to § 547(b), Union Bank v. Wolas, _U.S._, 112 S.Ct 527, 116 L. Ed. 2d 514, 519-523 (1991), and assuming for the sake of argument that the transfer was ordinary as to the ordinary course of dealing between the Fullers and Southwest, the Fullers have not presented sufficient evidence concerning industry-wide practices which would entitle them to a summary judgment under § 547(c)(2)(C). Therefore, even in light of the conclusory statements in Patrick E. Quinn's supporting affidavit, [60] the Fullers' motion for summary judgment on this issue will also be **DENIED.**

### **[\*76]   F. _Equitable Subordination Under 11 U.S.C. § 510_**

Count IV of the trustee's complaint seeks to equitably subordinate any secured claim held by any of the defendants which arose in connection with the allegedly fraudulent leveraged buyout and related transfers under 11 U.S.C. § 510(c). [61] The

---

[60] Ex. J, Appx. to Fullers' Sum. Judg. Mo., Accomp. Court File No. 112.

[61] The controlling statutory provision is 11 U.S.C. § 510:

(c) Not withstanding subsections (a) and (b) of this section, after notice and a hearing, the court may -

(1) under principles equitable subordination, subordinate for

Fullers, however, maintain that the trustee is equitably estopped from subordinating any claim arising out of this litigation as he induced them to waive all claims against the estate as part of an agreement allowing Clyde Fuller to purchase certain Southwest assets. LaSalle, on the other hand, objects to equitable subordination because it has not asserted a claim against the debtor's bankruptcy estate. Finally, Talcott/Southern claims that the trustee is estopped from seeking equitable subordination due to the express terms of the November 24, 1987 Forbearance Agreement executed by Southwest, and the trustee's stipulation in a January 8, 1988 order of the bankruptcy court in which the trustee approved additional post-petition financing to Southwest.

  **[\*77]** Equitable subordination is an extraordinary

---

purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; . . .

*HN22*[⬆] ] In applying this statute, the courts have adopted a three-part test for determining whether equitable subordination is appropriate:

(1) The claimant must have engaged in some type of inequitable conduct;

   (2) The misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant.

   (3) Subordination must not be inconsistent with the provisions of the Bankruptcy Code.

 Bergquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.), 850 F.2d 1275, 1281 (8th Cir. 1988). See United States v. Mansfield Tire & Rubber Co. (In re Mansfield Tire & Rubber Co.), 942 F.2d 1055, 1061-1062 (6th Cir. 1991) cert. denied sub nom. Krugliak v. United States, _U.S._, 112 S. Ct. 1165, 117 L. Ed. 2d 412 (1992) (a claim is generally subordinated only if the holder of such claim is guilty of inequitable conduct, or the claim itself is of a status susceptible to subordination, such as penalty . . . .); Gaff v. FDIC, 919 F.2d 384, 392-394 (6th Cir. 1990). In this context, the term misconduct has been interpreted to include inter alia fraud, illegality, breach fiduciary duties, bad faith, undercapitalization and the claimant's use of the debtor as a mere instrumentality or alter ego. Ashbrook v. Block, 917 F.2d 918, 926 (6th Cir. 1990).

remedy. The misconduct which warrants the imposition of this remedy must be substantial. Gross or egregious misconduct must be established before a claim can be equitably subordinated in non-insider cases. Blaine-Hays Construction Co. v. Union Planters Nat'l Bank (In re Edgewater Motel, Inc.), 121 Bankr. 962, 973 (Bkrtcy.E.D.Tenn. 1988) (citing cases). [62]

At this point, the record is not conclusive of whether any of the defendants' actual or potential claims may be subject to equitable subordination. The answer to this **[\*78]** question depends on the final resolution of the trustee's substantive claims, which in turn will depend on certain facts emerging from the trial. Similarly, the record is inconclusive on whether the trustee is estopped from seeking the remedy of equitable subordination, either collaterally, equitably, or judicially, under the principles set forth in Teledyne Industries, Inc. v. N.L.R.B., 911 F.2d 1214, 1218, 1219-1220 (6th Cir. 1990). [63] Such necessarily precludes entering a summary judgment in favor of the defendants on Count IV, therefore their respective motions regarding this issue shall be **DENIED.**

## VI. Additional Conclusions of Law

In their respective briefs the parties have raised issues of law which, while not immediately relevant to the motions currently pending before the Court, shall by virtue of the trustee's amended complaint have a determinative impact on the **[\*79]** outcome of this case.

### A. *Proper Method for Determining Insolvency*

The issue of insolvency is relevant to the trustee's

---

[62]  See also Mason Dixon Lines v. First Nat'l Bank of Boston, 883 F.2d 2, 4 (4th Cir. 1989); Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.), 848 F.2d 414, 419-420 (3rd Cir.), cert. denied, 488 U.S. 967, 102 L. Ed. 2d 532, 109 S. Ct. 495 (1988); FDIC v. Berry, 659 F. Supp. 1475, 1486 (E.D.Tenn. 1987).

[63]  See also Reynolds v. C.I.R., 861 F.2d 469, 472-73 (6th Cir. 1988).

remaining claims under §§ 547(b) and 548 of the Bankruptcy Code, and §§ 66-3-306 and 307 of the TUFCA. These statutes, however, incorporate different insolvency standards.

The Bankruptcy Code utilizes a balance-sheet insolvency analysis which tests whether at the time of a particular transfer the transferor's debts exceeded the "fair valuation" of its assets, exclusive of property exempted or fraudulently transferred. 11 U.S.C. § 101(32)(A) (1992); Brown v. Riley (In re Omni Mechanical Contractors, Inc.), 114 Bankr. 518, 521-22 (Bkrtcy.E.D.Tenn. 1990). See generally In re Taxman Clothing Co., Inc., 905 F.2d 166 (7th Cir. 1990); DuVoison v. Anderson (In re Southern Industrial Banking Corp.), 71 Bankr. 351, 356-357 (Bkrtcy.E.D.Tenn. 1987); Parlon v. Claiborne (In re Kaylor Equipment & Rental, Inc.), 56 Bankr. 58, 61 (Bkrtcy.E.D. Tenn. 1985); 15A Fletcher Cyc. Corp. § 7360, pp. 11-13 (1990 Rev. Vol.). [*80]

Under the balance-sheet definition of insolvency, factual findings must be made as to the fair valuation of the debtor's assets. In this context, fair valuation does not mean historical value or cost, or refer to the value of the debtor's assets under the worst or best circumstances. Instead, fair valuation is measured by a hypothetical liquidation of the debtor's assets over a reasonable period of time. DuVoison v. Anderson (In re Southern Industrial Banking Corporation), 71 Bankr. 351, 356-357 (Bkrtcy.E.D.Tenn. 1987). [64] It is this analysis which the Court shall apply to the trustee's § 547 preference and § 548 fraudulent conveyance claims after first evaluating the evidence introduced at trial.

[*81]  The TUFCA, on the other hand, utilizes a more traditional equity insolvency analysis which tests whether the transferor is able to meet its obligations as they come due in the ordinary course of business. Tenn. Code Ann. § 66-3-302; Brown, 114 Bankr. at 530. Therefore, with regard to the issue of insolvency and the trustee's state law fraudulent conveyance claims, the evidence introduced at trial must be weighed in light of the considerations announced by Bankruptcy Judge John C. Cook in Brown v. Riley, supra:

> The equity-insolvency test is not a bright line test. A corporation operating as a going concern under normal conditions with significant shareholder equity is a strong indication that no issue should arise under this test. In contrast, a corporation encountering difficulties or in an uncertain position concerning liquidity or operations may have to address the issue when considering distributions or stock redemptions. Various factors and judgments will determine whether the equity-insolvency test has been met. These include the ability to generate funds from existing and contemplated demand for the corporation's [*82] goods or services which will satisfy existing and anticipated obligations as they come due. Another relevant consideration is whether a cash flow analysis of the corporation, considering the business forecast, the budget, and a sufficient time period, permits a conclusion that obligations will be paid as they mature. If the corporation has any debt, the ability of the corporation to refinance the debt is important. Also, the general availability of credit to the corporation to enable it to continue normal business operations is a factor. Finally, to the extent the corporation may be subject to asserted or unasserted contingent liabilities, these must be estimated and considered in the evaluation.

114 Bankr. at 530 (citations omitted). [65]

---

[64] Fair valuation is not synonymous with liquidation value, although it may be appropriate to reduce or eliminate the value of assets which cannot be made available for payment of debts within a reasonable time, and to discount the value of accounts receivable for uncollectible and disputed debts. See Brown, 114 Bankr. at 521.

[65] Compare John Ownbey Co., Inc. v. C.I.R., 645 F.2d 540 (6th Cir. 1981); Hyde Properties v. McCoy, 507 F.2d 301, 307 (6th Cir. 1974) ((The statutory provision anticipates a voluntary, open market sale of all of an individual's assets. If the fair market value of the individual's property will not cover his obligations as they fall due,

[*83] Insolvency is a mixed question of law and fact. Tabor Realty, 803 F.2d at 1303; Ohio Corrugating, 70 Bankr. at 927. Having identified the proper methods for determining insolvency, under 11 U.S.C. § 548 and UFCA § 2, the burden of proving by a preponderance of the evidence either balance-sheet or equity insolvency generally lies with the party challenging the validity of the transfer. Calhoun v. Baylor, 646 F.2d 1158, 1163 (6th Cir. 1981); Ohio Corrugating Co. v. DPAC, Inc. (In re Ohio Corrugating Co.), 91 Bankr. 430, 433 (Bkrtcy.N.D.Ohio 1988). The burden of proving that the corporation was solved at the time the suspect transfer occurred, however, shifts to the transferee if lack of consideration is proved by the trustee. Moody v. Security Pacific Bus. Cred., Inc., 127 Bankr. 958, 993 (D.Mass. 1991) (Pa.UFCA); Ohio Corrugating, 70 Bankr. at 927 (Ohio UFCA).

### B. Determining Unreasonably Small Capital

The trustee's fraudulent conveyance claim in Count VIII [*84] of his amended complaint is based on Tenn. Code Ann. § 66-3-306, which permits avoidance of a transfer made without fair consideration if it left the debtor with unreasonably

---

the debtor is insolvent.); United States v. Kerr, 470 F.Supp 278 (E.D.Tenn. 1978); with Seals v. Sears, Roebuck & Co., Inc., 688 F. Supp. 1252, 1258 (E.D.Tenn. 1988)(a products liability case analyzing Tenn. Code Ann. § 29-28-106(b)'s manufacturer insolvency requirement and bring to the Tennessee analysis under § 66-3-302 as a "flexible" balance-sheet type determination for insolvency); Cate v. Nicely (In re Knox Kreations, Inc.), 474 F. Supp. 567, 571-72 (E.D.Tenn. 1979), aff'd in part, rev'd in part, 656 F.2d 230 (6th Cir. 1981)(applying the Bankruptcy Act of 1898, as amended by the Chandler Act of 1935)(Knox Kreations involved an attempt by the case trustee to void a $ 200,000 security interest which was conveyed by the debtor in the form of a guarantee for a purchase of 81% of the former owner's stock. In its review of the trustee's appeal from the bankruptcy court, the district court held that the interest of the parties in a healthy corporation was another factor to be considered in determining insolvency under Tennessee's constructive fraudulent conveyance statute. In addition, the court stated that application of a strict balance sheet analysis for insolvency neglects the flexible approach utilized in Tennessee, and that the surest sign of the insolvency of a corporation is the worthlessness of its stock.). See generally, 4 Tenn. Juris., Bankruptcy, § 6, on Fraudulent Conveyances, pp.424-29 (1991); 13 Tenn. Juris., Fraudulent and Voluntary Conveyances, §§ 3 and 4 nn. 20 and 1, § 14 (1991).

---

small capital to carry on its business. Like insolvency, whether a transfer leaves a corporation with "unreasonably small capital" is a mixed question of law and fact. Moody, 127 Bankr. at 996; Yoder v. T.E.L. Leasing (In re Suburban Motor Freight, Inc.), 124 Bankr. 984, 998-999 (Bkrtcy.S.D.Ohio 1990). See Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply), 100 Bankr. 127, 137 (Bkrtcy.D.Mass. 1989).

Generally, a corporation's insolvency is relevant to a finding of unreasonably small capital, because a transfer rendering the corporation insolvent will have the practical effect of leaving the corporation with unreasonably small capital. Neither insolvency under the equity insolvency test, however, nor the capital condition of a corporation on a specific date is dispositive of the issue, as was recognized by the First Circuit in Barrett v. Continental Nat'l Bank & Trust, 882 F.2d 1 (1st Cir. 1989), [*85] cert. denied, 494 U.S. 1028, 108 L. Ed. 2d 613, 110 S. Ct. 1476 (1990):

> We believe that the proper application of § 5 requires a court to examine a company's capital throughout a reasonable period of time surrounding the precise date the challenged transfer. This approach avoids the risk of ascribing undue weight to the state of a company's balance sheet on a particular day, and ally's the court to make a realistic assessment of the impact of a transfer on a company's ability to conduct its affairs . . . .

> "Unreasonably" is clearly a relative term and demands, for purposes of § 5, the sort of relative, contextual judgment which looks to both the ends served by § 5 and the overall state of affairs surrounding the transferor corporation and the challenged transfer itself. The critical inquiry when considering ether a transfer or conveyance has left a company with an unreasonably small capital is, therefore, one that weighs raw financial data against both the nature of the enterprise itself and the extent of the enterprise's need for capital during the

period in question.

Id., 882 F.2d at 4 (applying the Massachusetts' UFCA, which is identical to [*86] Tenn. Code Ann. § 66-3-306, and discussing the Third Circuit's approach in Gleneagles Inv. Co., Inc., 565 F. Supp. 556 (M.D.Pa 1983), aff'd sub nom., United States v. Tabor Realty Corp., 803 F.2d 1288 (3rd Cir. 1986). Instead, the fact finder must examine the relationship between the amount of capital remaining in the business after the transfer, and the corporation's ability to continue operations during that period in the same manner as it conducted them before the transfer. See In re Suburban Motor Freight, Inc., 129 Bankr. at 999; 15A FLETCHERS CYC. CORP. § 7405.55 (Perm. ed., 1990 Rev. Vol., 1991 Pkt. Pt.). In this situation, while the burden of proof initially lies with the trustee, upon a showing of lack of fair consideration, the burden shifts to the defendants to prove that Southwest was not left with unreasonably small capital after the 1984 or 1985 transfers. See Credit Managers Asso. of So. Calif. v. Federal Co., 629 F. Supp. 175, 182-183 (C.D.Calif. 1986).

## V. Case Status

In conclusion, summary judgment shall be **GRANTED** favor of the Fullers [*87] with regard to P 37 in Count V, and in favor of all the defendants With regard to Counts I, II, III, and VII of the trustee's original complaint. Consistent with this Court's rescheduling order entered May 4, 1992 (Court File No. 146), and by virtue of the Magistrate's order of February 27, 1992 granting the Trustee's motion to file an amended complaint (Court File No. 123), the parties shall proceed to trial on the following issues:

(1) Whether the $ 105,770.94 payment from Southwest to the Fullers under the non-compete and consulting agreement, which was received by the Fullers within 90 days of Southwest's bankruptcy filing, is a voidable preference under 11 U.S.C. § 547(b) (P 38 of Count V, Trustee's Original Complaint, Court File No.

1);

(2) Whether the $ 480,777.00 in payments from Southwest to the Fullers under the non-compete and consulting agreement which were received by the Fullers within one year of Southwest's bankruptcy filing, were fraudulent conveyances under 11 U.S.C. § 548(a)(2)(A) and (a)(2)(B)(i)(Count VI, Trustee's Original Complaint);

(3) Whether under Tenn. Code Ann. § 66-3-306 the [*88] trustee may avoid the 1984 LBO and 1985 loan transactions with the defendants because these transfers left Southwest with unreasonably small capital (Count XIII, Trustee's Amended Complaint Court File No. 124);

(4) Whether under Tenn. Code Ann. § 66-3-307 the trustee may avoid the 1984 LBO and 1985 loan transactions with the defendants because these obligations were incurred without fair consideration when the transferor intended or believed that Southwest was incurring debts beyond its ability to pay as they came due (Count IX Trustee's Amended Complaint);

(5) Whether, in connection with the 1984 LBO and the 1985 loan transactions, any of the defendants breached their fiduciary duties to Southwest (Count XI, Trustee's Amended Complaint);

(6) Whether under 11 U.S.C. § 550 the trustee may recover all monies received by the Fullers, Exchange/LaSalle, or Talcott/Southern in connection with the alleged voidable transfers for Southwest's bankruptcy estate (Count X, Trustee's Amended Complaint);

7) Whether any of the defendants claims against Southwest's bankruptcy estate, whether post-petition, pre-petition, or resulting from this litigation, should [*89] be subject to equitable subordination under 11 U.S.C. § 510 (Count IV, Trustee's Original Complaint).

An appropriate order will enter.

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc In re
Southwest Equip. Rental   Page 34 of 38

Page 34 of 38

R. ALLAN EDGAR

UNITED STATES DISTRICT JUDGE

**ORDER** - July 9, 1992, Filed

In accordance with the accompanying memorandum opinion, it is hereby **ORDERED** that the defendants' respective motions for summary judgment are **GRANTED** with regard to Counts I, II, III, VII, and P 37 of Count V in the plaintiff's complaint. Pursuant to Fed. R. Civ. P. 56. Pursuant to Fed. R. Civ. P. 56, said counts in the plaintiff's complaint are **DISMISSED WITH PREJUDICE.**

It is **FURTHER ORDERED** that the defendants' motions for summary judgment respect to Counts IV and P 38 of Count V of the plaintiff's complaint, and the plaintiff's motion for partial summary judgment on the issue of fair consideration are **DENIED.**

R. ALLAN EDGAR

UNITED STATES DISTRICT JUDGE

**Table1** ([Return to related document text](#))

| # Tractors | Model Year | Lienholder |
|---|---|---|
| 40 | 1981 | Kenworth Tractors (prior lien of Associates Discount Corporation); |
| 10 | 1981 | Kenworth Tractors (prior lien of Truckers Bank Plan); |
| 95 | 1982 | GMC Tractors (prior lien of Associates Discount Corporation); |
| 50 | 1982 | Freightliner tractors with prior lien of Mercedes-Benz Credit Corporation). |
| 195 Total | | |

**Table1** ([Return to related document text](#))

---

**Table2** ([Return to related document text](#))

| | | | |
|---|---|---|---|
| i) | restrictive covenant | $ 215,000 | |
| ii) | consulting agreement | 35,000 | |
| | | $ 250,000 | Total |

**Table2** ([Return to related document text](#))

---

**Table3** ([Return to related document text](#))

| BALANCE SHEET | 12/31/83 | 10/31/84 | 12/31/84 |
|---|---|---|---|
| ASSETS (in thousands of dollars | | | |
| Accounts Receivable - trade, less allowance | | | |
|     for doubtful accounts | $ 3,566 | $ 5,167 | $ 6,016 |
| Accounts Receivable - officers and affiliates | 919 | 7 | |
| Drivers Advances | 330 | 566 | 390 |
| Inventories | 349 | 329 | 462 |
| Property, plant and equipment | 15,952 | 22,205 | 25,996 |
| Other Assets | 157 | 289 | 568 |
| Total Assets | $ 21,273 | $ 28,563 | $ 33,432 |

**Table3** ([Return to related document text](#))

---

**Table4** ([Return to related document text](#))

| LIABILITIES AND STOCKHOLDERS EQUITY | | | |
|---|---|---|---|
| (in thousands of dollars) | | | |
| Accounts Payable | $ 3,869 | $ 3,335 | $ 4,060 |
| Accrued Expenses | 367 | 898 | 854 |

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc In re
Southwest Equip. Rental   Page 36 of 38

Page 36 of 38

| | | | |
|---|---|---|---|
| Notes Payable (combined w/equipment obligations on 12/31/84 audit) | 255 | 432 | 26,480 |
| Equipment Obligations | 9,928 | 17,216 | |
| Deferred Income Taxes | 511 | 202 | 2 |
| | | | |
| Total Liabilities | $ 15,130 | $ 22,103 | $ 31,396 |
| | | | |
| *10 year Noncompete Consulting Agreement | | $ 5,000 | $ 5,000 |
| | | | |
| *Total Adjusted Liabilities | | $ 27,103 | $ 36,396 |

## Table4 ([Return to related document text](#))

---

## Table5 ([Return to related document text](#))

| | | | |
|---|---|---|---|
| **Stockholders' Equity** | | | |
| Prior to November 2, 1984 | | | |
| Common Stock, $ 50 par value | | | |
| Authorized 4,000 shares; | | | |
| issued and outstanding 284 shares | | 14 | 14 |
| | | | |
| After November 2, 1984 | | | |
| Common Stock, no par value | | | |
| Authorized 4,000 shares; | | | |
| issued and outstanding 3,000 shares | | | 10 |
| | | | |
| Additional Paid-in Capital | 1,471 | 1,471 | 1,990 |
| Retained Earnings | 4,658 | 4,975 | 36 |
| | | | |
| Total Stockholders Equity | 6,143 | 6,460 | 2,036 |
| | | | |
| Total Liabilities | | | |
| and Stockholders Equity | $ 21,273 | $ 28,563 | $ 33,432 |
| | | | |
| *Total Adjusted Liabilities | | | |
| and Stockholders Equity | | $ 33,563 | $ 38,432 |

## Table5 ([Return to related document text](#))

---

## Table6 ([Return to related document text](#))

| INCOME STATEMENT | 12/31/83 | 10/31/84 | 11/01/84 |
|---|---|---|---|
| **(in thousands of dollars)** | | | **12/31/84** |
| Operating Revenue | $ 49,162 | $ 50,001 | $ 9,731 |
| | | | |
| Operating Expenses | 46,577 | 48,513 | 9,099 |

Case 25-07009   Doc 9-6   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc  In re
Southwest Equip. Rental   Page 37 of 38

Page 37 of 38

| INCOME STATEMENT | 12/31/83 | 10/31/84 | 11/01/84 |
|---|---|---|---|
| (in thousands of dollars) | | | 12/31/84 |
| Operating Income | 2,585 | 1,488 | 632 |
| Interest Income | 1,903 | 1,479 | 575 |
| Pre-Tax Income | 682 | 9 | 38 |
| Net Earnings | 152 | (308) | 36 |

**Table6 (**Return to related document text**)**

---

**Table7 (**Return to related document text**)**

[figures are in thousands of dollars]

| | |
|---|---|
| Net Property, plant, and equipment | $ 26,002 |
| Other assets | 6,358 |
| Total Assets | $ 32,360 |
| Long-term debt | $ 22,848 |
| Subordinated long-term debt | 3,000 |
| Other liabilities | 4,512 |
| Total Liabilities | $ 30,360 |
| Stockholders' equity | 2,000 |
| Total liabilities and stockholders' equity | $ 32,360 |

**Table7 (**Return to related document text**)**

---

**Table8 (**Return to related document text**)**

| Year Ending | October 31, 1984 Audit | December 31, 1984 Audit |
|---|---|---|
| 1985 | $ 6,380,000 | $ 6,599,000 |
| 1986 | 3,138,000 | 6,712,000 |
| 1987 | 2,883,000 | 3,696,000 |
| 1988 | 3,169,000 | 3,790,000 |
| 1989 | 2,079,000 | 5,683,000 |
| | $ 17,648,000 | $ 26,480,000 |

**Table8 (**Return to related document text**)**

Case 25-07009    Doc 9-6    Filed 04/02/25    Entered 04/02/25 16:06:58    Desc In re
Southwest Equip. Rental    Page 38 of 38

Page 38 of 38

End of Document