

**i** Cited

As of: April 2, 2025 8:29 PM Z

# Quinn v. Elite Custom Transporters & Motorcoaches, LLC

United States District Court for the District of Minnesota

May 16, 2011, Decided; May 16, 2011, Filed

Civil File No. 10-118 (MJD/AJB)

**Reporter**

2011 U.S. Dist. LEXIS 52362 *; 2011 WL 1869391

Patrick J. Quinn and Janet S. Quinn, Plaintiffs, v. Elite Custom Transporters and Motorcoaches, LLC, Homer F. Bruggeman, Brenda Bruggeman, and Gretchen Bruggeman, Defendants.

**Counsel:  [*1]** John C. Ekman and Kelly G. Laudon, Lindquist & Vennum PLLP, Counsel for Plaintiffs.

Peter J. Diessner, Brian S. McCool, and John M. Koneck, Fredrikson & Byron, PA, Counsel for Defendants.

**Judges:** Michael J. Davis, United States District Court Chief Judge.

**Opinion by:** Michael J. Davis

# Opinion

**MEMORANDUM OF LAW & ORDER**

## I. INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Summary Judgment [Docket No. 23] and Defendants' Motion for Partial Summary Judgment [Docket No. 21]. Oral argument was heard Friday, April 1, 2011.

## II. FACTUAL BACKGROUND

### A. Plaintiffs Contract for a Custom Motor Home

On or about May 31, 2003, Plaintiffs Patrick J. Quinn and Janet S. Quinn (collectively "Plaintiffs"), agreed to purchase a custom motor home from Jim Bruggeman and his company, Elite Trailers, Inc., d/b/a Elite Custom Coaches and Trailers, Inc. ("Elite #1") for $876,796.39. Jim Bruggeman is the husband of Defendant Brenda Bruggeman and the son of Defendants Homer and Gretchen Bruggeman. Plaintiffs paid Elite #1 the full contract price and delivered approximately $2,000 in personal property to Elite #1 for use in manufacturing the custom motor home. Ultimately, Jim Bruggeman and Elite #1 did not deliver the motor home,  **[*2]** and Plaintiffs' personal property and payment were never returned.

### B. Plaintiffs Commence Suit Against Jim Bruggeman and Elite #1

On November 8, 2004, Plaintiffs brought suit against Jim Bruggeman and Elite #1 in Hennepin County District Court for breach of contract, wrongful conversion of personal property, and unjust enrichment. Jim Bruggeman and Elite #1 failed to answer, and on February 9, 2005, the court entered default judgment in favor of Plaintiffs in the amount of $876,215.89. On August 16, 2005,

Jim Bruggeman moved the court to vacate the default judgment. Ultimately, despite concerns raised by the court concerning the purpose of the motion, the motion was granted and the default judgment was vacated.

After the default judgment was vacated Jim Bruggeman and Elite #1 failed to defend the lawsuit, and Plaintiffs moved for summary judgment on their claims. On June 26, 2006, the court entered summary judgment in favor of the Plaintiffs against Elite #1 for breach of contract and conversion in the amount of $1,009,141.30 plus interest, costs, and attorney's fees. The court, at that time, gave Jim Bruggeman another opportunity to answer Plaintiffs' discovery requests. On November **[*3]** 1, 2006, based on Jim Bruggeman's continued failure to respond, the court entered summary judgment against him for breach of contract and conversion in the amount of $1,023,893.62, plus interest, costs, and attorney's fees.

## C. Business of Elite #1 and Jim Bruggeman

When judgment was entered against Elite #1 and Jim Bruggeman in favor of Plaintiffs, Elite #1 was in the business of manufacturing custom trailers and motor coaches from its Leibel Street property in White Bear Lake, Minnesota. Elite #1's business focused on the racing industry, and included work for a number a racing organizations, including NASCAR and NHRA. The Leibel Street property where Elite #1 operated its business is owned by Jim and Brenda Bruggeman.

With the downturn of the economy, Elite #1's opportunities for business in the racing industry began to diminish. Jim Bruggeman began developing new business opportunities in the municipal fire and rescue industry, which led to work with the Miami-Dade County Fire Department. Despite Jim Bruggeman's attempts to expand the business of Elite #1, the company's liabilities greatly exceeded its assets.

## D. Loans and Financial Concerns of Elite #1

During its existence, Elite #1 **[*4]** entered into a number of loans. On March 18, 2002, JM Bruggeman Companies, Inc. ("JM Bruggeman"), another company owned by Jim Bruggeman, executed a $300,000 promissory note with Premier Bank. The note was signed and personally guarantied by Jim and Brenda Bruggeman. Although the note was to JM Bruggeman, both JM Bruggeman and Elite #1 entered into a commercial security agreement with Premier Bank. The security agreement for Elite #1 included a 1992 Kenworth tractor and a general security interest in all of Elite #1's inventory, equipment, and accounts. Additionally, this security agreement granted Premier Bank a security interest in the intangible assets related to the foregoing property. Premier Bank recorded this security interest by recording a UCC-1 Financing Statement with the Minnesota Secretary of State on March 25, 2002. In connection with this loan, Jim and Brenda Bruggeman granted Premier Bank a $300,000 mortgage on the Leibel Street property.

On January 10, 2003, Elite # 1 and JM Bruggeman executed a $210,000 promissory note with Premier Bank. The note was signed by Jim and Brenda Bruggeman on behalf of both companies. Once again, Elite #1 and JM Bruggeman entered into a **[*5]** commercial security agreement with Premier Bank, which was also signed by Jim and Brenda Bruggeman. The commercial security agreement for Elite #1 included three tractors and a general security interest in all of Elite #1's inventory, equipment, and accounts. Additionally, this security agreement granted Premier Bank a security interest in the intangible assets relating to foregoing property. Premier Bank recorded its security interest by recording a UCC-1 Financing Statement with the Minnesota Secretary of State on January 23, 2003. The note was personally guarantied by Jim and Brenda Bruggeman. Jim and Brenda Bruggeman also granted Premier Bank a $210,000 mortgage on their residence in Hugo, Minnesota.

Additionally, between 2002 and 2005, Homer Bruggeman made numerous loans to Jim and Brenda Bruggeman, Elite #1, and JM Bruggeman. In 2004 and 2005, Homer Bruggeman loaned a total of $123,637 to Elite #1 and Jim Bruggeman. Additionally, Homer made three loans to JM Bruggeman for $255,000. Homer also made a personal loan to Jim and Brenda Bruggeman in the amount of $350,000, in July of 2002. Furthermore, in 2003, Gretchen and Homer Bruggeman loaned Jim Bruggeman $100,000. Although all [*6] of these loans have matured, the debts remain outstanding, no efforts have been made to enforce the terms of the notes, and the debts have not been forgiven.

On August 4, 2005, Jim Bruggeman executed a $250,000 mortgage in favor of Homer Bruggeman on Jim Bruggeman's interest in the Leibel Street property. No promissory note related to this mortgage exists. Jim Bruggeman cannot remember if he received a $250,000 loan at the time he granted the mortgage, or if the mortgage was granted to secure past loans, but he believes that the mortgage was granted in relation to a contemporaneous loan.

Furthermore, Elite #1 and Jim Bruggeman owed payroll taxes to the IRS which, including penalties and fees, totaled more than $600,000. Jim Bruggeman worked with the IRS for two to three years in an effort to keep Elite #1 going, but was ultimately unsuccessful.

### E. Asset Purchase

On April 14, 2008, Elite #1 entered into an asset purchase agreement with a newly-formed company, Elite Custom Transporters and Motorcoaches, LLC ("Elite #2") by which Elite #1 would sell all its assets to Elite #2. According to the Asset Purchase Agreement, all of Elite #1's tangible assets, including capital equipment and inventory [*7] were transferred to Elite #2. Elite #1 also transferred its intangible assets, "including but not limited to, goodwill, trade secret, and trade dress"

to Elite #2. As consideration for the asset purchase, Elite #2 agreed to assume $285,302.62 of Elite #1's debt owed to Premier Bank. The debt assumed by Elite #2 included the $210,000 Premier Bank loan made to Elite #1 and JM Bruggeman, as well as a $75,000 loan made to Jim and Homer Bruggeman, which was used to purchase a Kenworth Freightliner tractor. In addition to these two loans, Elite #2 began making payments, and continues to make payments, on Premier Bank's $300,000 loan to JM Bruggeman. As of April 2008, the outstanding balance on the $210,000 loan was about $200,000, and the outstanding balance on the $300,000 was almost $300,000.

Elite #2 has not provided Premier Bank with any additional collateral or guaranties for either loan, nor has Elite #2 satisfied either loan or taken any action to officially assume the debt. Elite #1 is still the borrower on the $210,000 loan from Premier Bank. Additionally, Jim and Brenda Bruggeman remain the only mortgagors and guarantors of that loan.

Brenda Bruggeman owns 40 percent of Elite #2 [*8] and Gretchen Bruggeman owns 60 percent of the company. In relation to this transaction, Gretchen Bruggeman paid $120 for her interest, and Brenda Bruggeman paid $80. Gretchen did not sign any personal guaranties on any of the loans assumed by Elite #2.

### F. Business of Elite # 2 after the Asset Purchase

After Elite #2 purchased the assets of Elite #1, Elite #2 operated from the same location, with the same employees, in substantially the business. At least one employee did not know of the change in companies until the new company's name showed up on his paycheck. The employees who worked for Elite #1 continued to work for Elite #2 without change in role or salary. Jim Bruggeman, in his role with Elite #2, continues to oversee business, supervise employees, and run the sales and manufacturing, as he did with Elite #1. In addition, Elite #2 purchases parts from many of the same

vendors as Elite #1 and sells to many customers who were also customers of Elite #1.

Although Gretchen Bruggeman owns a 60 percent share in Elite #2, she is not involved in any management or day-to-day operations of Elite #2. She holds the title of Vice President and Treasurer but has almost no involvement in the affairs **[*9]** of Elite #2.

## G. Procedural Background

Plaintiffs commenced this action by filing a Complaint with this Court on January 14, 2010. Plaintiffs' Complaint alleges five counts: (1) Fraudulent Transfers Pursuant to Minn. Stat. § 513.45(a) against Elite #2, Gretchen Bruggeman, and Brenda Bruggeman; (2) Fraudulent Transfer Pursuant to Minn. Stat. § 513.44(a) against Elite #2, Gretchen Bruggeman, and Brenda Bruggeman; (3) Successor Liability against Elite #2; (4) Fraudulent Transfer Pursuant to Minn. Stat. § 513.45(a) against Homer Bruggeman; and (5) Fraudulent Transfer Pursuant to Minn. Stat. § 513.44(a) against Homer Bruggeman. On December 31, 2010, Plaintiffs brought a Motion for Summary Judgment on all counts [Docket No. 23], and Defendants brought a Motion for Partial Summary Judgment seeking to have Count III of Plaintiffs' Complaint dismissed [Docket No 21]. Additionally, although Defendants have only formally moved for dismissal of Count III, in their briefs Defendants now request that the Court also dismiss Counts I and II of Plaintiffs' Complaint.

## III. DISCUSSION

## A. Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving **[*10]** party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a);

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment bears the burden of showing that there is no genuine dispute as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Factual disputes that are irrelevant or unnecessary will not be counted. Id. "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552, 119 S. Ct. 1545, 143 L. Ed. 2d 731 (1999).

## B. Minnesota Fraudulent Transfer Act

The Minnesota Fraudulent Transfer Act, Minn. Stat. §§ 513.41-.51 ("MFTA"), prevents debtors from placing **[*11]** assets that are available to pay debts beyond their creditors' reach. In re Butler, 552 N.W.2d 226, 232 (Minn. 1996). "A threshold question" under the MFTA is "whether a particular event qualifies as a 'transfer' within the purview of the Act." Id. at 231. Pursuant to the MFTA a transfer "means every mode, direct, or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Minn. Stat. § 513.41(12). The MFTA defines the term "asset" as "property of a debtor, but the term does not include property to the extent it is encumbered by a valid lien." Id. § 513.41(2). A "valid lien" is described as "a lien that is effective against the holder of a judicial lien

subsequently obtained by legal or equitable process or proceedings." Id. § 513.41(13). Under the MFTA the term lien "includes a security interest created by agreement...." Id. § 513.41(8).

## C. Fraudulent Transfers Associated with the Asset Purchase

### 1. Assets within the Meaning of the MFTA

Initially, Defendants argue that with regard to the asset transfer there was no transfer **[*12]** of assets according to the definitions of the MFTA, because at the time of the asset purchase, Elite #l's property was encumbered by security interests in favor of Premier Bank, and therefore was not an asset pursuant to the MFTA. Defendants assert that since there were no assets transferred, the MFTA is inapplicable, and thus Counts I and II should be dismissed. "Where the term 'asset' does not apply to property which has been conveyed, neither then does the MFTA." In re Wintz Co., 230 B.R. 848, 860 (B.A.P 8th Cir. 1999).

At the time of the asset purchase, it is clear that Elite #l's tangible property was encumbered by a security interest in favor of Premier Bank. Additionally, Premier Bank had a security interest in the intangible assets related to Elite #1's tangible property. This security interest in Elite #1's property comes from two Security Agreements. At the time of the Asset Purchase Agreement, Elite #1 owed Premier Bank $200,000 on a $210,000 loan and owed Premier Bank $300,000 pursuant to a $300,000 Security Agreement. Thus, at the time of the asset purchase, Premier Bank had a security interest of nearly $500,000. Accordingly, Defendants correctly assert that the above **[*13]** described property transferred in the Asset Purchase Agreement does not qualify as assets under the MFTA.

However, as part of the asset transfer there was also a transfer of goodwill and other intangible assets. As stated above, the intangibles related to the physical assets of Elite #1 were encumbered by the security agreements with Premier Bank. Nevertheless, other intangibles, and the goodwill of Elite #1, related to such things as the advantage of operating from the same location, with the same employees, buying from the same vendors, and selling to the same customers were unencumbered at the time of the asset transfer. Under Minnesota law, it is an open question whether goodwill may be considered an asset within the meaning of the MFTA, although at least one court in Minnesota has allowed a plaintiff to seek to prove the fraudulent transfer of goodwill on appeal. Pa D'or Mfg., Inc. v. Woodland Container Corp., No. A007-1858, 2008 Minn. App. Unpub. LEXIS 997, 2008 WL 3836630, at *9 (Minn. Ct. App. Aug. 19, 2008). Other states addressing the issue have held that goodwill can be an asset for the purposes of the Uniform Fraudulent Transfer Act ("UFTA"). See Stanley v. Miss. State Pilots, Inc., 951 So. 2d 535, 539-40 (Miss. 2006); **[*14]** Preferred Funding, Inc. v. Jackson, 185 Ore. App. 693, 61 P.3d 939, 943 (Or. Ct. App. 2003); Airflow Houston, Inc. v. Theriot, 849 S.W.2d 928, 933 (Tex. App. 1993). Accordingly, the Court views the unencumbered intangible assets of Elite #1, described above, as assets within the purview of the MFTA.

Although Defendants contend that the intangible assets of Elite #1 were $0, the expert report of Defendant's own expert, Howard Kaminsky, lists $300,000 of goodwill on Elite #2's opening balance sheet. (Diessner Decl. in Support of Def.'s Opp'n to Pl.'s Motion for Summary Judgment Ex. B at Appendix 2, pg.1.) Thus, it is clear that there was some value to the intangible assets transferred. However, there are disputes of material fact concerning the value of these assets. Accordingly, because the Court finds that there was a transfer of assets pursuant to the MFTA, the Court will deny Defendants request that Counts I and II be dismissed.

### 2. Count I: Fraudulent Transfer under Minn. Stat. § 513.45(a)

Minn. Stat. § 513.45(a) provides that:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor **[*15]** made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

It is not disputed that Elite #1 was insolvent at the time it transferred its assets to Elite #2. "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." Minn. Stat. § 513.42(a). "A debtor who is generally not paying debts as they become due is presumed to be insolvent." Id. § 513.42(b). At the time of the transfer, Elite #1's debts exceeded its assets. Additionally, the fact that the Plaintiffs' 2006 judgment was not satisfied shows that Elite #1 was not paying its debts as they became due. Furthermore, Plaintiffs judgment against Elite #1 arose before the asset transfer. The remaining question is whether Elite #1 received a reasonably equivalent value in exchange for the assets transferred.

Plaintiffs contend that Elite #1 transferred its assets without receiving a reasonably equivalent value in exchange for the transfer because although Elite #2 agreed to assume certain **[*16]** debts owed by Elite #1 to Premier Bank, Plaintiffs argue that Elite #2 did not provide any new or different security for that debt. With regard to value, the MFTA states that:

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

Minn. Stat. § 513.43(a). Whether a party received reasonably equivalent value is a question of fact. In re Ozark Rest. Equip. Co., Inc., 850 F.2d 342, 344 (8th Cir. 1988). "The court must consider all aspects of the transaction and 'carefully measure the value of all benefits and burdens to the debtor.'" United States v. Spencer, No. Civ. 04-141 MJDSRN, 2005 U.S. Dist. LEXIS 28257, 2005 WL 2648688, at *3 (D. Minn. Oct. 17, 2005) (citation omitted). However, "consideration is not always measured in dollars." Id. (citation omitted).

Despite Plaintiffs' argument that Elite #1 received no value for the assets transferred, it is clear that Elite #2 agreed to assume certain debts owed by Elite #1 to Premier Bank. Elite **[*17]** #2 assumed debt owed to Premier Bank amounting to $285,302.62. This assumption of debt provided Elite #1 with some value for the assets transferred. Although the $210,000 obligation is still guaranteed by Jim and Brenda Bruggeman, is still secured by a mortgage on Jim and Brenda Bruggeman's residence, the collateral securing the loan remains the same, and Elite #1 is still listed as the borrower on the note, this does not mean that Elite #1 received no value. If Premier Bank brought an action against Elite #1, in relation to this debt, Elite #1 would have a right to seek contribution from Elite #2, because Elite #2 contractually assumed this debt under the Asset Purchase Agreement. Thus, the Court finds that Elite #1 received some value in the asset transfer. However, as mentioned above, there are genuine disputes of material fact concerning the value of the intangibles transferred. Thus, there are genuine disputes of material fact with regard to whether Elite #1 received reasonably equivalent value for its property through the asset purchase. Accordingly, Plaintiffs' motion for summary judgment on Count 1 will be denied.

### 3. Count II: Fraudulent Transfer under Minn. Stat. § 513.44(a)

Minn. Stat. § 513.44(a)(1) **[*18]** provides that:
> (a) A transfer made or obligation incurred by a

debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> 1) with actual intent to hinder, delay, or defraud any creditor of the debtor

In determining whether actual intent to hinder, delay, or defraud exists, the MFTA identifies a number of factors which a court may consider. Minn. Stat. § 513.44(b). Those factors are whether:

> (1) the transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property transferred after the transfer;
> (3) the transfer or obligation was disclosed or concealed;
> (4) before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;
> (5) the transfer was of substantially all of debtor's assets;
> (6) the debtor absconded;
> (7) the debtor removed or concealed assets;
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (9) the debtor was insolvent or became insolvent shortly after **[*19]** the transfer was made or the obligation was incurred;
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Id. Although the Court may consider these factors, the statute does not compel the Court to draw an inference that the transfer was fraudulent from any of these factors. In re Jolly's Inc., 188 B.R. 832, 840 n.15 (Bankr. D. Minn. 1995).

Plaintiffs argue that in this case many of the above listed factors are present. First, Plaintiffs note that

the transfer in this case was made to an insider. The MFTA defines an insider as "a relative of the debtor," if the debtor is an individual, and as a "relative of a general partner, director, officer, or person in control of the debtor," if the debtor is a corporation. Minn. Stat. § 513.41(7). Plaintiffs argue that both Gretchen and Brenda Bruggeman are insiders within the definition of the MFTA.

Second, Plaintiffs assert that Jim Bruggeman controls Elite #2, just as he controlled Elite #1. Plaintiffs argue that Jim Bruggeman runs the business and is the face of the company, **[*20]** just as he was with Elite #1. Further, Plaintiffs highlight that Elite #2 is run from the same location as Elite #1, uses the same employees, same vendors, the same marketing materials, under a nearly identical name.

Third, Plaintiffs argue that the non-disclosure of the asset transfer shows an actual intent to defraud. Plaintiffs state that Elite #1's employees were not informed of the change until they began receiving paychecks from Elite #2. Plaintiffs additionally assert that the name change does not reveal the asset transfer because both companies use trade names which are nearly identical.

Fourth, Plaintiffs contend that the remaining factors also support a finding that the transfer was fraudulent to Plaintiffs, because the transfer was made after the judgment, Elite #1 received no consideration, and Elite #1 was insolvent at the time of the transfer.

The Court agrees with Plaintiffs that a number of these factors are present in this case. However, as described above, the Court finds that there are genuine disputes of material fact concerning the value Elite #1 received for the assets it transferred. Viewing the evidence in the light most favorably to Defendants, the debt Elite **[*21]** #2 assumed was greater than the value of the tangible assets of Elite #1. Moreover, at this time the Court cannot determine the value of the intangible assets which were transferred. Under these circumstances, the Court cannot find as a matter of law that the intent

of the transfer was to hinder, delay, or defraud the Plaintiffs. Accordingly, Plaintiffs' motion for summary judgment on Count II will be denied.

## D. Count III: Successor Liability

Under Minnesota law, successor liability is governed by Minn. Stat. § 302A.661, subdivision 4, which states:

> **Transferee Liability.** The transferee is liable for the debts, obligations, and liabilities of the transferor only to the extent provided in the contract or agreement between the transferee and the transferor or to the extent provided by this chapter or other chapters of this state. A disposition of all or substantially all of a corporation's property and assets under this section is not considered to be a merger or a de facto merger pursuant to this chapter or otherwise. The transferee shall not be liable solely because it is deemed to be a continuation of the transferor.

Furthermore, the 2006 Reporter's Notes to § 302A.661, subdivision 4, **[*22]** concerning a 2006 amendment to the statute, states that

> **Subdivision 4 (Transferee liability).** This subdivision is amended to confirm the general rule that transferees of corporate assets are not liable for the obligations of their transferors. This limitation of liability is subject only to two specific exceptions, both explicitly provided in the statute. First, there is transferee liability "only to the extent provided in the contract or agreement between the transferee and the transferor.". . . Second, despite the general rule of non-liability for asset transferees, there is transferee liability under this section "to the extent provided by this chapter or other statutes of this state." Liability under these other statutes, such as Minnesota's environmental laws or the Minnesota fraudulent transfer act, is still possible, as is liability under federal statutes . . . . Beyond these two explicit

statutory exceptions, however, there are no common law exceptions to the rule of transferee non-liability . . . . The newly added last sentence to this subdivision is designed to . . . confirm elimination of any common law exceptions, such as those employed under the rubrics of *de facto* merger **[*23]** or continuation of the transferor theories. It clarifies that a purchase of all or substantially all of a corporation's assets is not a *de facto* merger and that the buyer is not liable for the seller's obligations solely because the buyer is deemed to be a continuation of the seller.

These notes make it clear that beyond the above described exceptions, there are no common law exceptions to the rule that a transferee of corporate assets is not liable for the debts of the predecessor. Thus, successor liability exists where such liability is agreed upon or to the extent provided by other statutes. Among the statutes, identified in the reporter's notes, which can serve to impose successor liability is the MFTA. Notably, Minnesota courts have stated that the 2006 amendment to Minn. Stat. § 302A.661 did not eliminate the fraudulent transfer exception to successor liability, which imposes successor liability where a transaction was fraudulent pursuant to the MFTA. Schwartz v. Virtucom, Inc., No. A08-1059, 2009 Minn. App. Unpub. LEXIS 495, 2009 WL 1311816, at *2 n.2 (Minn. Ct. App. May 12, 2009). Despite Defendants' argument to the contrary, a claim for successor liability does exist if there was a fraudulent transfer. Since, **[*24]** as described above, there are genuine disputes of material fact concerning Plaintiffs' fraudulent transfer claims, there are genuine disputes of material fact with regard to Plaintiffs' successor liability claim under Count III. Accordingly, both Plaintiffs' and Defendants' motion for summary judgment on Count III will be denied. Furthermore, because both motions will be denied, the Court will not address Plaintiffs' or Defendants' arguments concerning the extent of Defendants' potential liability under a theory of successor liability.

**E. Fraudulent Transfer Associated with Mortgage Conveyance to Homer Bruggeman**

**1. Count IV: Fraudulent Transfer under Minn. Stat. § 513.45(a)**

As stated above, Minn. Stat. § 513.45(a) provides that:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Plaintiffs argue that the conduct of Jim **[*25]** and Homer Bruggeman in relation to the default judgment and the August 4, 2005, $250,000 mortgage against the Leibel Street property in favor of Homer Bruggeman constituted a fraudulent transfer in violation of Minn. Stat. § 513.45(a). Plaintiffs note that, in February of 2005, Plaintiffs obtained a default judgment against Jim Bruggeman personally. As a judgment creditor Plaintiffs owned a security interest in the property owned by Jim Bruggeman, including the Leibel Street property. On August 4, 2006, Jim Bruggeman granted a $250,000 mortgage on the Leibel Street property to his father. After granting the mortgage, which was subordinate to Plaintiffs' judgment, Jim Bruggeman moved to vacate the default judgment. The Hennepin County District Court granted this request and the Plaintiffs' judgment was vacated. After this point Jim Bruggeman failed to defend the litigation and judgment was once again entered, although now Plaintiffs' judgment was subordinate to the mortgage. Plaintiffs assert that Jim Bruggeman only moved to vacate the initial default judgment in order to subordinate Plaintiffs judgment to the

$250,000 mortgage in favor of Homer Bruggeman.

Once again, there are genuine **[*26]** issues of material fact concerning whether the mortgage was given for reasonable value. Although Plaintiffs highlight the fact that there is no documentation of a corresponding $250,000 loan, Jim Bruggeman stated that he believes the mortgage was given to secure a contemporaneous loan. Given the amount and size of the loans that Homer Bruggeman made to Jim and Brenda Bruggeman and the various businesses over the years it is plausible that this mortgage would have been given to secure a contemporaneous loan. Additionally, it may be that the mortgage was given to secure previous loans from Homer Bruggeman. Viewing the facts in the light most favorable to the Defendants, the Court cannot determine as a matter of law that Jim Bruggeman did not receive reasonable value for the mortgage in favor of Homer Bruggeman. Accordingly, the Court will deny Plaintiffs' motion for summary judgment with regard to Count IV.

**2. Count V: Fraudulent Transfer under Minn. Stat. § 513.44(a)**

Count V of Plaintiffs' Complaint alleges that the mortgage in favor of Homer Bruggeman constituted a fraudulent transfer in violation of Minn. Stat. § 513.44(a). Plaintiffs argue that Jim Bruggeman intended to hinder, delay, **[*27]** and defraud the Plaintiffs through the conveyance of a $250,000 mortgage interest to his father and moving the Hennepin County District Court to vacate the default judgment.

Although once again many of the factors the Court may consider concerning whether Jim Bruggeman had an actual intent to hinder, delay, or defraud the Plaintiffs are present, viewing the facts in the light most favorable to the Defendants, the Court cannot as a matter of law find that such an intent was the purpose behind the execution of this mortgage. As described above, Jim Bruggeman believes that this mortgage was conveyed in relation to a loan for $250,000. Additionally, Homer Bruggeman had

lent Jim Bruggeman, and Jim's companies, hundreds of thousands of dollars over the years, and this mortgage may have been granted to secure some of these loans. Since there are genuine disputes of fact concerning Jim Bruggeman's intent with regard to the conveyance of the $250,000 mortgage to Homer Bruggeman, the Court will deny Plaintiffs' motion for summary judgment on Count V.

### F. Damages Pursuant to the MFTA

Since the Court has denied both Plaintiffs' and Defendants' motions for summary judgment in their entirety because **[\*28]** of genuine disputes of material fact, the Court will not make a determination of Defendants' potential damages under the MFTA at this time.

### IV. CONCLUSION

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for Summary Judgment [Docket No. 23] is **DENIED**.

2. Defendants' Motion for Partial Summary Judgment [Docket No. 21] is **DENIED**.

Date: May 16, 2011

/s/ Michael J. Davis

Michael J. Davis

Chief Judge

United States District Court

---

**End of Document**