



Positive

As of: April 2, 2025 8:29 PM Z

# Stone v. Citizens Equity First Credit Union (In re Int'l Supply Co.)

United States Bankruptcy Court for the Central District of Illinois

March 30, 2022, Decided

Case No. 15-81467, Chapter 11, Adv. No. 17-08049

**Reporter**

2022 Bankr. LEXIS 865 *; 2022 WL 962296

In Re INTERNATIONAL SUPPLY CO., Debtor.SHELDON STONE, not individually but solely as trustee of the International Supply Co. Creditor Trust, Plaintiff, v. CITIZENS EQUITY FIRST CREDIT UNION, Defendant.

**Subsequent History:** Affirmed by Stone v. Citizens Equity First Credit Union (In re Int'l Supply Co.), 2023 U.S. Dist. LEXIS 160713 (C.D. Ill., Sept. 11, 2023)

## LexisNexis® Headnotes

Bankruptcy Law > Procedural Matters > Jurisdiction > Federal District Courts

*HN1*[ ] **Jurisdiction, Federal District Courts**

The court has jurisdiction over proceedings arising under title 11, or arising in or related to cases under title 11 pursuant to 28 U.S.C.S. § 1334.

Bankruptcy Law > Procedural Matters > Jurisdiction > Core Proceedings

Bankruptcy Law > Estate Property > Avoidance > Transferee Liabilities & Rights

*HN2*[ ] **Jurisdiction, Core Proceedings**

Actions to determine, avoid, or recover fraudulent conveyances are core proceedings. 28 U.S.C.S. § 157(b)(2)(H).

Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule

*HN3*[ ] **Appellate Jurisdiction, Final Judgment Rule**

Any impediment to the entry of a final judgment may be overcome by the knowing and voluntary consent of the parties to final adjudication by a bankruptcy judge.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Constructively Fraudulent Transfers

Contracts Law > Contract Formation > Consideration > Adequate Consideration

Business & Corporate Compliance > ... > Contract Formation > Consideration > Adequate Consideration

Evidence > Burdens of Proof > Preponderance

of Evidence

Civil Procedure > Judgments > Enforcement & Execution > Fraudulent Transfers

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Value

## HN4[⬇] Fraudulent Transfers, Constructively Fraudulent Transfers

Constructive fraud is sometimes referred to as fraud in law and, unlike actual fraud, does not require proof of fraudulent intent. Rather, fraud in law is established by proof that a debtor made a voluntary transfer without consideration or for inadequate consideration that hinders or delays the rights of creditors. Specifically, 740 ILCS 160/5(a)(2) requires proof: (1) that the debtor made a voluntary transfer; (2) when the debtor had debt or was about to incur debt; (3) without receiving a reasonably equivalent value in exchange; (4) resulting in the debtor retaining insufficient property to pay debts. Section 160/6 requires similar proof except the final element of insufficient assets remaining to pay debts is replaced by requiring proof that the debtor was insolvent when the transfer was made or became insolvent as a result of the transfer. The Trustee has the burden of proof by a preponderance of the evidence.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Constructively Fraudulent Transfers

## HN5[⬇] Fraudulent Transfers, Constructively Fraudulent Transfers

A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation. 740 ILCS 160/3(a). This provision mirrors the definition of insolvency in the Code. 11 U.S.C.S. § 101(32). A debtor who is generally not paying his debts as they become due is presumed to be insolvent. 740 ILCS 160/3(b). Whether an entity is insolvent is a question of fact. Bankruptcy courts

have broad discretion to determine insolvency.

Bankruptcy Law > Individuals With Regular Income > Eligibility > Means Testing

## HN6[⬇] Eligibility, Means Testing

The balance sheet test determines whether a debtor's assets exceed its liabilities; a debtor is considered solvent under the balance sheet test if assets exceed liabilities.

Bankruptcy Law > Individuals With Regular Income > Eligibility > Means Testing

## HN7[⬇] Eligibility, Means Testing

The cash flow test is used to determine whether a debtor has cash available to pay its debts as they become due within a period.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Value

## HN8[⬇] Fraudulent Transfers, Value

Bankruptcy courts may look to cases decided under 11 U.S.C. § 548 when determining whether reasonably equivalent value was received.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Constructively Fraudulent Transfers

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Value

## HN9[⬇] Fraudulent Transfers, Constructively Fraudulent Transfers

Determining whether a debtor received reasonably equivalent value in exchange for a transfer it made involves a three-part inquiry: (1) the court must

determine that a debtor received some value; (2) the value received must have been in exchange for a transfer made by the debtor; and (3) the value of what was received by the debtor must have at least a reasonable equivalence to the value of what the debtor transferred. Under Illinois law, value is given for a transfer if, in exchange for the transfer, property is transferred or an antecedent debt is secured or satisfied. 740 ILCS 160/4(a). As for whether there is a reasonable equivalence between values exchanged, the Seventh Circuit has described the test—at least under 11 U.S.C.S. § 548—as one not controlled by a fixed mathematical formula but, instead, a comparison of the value of what was transferred to the value of what the debtor received in exchange.

Bankruptcy Law > ... > Preferential Transfers > Elements > Benefit of Creditor

### HN10[⬇]   Elements, Benefit of Creditor

Courts do recognize indirect benefits of paying the debts of third parties as value received in certain situations where the debtor and third party share an identity of interests, the benefit is fairly concrete, or the debtor receives the benefit of the original consideration.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Constructively Fraudulent Transfers

### HN11[⬇]   Fraudulent Transfers, Constructively Fraudulent Transfers

Reasonably equivalent value is a factual issue that must be evaluated as of the date of the transaction.

Bankruptcy Law > Estate Property > Avoidance > Transferee Liabilities & Rights

### HN12[⬇]   Avoidance, Transferee Liabilities & Rights

A transferee is one that has dominion over the money or other asset, the right to put the money to one's own purposes. Naturally, an initial transferee is the first transferee in the line. An immediate or mediate transferee, then, is one who takes in a later transfer down the chain of title or possession. There is no defense against liability for an initial transferee under 11 U.S.C.S. § 550.

Bankruptcy Law > Estate Property > Avoidance > Transferee Liabilities & Rights

### HN13[⬇]   Avoidance, Transferee Liabilities & Rights

11 U.S.C.S. § 550(a) provides for recovery against the initial transferee, as well as any immediate or mediate transferee.

Bankruptcy Law > Procedural Matters

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

### HN14[⬇]   Bankruptcy Law, Procedural Matters

Although the Bankruptcy Code makes no provision for it, bankruptcy courts have the discretion to award prejudgment interest to a trustee in a fraudulent conveyance action. But that discretion is not unfettered; it must be exercised according to the law. And the Seventh Circuit has expressed its preference for awarding prejudgment interest as a component of compensation in federal cases unless there is sound reason not to do so. In other words, the purpose of allowing prejudgment interest is compensatory, not punitive; such interest is granted to make the prevailing party whole. After all, compensation deferred is compensation reduced by the time value of money; that is why prejudgment

interest is an ingredient of full compensation.

Civil Procedure > Remedies > Judgment
Interest > Prejudgment Interest

*HN15*[⬇] **Judgment Interest, Prejudgment
Interest**

Absent other controlling authority, bankruptcy
courts have awarded prejudgment interest pursuant
to the rate set forth in 28 U.S.C.S. § 1961 from the
date the adversary proceeding was filed.

Civil Procedure > ... > Attorney Fees &
Expenses > Basis of Recovery > American Rule

*HN16*[⬇] **Basis of Recovery, American Rule**

Illinois law generally follows the American Rule
that attorney fees are not available to a prevailing
party absent statutory authority or an express
contractual provision between the parties.

Civil Procedure > Preliminary
Considerations > Equity > Relief

Contracts Law > Remedies > Equitable
Relief > Quantum Meruit

*HN17*[⬇] **Equity, Relief**

Recovery under a theory of unjust enrichment is an
equitable remedy only available when there is no
adequate remedy at law. It appears that, under
Illinois law, unjust enrichment may be recognized
as a stand-alone cause of action.

Business & Corporate
Compliance > Contracts > Types of
Contracts > Quasi Contracts
Contracts Law > Types of Contracts > Quasi
Contracts

Contracts Law > Remedies > Equitable
Relief > Quantum Meruit

*HN18*[⬇] **Types of Contracts, Quasi Contracts**

While a plaintiff may be able to maintain a stand-
alone cause of action for unjust enrichment, such a
claim often rests on the same conduct or set of facts
forming the basis for another claim against the
same defendant, and, in such latter case, will be tied
to and will stand or fall with the related claim.

**Counsel:** **[*1]** For International Supply Co.,
Debtor (15-81467): Sumner A. Bourne, David L
Cover, Peoria, IL.

For U.S. Trustee, U.S. Trustee (15-81467): Sabrina
M Petesch, Peoria, IL.

For Official Committee of Unsecured Creditors,
Creditor Committee (15-81467): Harold Israel,
Levenfeld Pearlstein, LLC, Chicago, IL.

For Sheldon Stone, as Creditor Trustee of the
International Supply Co. Creditor Trust, Plaintiff
(17-08049): Daniel Curth, Goldstein & McClintock
LLLP, Chicago, IL.

For Citizens Equity First Credit Union, Defendant
(17-08049): Robert Hills, c/o Westervelt, Johnson,
Nicoll & Keller, Peoria, IL; Robert Hills, Thomas
A McConnaughay, Westervelt, Johnson, Nicoll &
Keller LLC, Peoria, IL.

For Citizens Equity First Credit Union, Cross-
Claimant (17-08049): Robert Hills, c/o Westervelt,
Johnson, Nicoll & Keller, Peoria, IL.

**Judges:** Mary P. Gorman, United States
Bankruptcy Judge.

**Opinion by:** Mary P. Gorman

## Opinion

Before the Court for decision after trial is a
complaint brought by the Trustee of the
International Supply Co. creditor trust to avoid and
recover prepetition fraudulent transfers made to

Citizens Equity First Credit Union. Because International Supply Co. was insolvent when it made the transfers, not to satisfy its own debts, [*2] but rather for the benefit of its controlling shareholder, the transfers will be avoided and judgment will be entered in favor of the Trustee.

## I. Factual and Procedural Background

The Debtor, International Supply Co. ("ISCO"), filed its voluntary petition under Chapter 11 of the Bankruptcy Code on September 24, 2015. Shortly thereafter, ISCO sought permission to sell substantially all its assets. The request was granted, and the closing of the sale generated more than $10 million gross for the bankruptcy estate. The previously-appointed creditors committee then filed a liquidating plan that was confirmed and established a creditor trust. Sheldon Stone was appointed as Trustee of the creditor trust and was vested with the authority to pursue causes of action for the benefit of the estate's creditors, including actions to avoid and recover fraudulent conveyances under the Bankruptcy Code or applicable nonbankruptcy law.

The Trustee commenced this proceeding by filing his ten-count complaint against Citizens Equity First Credit Union ("CEFCU"), E. Lee Hofmann, and Rebecca Hofmann, seeking to avoid transfers of money from ISCO to CEFCU and Rebecca Hofmann made on behalf of Lee Hofmann. The [*3] complaint seeks relief under the Bankruptcy Code and the Illinois Uniform Fraudulent Transfer Act. In the alternative, the complaint seeks judgment against the defendants for unjust enrichment and includes a count seeking damages against the Hofmanns for breach of their fiduciary duties to ISCO. Each of the defendants answered the complaint; CEFCU also asserted a cross claim against Lee Hofmann for breach of contract.

Following an initial pretrial conference, the judge presiding over the ISCO bankruptcy case and related proceedings entered an order recusing himself from further involvement in this proceeding due to a conflict. The matter was reassigned to another judge and proceeded with pretrial discovery. In March 2019, Lee Hofmann filed an individual voluntary bankruptcy petition; he was subsequently dismissed as a defendant from this proceeding. After an extended discovery period through which expert testimony was disclosed, the matter was finally set for trial beginning December 1, 2021. After a preliminary pretrial conference held in October 2021, the judge to whom the case had been previously reassigned recused himself and the matter was reassigned to this Court. Thereafter, [*4] CEFCU and the Trustee filed a joint final pretrial statement stipulating to almost all relevant facts. The trial was held as scheduled by video conference. Prior to the commencement of the trial, the Trustee's oral motion to dismiss Rebecca Hofmann as a defendant due to her recent filing of a Chapter 7 bankruptcy case was granted. The trial proceeded against CEFCU as the sole defendant.

### A. Undisputed Events Giving Rise to the Complaint[1]

Lee Hofmann founded ISCO in 1983. At all relevant times, Mr. Hofmann and his wife Rebecca Hofmann were Illinois residents and officers, controlling shareholders, and paid employees of ISCO.[2] In addition to her roles with ISCO, Mrs. Hofmann was a manager of a separate company, Games Management, LLC.

---

[1] The factual events underlying the Trustee's complaint in this proceeding are largely uncontested. These findings are based on facts admitted in the pleadings and the parties' joint final pretrial statement and are supported by documentary evidence.

[2] CEFCU denied this specific allegation in its answer to the complaint but has since acknowledged, in both its motion for summary judgment and the joint pretrial statement, that Lee and Rebecca Hofmann were officers and board members of ISCO. In any event, Lee and Rebecca Hofmann admitted in their answer to the complaint that they "were officers (President and Secretary, respectively), directors, and the controlling shareholders of" ISCO at all relevant times.

In September 2004, Games Management, LLC executed a note in favor of CEFCU for a $2.7 million loan ("CEFCU Note"). At that time, Lee Hofmann executed a commercial guaranty of the CEFCU Note, personally guaranteeing payment. Thereafter, Games Management, LLC defaulted on the CEFCU Note, triggering Lee Hofmann's liability. On January 19, 2011, CEFCU obtained a judgment in state court against Lee Hofmann in the amount of $2,803,491.25 based on his default under the [*5] guaranty. On March 18, 2011, a second state court judgment was entered in favor of CEFCU and against Lee Hofmann in the amount of $253,627.19.

As part of its effort to enforce or collect on the judgments against Lee Hofmann ("Hofmann judgments"), CEFCU served process and obtained citation liens against Lee Hofmann's non-exempt personal property, including his wages from ISCO. In an apparent attempt to avoid payment on the Hofmann judgments, Lee Hofmann's salary from ISCO was diverted to Rebecca Hofmann. Once the diversion was discovered, CEFCU obtained a state court judgment against ISCO and Rebecca Hofmann, jointly and severally, in the amount of $261,800 ("ISCO/Rebecca judgment"). The ISCO/Rebecca judgment expressly stated that any amounts collected were to be applied toward the satisfaction of the judgments against Lee Hofmann. The issue of attorney fees and costs was reserved for determination at a later date; CEFCU now asserts such fees and costs to have been at least $81,947.50.

While an appeal of the ISCO/Rebecca judgment was pending, CEFCU, Lee Hofmann, Rebecca Hofmann, and ISCO entered into a global settlement agreement. By the terms of the agreement, Lee Hofmann agreed to pay [*6] CEFCU $2,010,000 on or before August 1, 2013, upon receipt of which CEFCU would release all judgments and dismiss any related proceedings against Lee Hofmann, Rebecca Hofmann, and ISCO. The parties also agreed that the pending appeal of the ISCO/Rebecca judgment would be dismissed. In addition, CEFCU agreed to abstain, pending receipt of the settlement payment, from recording a deed to property previously transferred to CEFCU from the Hofmann Irrevocable Trust ("Hofmann Trust") by court order. Payment was not timely made, however, and CEFCU recorded the deed to the trust property. The settlement was renegotiated and an amended settlement agreement, dated August 2, 2013, was entered into increasing the amount to be paid to CEFCU to $2,020,000, with $1,400,000 due immediately and the balance of $620,000 due by August 15, 2013. If the balance owed was not paid by August 15, 2013, CEFCU would retain the trust property and apply any proceeds from the sale of the property to satisfy the outstanding balance on the judgments.

On August 2, 2013, ISCO tendered a cashier's check to CEFCU for the $1.4 million installment due from Lee Hofmann under the amended settlement agreement. On August 16, [*7] 2013, ISCO transferred another $320,000 from its savings account at Heartland Bank & Trust Company ("Heartland Bank") to the Games Management, LLC account at CEFCU, which CEFCU, in turn, applied to the balance due under the amended settlement agreement. The same day, Lee Hofmann and ISCO together borrowed $300,000 from Morton Community Bank, which was distributed directly to CEFCU as final payment due under the amended settlement agreement. Upon receipt of the final $300,000 payment, CEFCU released its judgments, dismissed the related proceedings, and transferred the real estate property it was holding as security back to the Hofmann Trust from which it came. The Hofmann Trust recorded the deed on the real estate a week later and, eventually, transferred the property by quitclaim deed to the Hofmanns.

On October 1, 2014, ISCO signed a promissory note in favor of Heartland Bank in the amount of $3.75 million. The same day, the Hofmanns signed a deed of trust in favor of Heartland Bank for the real estate previously held by the Hofmann Trust and that deed of trust was subsequently recorded. ISCO filed its bankruptcy petition on September

24, 2015. And on August 1, 2016, Heartland Bank [*8] released the deed of trust; the Hofmanns thereafter transferred the trust property to a third party.

## B. Evidence at Trial

The evidence at trial focused primarily on the nature of the transfers complained of by the Trustee and ISCO's financial condition at the relevant times. The disputed issues were whether ISCO was insolvent when the transfers were made or became insolvent by reason of the transfers and whether ISCO received reasonably equivalent value for all or some portion of the transfers it made.

Sheldon Stone testified first, providing background on his appointment as Trustee of the creditor trust and the commencement of this action against CEFCU. The Trustee's case against CEFCU was otherwise based entirely on the opinions of his expert, Bradley Sargent.

Mr. Sargent identified himself as, among other things, a certified public accountant, certified fraud examiner, and the managing member of The Sargent Consulting Group, LLC, a financial advisory and forensic accounting firm that also provides litigation consultation services. He explained that he and his firm were retained by the Trustee to review and analyze ISCO's financial condition and potential fraudulent transfers from ISCO [*9] to CEFCU. After questioning Mr. Sargent on his qualifications, the Trustee tendered him as an expert in the area of insolvency. CEFCU raised no objection, and the Trustee's examination of Mr. Sargent as an expert proceeded.

As part of his engagement for this proceeding, Mr. Sargent issued a written report of his findings and opinions. As set forth in his report, Mr. Sargent summarized his opinions as being that (1) ISCO received no equivalent value for the CEFCU transfers—which he defined as occurring August 2, 2013, and August 16, 2013, totaling $1.72 million—prior to, contemporaneous to, or after the transfers occurred; and (2) ISCO was insolvent, unable to pay its debts as they became due, and under-capitalized before and after the transfers occurred.

In forming his opinions, Mr. Sargent said he relied primarily on the Trustee's adversary complaint, ISCO's independently-reviewed annual financial statements prepared by its accounting firm, Gordon, Stockman & Waugh P.C., ("GSW Financials"), certain credit analysis forms prepared by ISCO's lender, Heartland Bank, deposition testimony of CEFCU representatives, the underlying state court judgment orders and settlement agreements, FASB [*10] (Financial Accounting Standards Board) codified accounting standards, and §548 of the Bankruptcy Code. To a lesser degree, he relied on ISCO's internally-prepared interim financial data, asserting that the independently-reviewed GSW Financials had a higher degree of reliability. He limited the temporal scope of his insolvency analysis to the 2011, 2012, 2013, and 2014 calendar years, basing his analysis on year-end financials for each year.

As to Mr. Sargent's conclusion that ISCO received no equivalent value for the transfers it made to CEFCU, he said he reviewed ISCO's accounting and bank records looking for any corresponding in-flow of value or reduction of liabilities and found none. Mr. Sargent further stated that he had also reviewed the deposition testimony of both Rhonda Heinz, an attorney who represented CEFCU in its collection efforts against ISCO and the Hofmanns, and Gary Moss, Vice President of Collections for CEFCU, to understand the relationship between ISCO and CEFCU. Based on his review of that testimony, Mr. Sargent determined that ISCO was not a client, customer, or borrower of CEFCU and that there was no other contractual relationship between them. According to Mr. Sargent, ISCO's relationship [*11] with and obligation to CEFCU was limited to the ISCO/Rebecca judgment. He concluded ISCO received no value in exchange for the two transfers it made to CEFCU totaling $1.72 million.

As for his opinion regarding ISCO's solvency, Mr. Sargent explained that he looked to the three tests prescribed by §548, which he described as the balance sheet test, the cash flow test, and the adequate capital test.[3] Mr. Sargent said he analyzed ISCO's financials under the tests over the four years surrounding the subject transfers. Before detailing his analysis under each test, Mr. Sargent highlighted aspects of ISCO's overall financial history that he found to be of particular significance.

In his review of the GSW Financials for the years leading up to and following the CEFCU transfers, Mr. Sargent noted a strong correlation between ISCO's redemption of numerous certificates of deposit ("CDs") and the cash advances it was making to Mr. Hofmann or on his behalf. The liquidation of those assets and use of other cash reserves funded ISCO's significant shareholder advances to Mr. Hofmann. In 2009, for instance, ISCO redeemed $2.94 million in CDs and advanced $2.98 million to Mr. Hofmann. In 2010, the company [*12] redeemed $5.8 million in CDs and had cash flow from operations of more than $2.25 million, but it also made advances to Mr. Hofmann in excess of $7 million. In 2011, ISCO redeemed another $900,000 in CDs and had nearly $1.8 million in cash flow from operations, but more than $1.8 million was advanced to Mr. Hofmann. According to Mr. Sargent, the balance sheets included in the GSW Financials show the value of CDs held by ISCO decreasing each year. Mr. Sargent believed this trend was very significant in understanding the overall picture of ISCO's "fatal disease" of making shareholder advances to Mr. Hofmann.

By the end of 2011, ISCO had all but depleted its cash reserves, redeeming nearly $10 million in CDs, and had made shareholder advances to Mr. Hofmann totaling approximately $13.7 million. The 2011 GSW Financials noted that roughly $8.3 million of those shareholder advances had been

reclassified to dividends during 2010, with the remainder being shown as a reduction in stockholder equity—what Mr. Sargent referred to as "contra-equity." Mr. Sargent opined that, because Mr. Hofmann was out over his own equity in ISCO, the IRS essentially forced the company to recharacterize a significant [*13] portion of the transactions as income to Mr. Hofmann rather than as loans that could be recorded as assets by ISCO. Still, ISCO continued to advance money to Mr. Hofmann resulting in corresponding reductions in both stockholder equity and the overall value of ISCO. Between 2012 and 2014, ISCO advanced more than $10 million to Mr. Hofmann, repayment of which, Mr. Sargent noted, was entirely dependent on the future income of the company.

Like the GSW Financials, the Heartland Bank credit analyses were both quantitatively and qualitatively instructive to Mr. Sargent. He described them as internal documents of the lender that assessed ISCO's creditworthiness while also providing other relevant information about ISCO and Mr. Hofmann. The credit analyses highlighted important financial data and provided insight into Heartland Bank's conclusions about that data. Mr. Sargent believed Heartland Bank's assessments of risk based on perceived strengths and weaknesses were particularly relevant to understanding the state of affairs at ISCO.

For example, in the credit analysis dated March 1, 2012, Heartland Bank identified several strengths that favored approving ISCO's request for financing, including [*14] the personal cash flow of Mr. Hofmann and a proposed sale of the company that was apparently in the works and would pay off all debt with the bank. According to Mr. Sargent, that said a lot about Heartland Bank's motivation for lending to ISCO. In recommending approval of ISCO's request for a loan, the loan officer specified that the "extension of existing debt will allow for continued operation of the company leading to the completion of sale." When Heartland Bank completed another credit analysis a few months later, however, there was no mention of any

---

[3] Mr. Sargent was referring to 11 U.S.C. §548.

proposed sale and the sole strength favoring loan approval was that "ISCO appears to be a profitable company." Weaknesses included a $2.2 million tax lien against Mr. Hofmann and ISCO's reported negative net worth at the end of 2011—both presumably related to the reclassification of shareholder advances as dividends and contra-equity accounts—as well as the fact that all excess cash flow from ISCO was being used to support Mr. Hofmann's other business ventures. Nevertheless, the loan officer ultimately recommended approval of the loan request.

Mr. Sargent placed particular importance on the Heartland Bank credit analysis dated June [*15] 24, 2013, because it was completed immediately before the CEFCU transfers. The analysis confirmed that the anticipated sale of ISCO—for an expected $19 million—had fallen through, and the value of the company was adjusted down to $7 million. The analysis also noted several problems with Mr. Hofmann's personal financial reporting, including inflated values of his interest in business ventures, the omission of $3 million in tax liens, and the omission of money judgments against him. The only strengths identified by Heartland Bank were that the company exhibited acceptable debt service coverage and reported sufficient collateral coverage.

The noted purpose of the June 2013 Heartland Bank credit analysis was to evaluate a request to renew maturing loans and obtain a new loan of $1,065,000 to cover input costs on a project for NC Machinery/Microsoft. The project contract included a price of $2.44 million to paid in five monthly installments of $244,000 plus a $1.2 million balloon payment in December 2013. The terms of repayment on the $1 million loan request for input costs were commensurate with the contract price—five monthly installments of $100,000 with the balance due in January 2014. [*16] In Mr. Sargent's view, it was very significant that ISCO did not have $1 million to cover its input costs on the NC Machinery/Microsoft contract just before it transferred $1.72 million to CEFCU.

Mr. Sargent acknowledged that ISCO had significant earning potential. At the time of the new contract, ISCO's total sales were down, but its profit margins were increasing. The new contract was expected to generate additional profits, and the company was growing. All excess cash, however, was going directly to Mr. Hofmann. In Mr. Sargent's view, the vast majority of ISCO's borrowing was being used to postpone the maturity of existing loans or to fund shareholder advances rather than to fund the company's operations or growth; everything was being used to satisfy Mr. Hofmann's personal obligations. And, in Mr. Sargent's opinion, the shareholder advances and resulting debt load directly led to ISCO's insolvency and eventual bankruptcy filing. Mr. Sargent ultimately concluded to a reasonable degree of professional certainty that ISCO was insolvent before and after the CEFCU transfers.

Turning to his application of each of the three tests for insolvency, Mr. Sargent began with his analysis under [*17] the balance sheet test. He first noted that the balance sheets in the GSW Financials showed negative equity for each of the years analyzed. But, he said, it would not be appropriate to completely rely on the GSW balance sheets because they were based on the book value of assets and, in conducting the balance sheet test, the fair value of assets controls.[4] Mr. Sargent drew a distinction between "fair value" and "fair market value." He said that "fair value" is "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." But "fair value" could be based on a transaction completed under compulsion and without full knowledge of all relevant facts. "Fair market value," on the other hand, presumes a willing buyer and willing seller, with knowledge of all relevant facts and under no

---

[4] The GSW Financials included notations stating that they were prepared based on the assumption that ISCO would continue as a going concern, which they said was uncertain given ISCO's negative equity. Mr. Sargent opined that the accounting firm was flagging an area of concern, consistent with generally accepted accounting principles.

compulsion to transact. Given this distinction, Mr. Sargent said that fair market value would generally yield the highest price but that fair value and fair market value may be similar and similarly determined.

Mr. Sargent explained that calculating the fair value of a company's assets is accomplished by first calculating [*18] the fair value of invested capital—which is equity plus interest-bearing debt—and then adding non-interest-bearing debt. Together, these calculations comprise the basic balance sheet equation—assets equal liabilities plus equity.

To determine the fair value of invested capital of ISCO, Mr. Sargent used a weighted average between what he called the market approach and income approach. Under the market approach, Mr. Sargent said he canvased the market and public records for comparable sales and from there determined a multiplier based on market value of invested capital and EBITDA (earnings before interest, taxes, depreciation, and amortization) and applied that multiplier to ISCO's historical EBITDA to determine the market value of invested capital of ISCO. Applying a multiplier of 4.85 to EBITDA for 2011, 2012, 2013, and 2014—with certain adjustments noted in his report—yielded the market value of invested capital for ISCO in each of the four years analyzed.[5] Mr. Sargent said that the market approach can be a very accurate measure of value when there is a large amount of data for comparison. But when comparable sales data is limited, the accuracy or reliability of the market approach [*19] is also limited. In this instance, he said he found only three comparable sales and therefore gave the market approach less weight than the income approach.

Under the income approach, Mr. Sargent said he started with projected EBITDA—what he expected earnings to be the following year based on

historical data—and then tax effected the earnings by deducting depreciation based on historical data and calculating the income tax liability to determine ISCO's debt-free income.[6] He then added the depreciation back into the debtfree income and made a deduction for capital expenditures based on historical data, which gave him ISCO's distributable cash flows for the year. Finally, Mr. Sargent said he applied a multiplier based on a capitalization rate—what equity holders and debt holders would expect as a reasonable return for investing—to ISCO's distributable cash flows, arriving at ISCO's calculated enterprise value.[7] Using the weighted average of the market values of invested capital under the market approach and the calculated enterprise values under the income approach,[8] Mr. Sargent then added in ISCO's non-interest-bearing liabilities to determine the fair value of ISCO's total assets. Offsetting [*20] the total assets by total liabilities, Mr. Sargent determined that ISCO had positive equity from 2011 through 2013 but negative equity in 2014.[9]

Based on his determination of ISCO's equity for each year, Mr. Sargent concluded that ISCO passed the balance sheet test for 2011, 2012, and 2013 but failed the test for 2014. Importantly, Mr. Sargent explained that passing the balance sheet test did not mean ISCO was solvent; the balance sheet test is but one of three tests and failing any one of the three signals insolvency. Again, Mr. Sargent explained that the balance sheet test clearly showed

---

[5] Mr. Sargent calculated the market value of invested capital for 2011, 2012, 2013, and 2014 to be $5.59 million, $15.21 million, $16.83 million, and $15.95 million, respectively.

[6] Mr. Sargent acknowledged that ISCO was an S corporation and that its earnings would generally flow through to the owners who then have the tax obligation. By including a deduction for income taxes in his analysis, he was recognizing the existence of the expense and that it would need to be paid somehow, most likely from a distribution of cash from ISCO.

[7] Mr. Sargent's calculated enterprise values for 2011, 2012, 2013, and 2014 were $7.11 million, $10.58 million, $11.27 million, and $11.34 million, respectively.

[8] 10% and 90%, respectively.

[9] Mr. Sargent's calculations showed positive equity of approximately $1.79 million, $5.9 million, and $5.575 million in 2011, 2012, and 2013, respectively. In 2014, ISCO had equity of approximately ($700,000).

Case 25-07009   Doc 9-13   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc Stone v. Citizens Equity First Credit Union (In re Intl Supply Co.)   Page 11 of 34

Page 11 of 34

ISCO's positive earnings and earning capacity but did not contemplate the shareholder advances to Mr. Hofmann that directly correlated with ISCO's increasing liabilities.

Moving on to the cash flow test, Mr. Sargent explained that the test was intended to demonstrate ISCO's ability to pay its debts as they became due. He evaluated ISCO's cash flow on a twelve-month basis because that was when ISCO's debts were due. Based on his review of the Heartland Bank credit analyses and GSW Financials previously discussed, Mr. Sargent determined that 99% of ISCO's debts were "current" debts, meaning they were **[*21]** due within the next twelve months. He believed this was an indication that lenders were not willing to lend to ISCO on a long-term basis; he opined that Heartland Bank was only willing to extend existing debt until the company could be sold.

With that background, Mr. Sargent explained his calculations under the cash flow test. For each period, he started with whatever cash ISCO had in its bank accounts and then analyzed the actual cash flows to invested capital for that year using the same formula for determining cash flow to invested capital under the income approach of the balance sheet test.[10] After determining how much cash flow was expected for the twelve-month period, Mr. Sargent said he measured that figure against projected interest expenses and scheduled principal debt payments for the same period.[11] The result was the cash surplus or shortfall for that period. Finally, the amount of cash on hand from the beginning of the period was added in to arrive at ending cash and

cash equivalents for the period. The result in each of the years analyzed was an ending cash shortfall of more than $3 million. The cash flow calculations from Mr. Sargent's report are:

⊞ Go to table1

Notes: 1.) Notes payable and current portion of long-term debt

Thus, Mr. Sargent concluded that ISCO failed the cash flow test in each of the four years observed. In his view, the shareholder advances to Mr. Hofmann rendered ISCO in deep insolvency from 2011 on under the cash flow test. Admittedly, his analysis was based on year-end numbers from the GSW Financials, but given how deep the insolvency was, Mr. Sargent thought it highly unlikely that ISCO was solvent at any time after 2011.

Questioned about how ISCO was able to continue operating after 2011, Mr. Sargent replied that Heartland Bank's willingness to extend the maturity dates of its loans to ISCO year after year allowed the company to stay afloat. And while financing **[*23]** is generally considered a source of cash, Mr. Sargent said he did not include the refinancing as cash proceeds because he did not believe it was truly a source of cash; the refinancing merely extended the due date of existing debt into the next year but added no new cash into the business. Mr. Sargent asserted that to treat the refinancing transactions as cash proceeds would be to render the cash flow test worthless and useless.

Mr. Sargent conceded that if he had included as a cash source the $6.5 million net cash from financing as stated on the 2014 GSW Financials, the result of his calculation for that year would have yielded a net positive for ending cash. But Mr. Sargent reiterated that this was not money that actually entered ISCO's bank accounts. And all cash that came in was canceled out by the millions being advanced to Mr. Hofmann. He also noted that, while available credit would normally be included in cash flows, he did not include any

---

[10] Again, Mr. Sargent deducted as much as $1.2 million from ISCO's earnings each year for the income tax liability of the company's owners, but he explained that the ultimate result would be the same if he had not made the deduction. His cash flow analysis also included an additional component described as "changes in working capital" that Mr. Sargent said he conservatively estimated at zero.

[11] Mr. Sargent said that he conservatively set the interest expense at $250,000 for each year even though the amount certainly would have increased over time. He also noted that scheduled principal payments included notes payable and the current portion of long-term debt.

available credit in his analysis simply because ISCO did not have any available credit; whatever credit was being extended was due within the same year.

Reconciling the different results under his balance sheet and cash flow tests, Mr. Sargent [*24] said that, together, the tests illustrated the reality of what was happening within ISCO. On the one hand, ISCO was a profitable company; it had positive earnings from operations and was growing in terms of revenue. It was the company's earning capacity that yielded significant value for its assets under the balance sheet test. On the other hand, the balance sheet test did not account for the shareholder advances to Mr. Hofmann and the resulting contra-equity accounts. Those shareholder advances, fueled first by the liquidation of company assets and later by increased borrowing, had a major negative impact on the cash flow test.

Finally, Mr. Sargent described the purpose of the third test, the adequate capital test, as demonstrating whether an entity has adequate capital to meet its operating expenses, capital expenditures, and debt repayment obligations—typically measured for the following year. As for its application here, Mr. Sargent said that he did not conduct a full analysis because, having determined that ISCO failed the cash flow test analyzed over a twelve-month period, by default ISCO also failed the adequate capital test. Simply put, because ISCO did not have enough money [*25] to satisfy current debts as they became due in each of the one-year periods analyzed, it also could not have had enough money to fund its other capital needs. Mr. Sargent explained that he would have conducted a separate analysis had ISCO's debt been spread over a longer term. But under the circumstances, Mr. Sargent determined that ISCO necessarily failed the adequate capital test all four years and was insolvent at all relevant times before, during, and after the CEFCU transfers.

Upon conclusion of Mr. Sargent's testimony, the Trustee rested. Mr. Sargent's expert report was

admitted into evidence subject to the caveat that the Court would rely only on Mr. Sargent's testimony as evidence and would use the report as backup to notes taken during that testimony. Other exhibits discussed by and relied upon by Mr. Sargent, including the GSW Financials and the Heartland Bank credit analyses, were also admitted without objection.

CEFCU began its case by calling Neil Gerber as its expert witness. Mr. Gerber identified himself as a CPA with the accounting firm Sikich LLP. In his 44-year career, Mr. Gerber has done public accounting work, financial analysis work for business clients, audit work, [*26] and occasional fraud investigations. He is a certified fraud examiner and is accredited in business valuations. Mr. Gerber said that he has done numerous business valuations over several decades for both buyers and sellers as well as for litigation purposes. Over the years, he has testified an estimated 100 times in depositions and at trials. He said he is familiar with the insolvency tests at issue here and that he conducted those tests at the request of CEFCU. He submitted an expert report to CEFCU providing his written opinion on the issue of insolvency.

Mr. Gerber was tendered as an expert by CEFCU. He was questioned by counsel for the Trustee about his particular expertise on the issue of insolvency. He admitted that he had not published on the topic and that the only other case in which he had provided a written opinion on insolvency had not yet gone to trial. The Trustee objected to Mr. Gerber being allowed to offer an expert opinion on insolvency. The objection was overruled with this Court finding that the insolvency tests at issue involved common accounting principles about which Mr. Gerber was well qualified to testify. Allowing Mr. Gerber to testify as an expert was, however, [*27] without prejudice to cross-examination by the Trustee's attorney.

Back on direct examination, Mr. Gerber said that he had been asked to analyze whether ISCO was

insolvent when it made transfers to CEFCU of $1.4 million on August 2, 2013, and $320,000 on August 16, 2013, in settlement of Mr. Hofmann's personal debt obligations. He was familiar with Mr. Sargent's report and relied on many of the same documents in making his own report. He said he also relied on general internet searches regarding ISCO to gain an understanding of the company and its history.

In conducting the balance sheet test, Mr. Gerber relied in part on the GSW Financials, acknowledging, as Mr. Sargent had, that the asset values needed to be adjusted from book value. He also agreed that the market approach was generally the best indicator of value and said that he did not conduct a separate analysis under the income approach because his calculations would have been the same. He applied an EBITDA multiplier of 5.0, which he said came from comparable sales of similar-sized companies. He also added in available cash for the periods analyzed and made deductions for ISCO's actual and contingent liabilities. He estimated [*28] ISCO's contingent liabilities, which related to corporate guarantees of Mr. Hofmann's personal debts, using a weighted-average-probability method. The result for the periods analyzed was a net equity value in excess of $8 million.

Unlike Mr. Sargent, Mr. Gerber conducted his analysis looking specifically at July 2013 and August 2013 using ISCO's in-house, interim financials because he believed it was important to look at information from as close to the transfer dates as possible; he did not see any material inconsistencies when he checked his calculations against the year-end GSW Financials. He did not dispute that independently-reviewed financials provide an added layer of reliability but also said that does not make internal financials unreliable. In addition, he tested his calculations against the Heartland Bank credit analyses, which showed growing revenues, new projects, increasing accounts receivables, and stable profit margins. That told him that ISCO had significant earning

capacity and that its assets should be valued accordingly. His conclusion was that ISCO passed the balance sheet test at all relevant times. He said problems for ISCO did not arise until the end of 2014 [*29] and into 2015 after the company's debt doubled in order to make advances to Mr. Hofmann to pay off his personal debt obligations.

Mr. Gerber described the cash flow test as a measure of an entity's ability to meet its obligations as they become due, typically within a twelve-month period. As with the balance sheet test, Mr. Gerber looked specifically at the months of July and August 2013. He used the statements of cash flows in the year-end GSW Financials to calculate net repayments of debt on a yearly basis for 2011, 2012, 2013, and 2014. The result, he said, showed that ISCO paid down more debt than it incurred in 2011 and 2012 but incurred $1 million and $6.5 million more debt than it paid down in 2013 and 2014, respectively. He said the change in 2013 was directly related to the transfers made to CEFCU but opined that the increased borrowing was also necessary to match ISCO's growth and could be expected to be repaid from future operations.

As to Mr. Gerber's analysis of cash flows in July and August 2013, he explained that he used information from ISCO's internal financials for those months, the Heartland Bank credit analyses, and the GSW Financials to determine annualized projections [*30] for each month. For both periods, he started with EBITDA of $3.5 million and then figured in projected sales growth and input costs based on the full value of the NC Machinery/Microsoft contract. He then made upward adjustments for cash on hand and the refinancing of existing bank debt to calculate ISCO's total sources of cash for the two periods. From there, Mr. Gerber deducted total uses of cash, including capital expenditures, interest expense, and the repayment of existing debt, to determine ISCO's annualized net cash flows for July and August 2013. The calculations of projected cash flows from Mr. Gerber's report are:

| | July 2013 | | | August 2013 | |
| | Historical (based on historical amounts) | Projected (based on forecasted growth) | | Historical (based on historical amounts) | Projected (based on forecasted growth) |
|---|---|---|---|---|---|
| **Sources of Cash** | | | | | |
| EBITDA | $ 3,500,000 | $ 3,500,000 | | | |
| Projected sales growth | | 2,440,000 | | | |
| Less input costs | | (1,065,000) | | | |
| Restated EBITDA | 3,500,000 | 4,875,000 | $ 3,500,000 | $ 4,875,000 | |
| **Adjustments:** | | | | | |
| Cash on hand | 362,000 | 362,000 | 32,000 | 32,000 | |
| Refinancing of existing bank debt | 3,600,000 | 3,600,000 | 3,600,000 | 3,600,000 | |
| Total sources of cash | 7,462,000 | 8,837,000 | 7,132,000 | 8,507,000 | |
| **Uses of Cash** | | | | | |
| Capital expenditures | (450,000) | (450,000) | (450,000) | (450,000) | |
| Illinois replacement taxes | (60,000) | (60,000) | (40,000) | (60,000) | |
| Repayment of existing bank debt | (4,080,000) | (4,080,000) | (5,319,000) | (5,319,000) | |
| Interest expense | (250,000) | (250,000) | (310,000) | (310,000) | |
| Total uses of cash | (4,820,000) | (4,840,000) | (6,119,000) | (6,139,000) | |
| Net Cash Flows | $ 2,642,000 | $ 3,997,000 | $ 1,013,000 | $ 2,368,000 | |

According to Mr. Gerber, it was important to include the refinancing of debt as a source of cash for ISCO because manufacturers rely on lines of credit for their operations. He said a 50/50 debt to equity ratio would be completely normal. He conceded, however, that it was atypical for a company to have all its debts due in the short term. Still, Mr. Gerber noted that Heartland Bank was willing to extend credit to ISCO because the company had positive earning capacity and, looking specifically at the first half of 2013, was able to erase the deficit in stockholder [*31] equity from the end of 2012 caused by advances to Mr. Hofmann. And while stockholder equity dropped nearly $2 million into negative territory between July and August 2013, Mr. Gerber opined that ISCO's revenues were strong enough to also erase that deficit in the short term, barring something bad happening as it did in 2014. Between the end of 2013 and 2014, shareholder advances nearly doubled and EBITDA dropped, eroding the debt service coverage ratio. It was not until that point, Mr. Gerber concluded, that ISCO was really in trouble.

In Mr. Gerber's opinion, to exclude the refinanced debt as a source of cash would be to make the assumption that companies like ISCO have to be debt free. He admitted that if he were to remove the refinancing as cash from his analysis, ISCO would fail the cash flow test. And he conceded on cross-examination that he would have treated long-term debts as only a use of cash; he treated the refinanced debt as both a source and use of cash because it was due in the same year. Under the circumstances, he did not believe it reasonable to ignore the refinanced debt as a cash source. He therefore concluded that ISCO was solvent immediately before and after the [*32] CEFCU transfers and passed the cash flow test in July and August 2013.

Moving on to the adequate capital test, Mr. Gerber said that it is used to determine whether an entity has adequate capital relative to its assets and its ability to meet its obligations as they become due. He said that all three tests are interconnected, providing different ways of looking at the same issues. While quantitative in nature like the balance sheet and cash flow tests, Mr. Gerber explained that, in his view, the adequate capital test also involves qualitative factors, like the value of a company's goodwill. He said that ISCO had intangible value created from its technology, earnings, customer base, and ability to generate profits, among other things. Because, under his analysis, ISCO passed the cash flow test, Mr. Gerber ultimately concluded that, with the added value of goodwill, ISCO passed the adequate capital test as well.

On cross-examination, Mr. Gerber conceded that it was the shareholder advances to Mr. Hofmann that ultimately left ISCO with limited assets and significantly increased debt, but he did not think the trend became problematic until 2014. When challenged on his contention that $3.6 [*33] million from refinancing should be included as a source of cash under the cash flow test, Mr. Gerber responded that if it were not included then the repayment of that debt as a use of cash would also have to be excluded even though the obligation still existed. Mr. Gerber was also challenged on his EBITDA calculations under the cash flow test. He conceded that the $3.5 million historical EBITDA used in both July and August 2013 would have included payments already made under the NC Machinery/Microsoft contract, but he still included the full amount of the contract less input costs—a

Case 25-07009 Doc 9-13 Filed 04/02/25 Entered 04/02/25 16:06:58 Desc Stone
v. Citizens Equity First Credit Union (In re Intl Supply Co.) Page 15 of 34

Page 15 of 34

net increase of $1.375 million—in calculating a projected EBITDA of $4.875 million for both months. And although he admitted knowing at the time of conducting his analysis that ISCO never achieved an EBITDA of even $4 million, he maintained that his calculations were sound. He claimed that the only reason ISCO did not ultimately meet projections was that the company ran into production problems in 2014.

When asked why ISCO would need to borrow the $1 million in 2013 to cover input costs on the NC Machinery/Microsoft contract if it were solvent at that time, Mr. Gerber acknowledged that all the company's **[*34]** cash was going directly to Mr. Hofmann and that ISCO had to rely on financing to cover its operating costs. And with all of ISCO's cash going to Mr. Hofmann, Mr. Gerber admitted, ISCO was unable to pay its debts absent refinancing.

Mr. Gerber acknowledged that current assets are those that are readily liquidated to satisfy the needs of a company. He also admitted that almost all liabilities of ISCO were current. Assuming that ISCO could not refinance or borrow more, its current assets in July and August 2013 were not sufficient to cover its current liabilities. When asked to agree that adding $3.6 million for refinancing to the $3.5 million in current assets for August 2013 would still not be enough to cover then-current liabilities exceeding $8 million, Mr. Gerber responded that an important part of the equation was being left out—cash flow from operations and ISCO's significant earning potential. Mr. Gerber remained firm in his opinion that ISCO was solvent in July and August 2013.

CEFCU next called as a witness Rhonda Heinz, an attorney with the law firm of Westervelt Johnson Nicoll and Keller LLC ("WJNK") that represented CEFCU in various collection actions against the Hofmanns and **[*35]** ISCO. Attorney Heinz said she joined the firm in March 2012 and began working on the Hofmann and ISCO matters at that time. She identified the ISCO/Rebecca judgment,

entered January 11, 2013, and signed by her as the attorney for CEFCU. The judgment had been entered against ISCO and Rebecca Hofmann, jointly and severally, in the amount of $261,800; the issue of costs and attorney fees was expressly reserved in the judgment. Attorney Heinz also identified a heavily-redacted set of attorney time and billing records generated by WJNK purporting to show the fees incurred by attorneys in the firm for collection work against the Hofmanns and ISCO between January 1, 2011, and January 31, 2013. According to Attorney Heinz, the time and billing records included time for all collection efforts against the Hofmanns and their various related business entities. She had been tasked with redacting entries not specifically attributable to the collection efforts against ISCO. She claimed that she had completed the task and that the resulting amount of time properly billed for the ISCO collection work was $81,947.50. CEFCU sought to admit the time and billing records as a business record.

The Trustee **[*36]** objected to the admission of the time and billing records, challenging the reliability and relevance of the records, as well as Attorney Heinz's foundation for testifying about them. On cross-examination, Attorney Heinz acknowledged that she was not associated with the firm for much of the period covered by the records and was therefore not actually familiar with the entries that she reviewed and then either redacted or charged to ISCO. She also had not spoken with most of the attorneys who did the work about whether their time should be redacted; several of the attorneys who billed significant amounts of time in the collection efforts were no longer with WJNK. Although she testified that the time records had been carefully reviewed and redacted to show only compensable time attributable specifically to collection from ISCO, she also acknowledged several discrepancies that raised questions about the accuracy of the redacted records. Attorney Heinz was also asked why CEFCU did not seek fees in state court at the time. She responded that there was a lot happening at the time and that the fees were

not pursued for strategic reasons.

The Trustee's objection was sustained, and the time and [*37] billing records of WJNK were not admitted. Although the records were kept in the ordinary course of business by WJNK, the nature of the records involved a level of subjectivity that required more foundation than Attorney Heinz was able to provide. Further, the records had been altered by Attorney Heinz's significant redactions. Her testimony confirmed that she did not have sufficient knowledge of what had occurred before she joined the firm to independently redact the records; she was unable to explain why several entries were not redacted that appeared to relate to entities other than ISCO. The Court found the records to not be reliable evidence of the amounts incurred specifically and solely related to collection efforts against ISCO. Further, the Court questioned whether it could go back at this time to essentially award fees and costs to WJNK as part of a judgment that had been released in a case that had been settled years earlier. Because of those concerns, the Court also sustained the Trustee's objection as to the relevance of the records.

CEFCU rested at the conclusion of Attorney Heinz's testimony. Several exhibits including Mr. Gerber's expert report were admitted into evidence. [*38]  Mr. Gerber's report was admitted with the same caveat as Mr. Sargent's report.

The Trustee recalled Mr. Sargent as a rebuttal witness. He strongly disagreed with Mr. Gerber's opinions, specifically as they related to his application of the cash flow test. In Mr. Sargent's opinion, Mr. Gerber's description of the cash flow test was misleading in that it gave the impression that most debts become due within twelve months. Although that happened to be the case for ISCO, Mr. Sargent said that was atypical. He also disagreed with Mr. Gerber's contention that the $3.6 million refinanced debt was properly included as a source of cash. He said that Mr. Gerber's reasoning relied on an assumption that refinancing creates actual cash flow to an entity even though,

here, it merely extended the maturity date on debt that had clearly been incurred years prior. Mr. Sargent also said that Mr. Gerber's approach was not mathematically sound. If, as Mr. Gerber surmised, loan proceeds were being used to pay off existing debt and that debt was replaced with a "new" loan, then the amount of the new debt would need to be added in. Mr. Sargent said that Mr. Gerber did not do so and, as a result, his analysis [*39]  was completely misleading.

Mr. Sargent further stated that Mr. Gerber's calculation of "projected" EBITDA in his July and August 2013 cash flow analysis was also inappropriate and misleading for several reasons. First, while ISCO's profit margin was increasing at the time, its sales numbers were down, resulting in some leveling-off of projected growth. Second, projected sales growth was included in the EBITDA calculation itself; separately adding in the full value of the NC Machinery/Microsoft contract in July and August 2013 to arrive at the restated EBITDA for those periods surely resulted in double counting of growth projections. And third, simply subtracting the $1 million loan request to cover input costs from the $2.44 million contract price to create an additional $1.375 million in projected sales growth was not mathematically correct. Administrative and other costs of doing business should also have been charged against the contract proceeds to determine net earnings. Further, both the costs and revenue from the contract were payable in monthly installments that had already begun and would continue for the remainder of the year. Mr. Sargent said he was aware of the NC Machinery/Microsoft [*40]  contract in conducting his cash flow analysis and factored it into EBITDA as set forth in his report. It was inappropriate, in his opinion, for Mr. Gerber to include it twice and in full in his restated EBITDA under the cash flow test. He also disagreed with Mr. Gerber's opinion that the adequate capital test was qualitative in nature and that all three tests should yield similar results.

After considering the evidence and the arguments

of the parties, the matter is ready for decision.

## II. Jurisdiction

*HN1*[⬆️] This Court has jurisdiction over proceedings "arising under title 11, or arising in or related to cases under title 11" pursuant to 28 U.S.C. § 1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. § 157(a). *HN2*[⬆️] Actions to "determine, avoid, or recover fraudulent conveyances" are core proceedings. 28 U.S.C. § 157(b)(2)(H). Because actions to recover fraudulent conveyances do not arise exclusively under the Bankruptcy Code and do not strictly arise in a bankruptcy case—the same cause of action often could be prosecuted under state law in a state court—this Court is exercising "related to" jurisdiction in this proceeding, raising the question of whether there [*41] is a constitutional impediment to the entry of a final judgment. *Executive Benefits Ins. Agency v. Arkinson*, 573 U.S. 25, 37, 134 S. Ct. 2165, 189 L. Ed. 2d 83 (2014); *Stern v. Marshall*, 564 U.S. 462, 493, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011). *HN3*[⬆️] Any impediment to the entry of a final judgment may, however, be overcome by the knowing and voluntary consent of the parties to final adjudication by a bankruptcy judge. *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669, 135 S. Ct. 1932, 191 L. Ed. 2d 911 (2015). In their initial pleadings, the parties here resolved the issue by both affirmatively consenting to the entry of a final judgment by this Court.

## III. Legal Analysis

The Trustee filed a ten-count complaint. His authority to bring this proceeding on behalf of ISCO's creditors was specifically provided for in the confirmed liquidating plan and is based on the so-called "strong arm" provisions of the Code that allow trustees to stand in the shoes of certain lien creditors, unsecured creditors, or bona fide

purchasers. 11 U.S.C. § 544. CEFCU has not challenged the Trustee's standing.

Counts I and II seek judgment against CEFCU to avoid constructively fraudulent transfers. Count III seeks relief against CEFCU based on allegations of unjust enrichment. Count VIII seeks to recover avoided fraudulent transfers from and prays for relief against CEFCU. The Trustee focused his evidence at trial on Counts I, II, and VIII.[12]

Count I alleges that $1.72 million in payments made by [*42] ISCO to CEFCU in August 2013 were constructively fraudulent and is brought specifically under a provision of the Illinois Uniform Fraudulent Transfer Act ("IUFTA") which provides, in part:

> § 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> . . .
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a)(2).

Likewise, Count II also alleges that the August 2013 payments were constructively fraudulent conveyances and relies on another provision of the IUFTA, which provides:

---

[12] Both Lee Hofmann and Rebecca Hofmann have been dismissed as parties to this proceeding, but the orders of dismissal did not address the specific counts against them. For clarification purposes, the Order entered with this Opinion will include dismissal of the counts against the two individuals. The dismissals will be without prejudice.

§ 6. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation [*43] was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

740 ILCS 160/6.

Count VIII seeks to recover the August 2013 transfers, if found to be fraudulent conveyances, from CEFCU as transferee pursuant to § 550 of the Code, which provides, in part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

HN4[↑] Constructive fraud is [*44] sometimes referred to as fraud in law and, unlike actual fraud, does not require proof of fraudulent intent. *Society of Lloyd's v. Collins*, 284 F.3d 727, 730 (7th Cir. 2002). Rather, fraud in law is established by proof that a debtor made a voluntary transfer without consideration or for inadequate consideration that hinders or delays the rights of creditors. *Id.* Specifically, § 160/5(a)(2) of the IUFTA requires

proof: (1) that the debtor made a voluntary transfer; (2) when the debtor had debt or was about to incur debt; (3) without receiving a reasonably equivalent value in exchange; (4) resulting in the debtor retaining insufficient property to pay debts. *Grochocinski v. Schlossberg*, 402 B.R. 825, 838 (N.D. Ill. 2009) (citations omitted). Section 160/6 requires similar proof except the final element of insufficient assets remaining to pay debts is replaced by requiring proof that the debtor was insolvent when the transfer was made or became insolvent as a result of the transfer. *Id.* at 838-39 (citations omitted). The Trustee has the burden of proof by a preponderance of the evidence. *Brown v. Phillips (In re Phillips)*, 379 B.R. 765, 778 (Bankr. N.D. Ill. 2007).

Section 548 of the Bankruptcy Code provides a similar basis to avoid constructively fraudulent transfers. 11 U.S.C. § 548(a)(1)(B). A transfer made without receiving reasonably equivalent value in exchange may be avoided if it is made when the debtor was insolvent, it renders the debtor insolvent, or it leaves the debtor with unreasonably [*45] small capital or unable to pay debts as they mature. *Id.* Although the language of § 548 is not identical to §§ 5 and 6 of the IUFTA, the provisions have been called "materially identical," making the case law developed under § 548 relevant to an analysis under the IUFTA. *Baldi v. Samuel Son & Co.*, 548 F.3d 579, 581 (7th Cir. 2008); *Cox v. Nostaw, Inc. (In re Central Illinois Energy Cooperative)*, 521 B.R. 868, 871-72 (Bankr. C.D. Ill. 2014) (Perkins, J.); *Grochocinski v. Zeigler (In re Zeigler)*, 320 B.R. 362, 372 (Bankr. N.D. Ill. 2005) (citing *Scholes v. Lehmann*, 56 F.3d 750, 756 (7th Cir. 1995)) (other citations omitted).

The Trustee did not plead any counts in his complaint under § 548, most likely because, by the time of his appointment, the two-year statute of limitations under § 548 had run. 11 U.S.C. § 548(a)(1). The IUFTA, however, contains a four-year statute of limitations allowing the Trustee here, not appointed until confirmation of the

liquidating plan in May 2016, to reach the August 2013 transfers. 740 ILCS 160/10.

The Trustee and CEFCU stipulated to many of the relevant facts. The occurrence and amounts of the transfers are not in dispute. The fact that the transfers were used to satisfy CEFCU's judgments against Lee Hofmann and the ISCO/Rebecca judgment is not in dispute. It is also not disputed that the judgments were not released until the settlement amounts were paid in full. What remains in dispute is whether ISCO was insolvent at the time the transfers were made or became insolvent as a result of the transfers and whether **[\*46]** CEFCU provided reasonably equivalent value for the first two transfers it received in August 2013. These two issues were the focus of the evidence presented at trial and each will be reviewed here.

### A. ISCO Was Insolvent When It Transferred Funds to CEFCU

*HN5*[⬆️] Under the IUFTA, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 740 ILCS 160/3(a). This provision "mirrors" the definition of insolvency in the Code. 11 U.S.C. § 101(32); *Zeigler*, 320 B.R. at 375. Alternatively, the IUFTA provides that a "debtor who is generally not paying his debts as they become due is presumed to be insolvent." 740 ILCS 160/3(b). Whether an entity is insolvent is a question of fact. *Bachrach Clothing, Inc. v. Bachrach (In re Bachrach Clothing, Inc.)* 480 B.R. 820, 859 (Bankr. N.D. Ill. 2012) (citations omitted). Bankruptcy courts have broad discretion to determine insolvency. *Schlossberg*, 402 B.R. at 836-37.

Both the Trustee and CEFCU presented expert testimony on the issue of ISCO's solvency. Mr. Sargent and Mr. Gerber both prepared expert reports and testified using three different tests for insolvency: the balance sheet test, the cash flow test, and the adequate capital test. Each expert referenced the tests as being compelled by § 548 without reference to the IUFTA. The three tests are,

however, regularly relied on by courts deciding issues of insolvency **[\*47]** under both the Code and the IUFTA. *See, e.g., Paloian v. LaSalle Bank Nat'l Ass'n (In re Doctors Hosp. of Hyde Park, Inc.)* 507 B.R. 558, 632 (Bankr. N.D. Ill. 2013). This Court found the use of the three tests helpful in understanding the financial condition of ISCO and in rendering its decision about ISCO's solvency. Each test and each expert's analysis will be discussed.

Before discussing the tests, a few comments about the experts are warranted. Both Mr. Sargent and Mr. Gerber were well qualified by education and experience to testify and provide expert opinions in this matter. Each testified professionally under both direct and cross-examination. The testimony of both experts was helpful to the Court. They agreed that ISCO's business operation, standing alone, was a profitable enterprise. Both also agreed that ISCO's financial condition could not be determined by looking only at its operations; the depletion of cash reserves and frequent diversion of cash generated by operations to Lee Hofmann and the debts of his other businesses also had to be considered. In large measure the experts parted ways in considering the weight to be given to the diversion of cash from ISCO to Lee Hofmann. In running the three tests, Mr. Sargent placed significant weight on those diversions, and the diversions were **[\*48]** key to his finding that ISCO was insolvent. Mr. Gerber placed more weight on the positive outcomes of ISCO's manufacturing operations and, although not totally dismissive, placed much less weight on the diversions in making his assumptions and finding that ISCO was solvent when the CEFCU transfers were made. As will be explained below, this Court found Mr. Sargent's approach more persuasive.

### 1. The Balance Sheet Test

*HN6*[⬆️] The balance sheet test determines whether a debtor's assets exceed its liabilities; a debtor is considered solvent under the balance sheet test if

assets exceed liabilities. In discussing the balance sheet test, Mr. Sargent said that he conducted the test for the years 2011, 2012, 2013, and 2014. He noted that, for each of those years, the balance sheets included in the GSW Financials showed that ISCO had negative equity—its liabilities exceeded its assets. For each of those years, GSW had also included a "going concern qualification" on the GSW Financials noting that ISCO "had negative working capital and total liabilities exceed total assets." Mr. Sargent said that the GSW Financials, although helpful, were not determinative because the value of assets on the GSW Financials [*49] were listed at book values and, to properly determine solvency, the "fair value" of assets should be used.

Mr. Sargent used both a market approach and an income approach to determine the fair value of invested capital—the formula he said was best to determine the fair value of ISCO's assets. He said that, because he could not find many comparable sales upon which to base his market approach valuation, he gave more weight to the income approach.[13] From the fair values he determined for each of the years in question, he subtracted the total liabilities for each year as shown on the GSW Financials. That resulted in positive equity and a finding of solvency for 2011, 2012, and 2013, but it resulted in negative equity and a finding of insolvency for 2014. Mr. Sargent qualified his finding of solvency for the earlier years by pointing to the steep rise in ISCO's liabilities from year to year and the corresponding increases in cumulative shareholder advances made to Lee Hofmann. He also noted that the balance sheet test should be viewed somewhat cautiously because of the mandated reclassification of $8.3 million of shareholder advances in 2010. With those qualifications, he said that, according [*50] to the balance sheet test for 2013, ISCO was solvent when the CEFCU transfers were made.

Mr. Gerber described the balance sheet test similarly to Mr. Sargent. He opined that the assets needed to be adjusted from book value to fair market value and made his calculations for the more limited periods of July 2013 and August 2013.[14] He applied a multiplier to what he referred to as "normalized EBITDA" to determine the value of invested capital—the term also used by Mr. Sargent. He subtracted from that figure the actual liabilities as shown on the monthly, in-house accounting records for July and August. He also subtracted contingent liabilities described as ISCO's guarantees of Lee Hofmann's debts, which he had adjusted downward based on assumptions he made about the likelihood that ISCO would be called upon to pay such debts. His calculation resulted in positive net equity in excess of $8 million for both July and August 2013. Thus, he opined that, based on the balance sheet test, ISCO was solvent both before and after the CEFCU transfers were made.

Mr. Sargent and Mr. Gerber disagreed on the use of some terminology and methodology related to the balance sheet test. Because they both ultimately [*51] opined that ISCO passed the balance sheet test for the relevant periods, there is no need for the Court to resolve those disagreements.

## 2. The Cash Flow Test

*HN7*[⬆] The cash flow test is used to determine whether a debtor has cash available to pay its debts as they become due within a period. Because the vast majority of ISCO's debt was current debt, meaning it was due within twelve months, it is appropriate to evaluate ISCO's cash flows over a twelve-month period. Mr. Sargent performed the cash flow test for ISCO for the years 2011, 2012, 2013, and 2014 and opined that ISCO was insolvent throughout each of those periods.

---

[13] Mr. Sargent discussed his calculations in detail and provided charts and graphs in his written report to assist in understanding his calculations.

[14] Mr. Gerber also testified in detail about his calculations and provided charts and graphs in his written report to support his testimony.

In performing the cash flow test, Mr. Sargent said that available cash includes beginning cash balances, cash flow from the period, and unused and available credit. Cash flow from the period was calculated by Mr. Sargent by projecting EBITDA for the year and then adjusting that figure for projected income taxes.[15] The adjusted amount was added to the beginning cash balances. No amount was included for available credit because the GSW Financials for each year said no credit was available. From the total sources of cash, Mr. Sargent deducted interest and scheduled principal payments. [*52] The net sum in each year was negative, resulting in his conclusion that ISCO was insolvent.

Particularly for 2013, the year the CEFCU transfers were made, Mr. Sargent projected EBITDA at $3.4 million. After adjusting for taxes, he calculated "cash flow to invested capital" as $1,717,200. To that amount he added beginning cash of $6819 and subtracted interest expense of $250,000 and scheduled principal payments of $5,604,014. This resulted in negative cash flow for 2013 of $4,129,995.

Mr. Sargent said that, in each year, ISCO had an atypical amount of current debt versus long-term debt. For example, in 2013, 99.5% of its debt was current—due with twelve months. He said that the Heartland Bank credit analyses indicated an unwillingness to lend long term and that fact is reflected in the cash flow test. He also noted that

ISCO's dire cash situation was evidenced by the fact that it did not have the cash in June 2013 to cover the start-up costs for materials and labor associated with the new contract with NC Machinery/Microsoft. ISCO had to borrow $1 million to maintain operations and start the project. He concluded by saying that, based on the cash flow test, ISCO was insolvent at all times [*53] from 2011 through 2014—the entire period he tested.

Mr. Gerber described the cash flow test in similar terms as Mr. Sargent, with an eye toward the current, twelve-month period, and agreed that the methodology involves determining sources of cash and subtracting current debt from the total available. As with the balance sheet test, however, he performed the cash flow test for the limited periods of July 2013 and August 2013 and opined that ISCO was solvent at the end of each month.

Mr. Gerber began his cash flow test, as Mr. Sargent had, projecting EBITDA for the one-year period in the future. He estimated $3.5 million in EBITDA based on ISCO's history. He also included cash on hand in his calculation—$362,000 in July and $32,000 in August. Mr. Gerber made two other adjustments to his sources of cash that differed significantly from Mr. Sargent's calculations. First, he added in the total $2,440,000 contract price of the NC Machinery/Microsoft contract as a source of cash and then deducted from that the $1,065,000 in start-up costs associated with the contract as discussed in the June 2013 Heartland Bank credit analysis. This resulted in what he called "Restated EBITDA" of $4.875 million, [*54] which he used for both months. Secondly, he added the refinancing of $3.6 million in otherwise current debt due to Heartland Bank as a source of cash. With these adjustments, he projected ISCO to have positive cash flow even after paying all current debt. Mr. Sargent strongly criticized both adjustments. Because, without the adjustments, ISCO fails the cash flow test as conducted by Mr. Gerber, each adjustment must be closely examined.

---

[15] In admitting the expert reports of both Mr. Sargent and Mr. Gerber, the Court stated that it would rely on their testimony and use the reports as backup to that testimony but would not consider information in the reports not presented in testimony. That said, the Court did notice that Mr. Gerber said in his report that he did not adjust for taxes in his cash flow test because ISCO was an S corporation and tax obligations passed through to shareholders rather than being paid by the company. Mr. Sargent testified that he made adjustments for taxes in recognition of the fact that the tax obligation existed and would need to be paid somehow by someone. Mr. Sargent also said that removing the adjustment would not change the results of his analysis. The issue was not discussed at length at trial, but the Court agrees that the issue is not dispositive of either expert's analysis and therefore makes no finding as to whether adjusting for taxes was appropriate.

With respect to adding in the full NC Machinery/Microsoft contract price, Mr. Gerber attempted to justify the adjustment by saying that the contract was the first of a series and he expected significant growth for ISCO over the years that followed. But he admitted that deducting only the start-up costs from the expected gross proceeds resulted in a margin in excess of 50%, something that had never occurred in ISCO's history. He also admitted that ISCO's income statements calculating earnings and profits always included deductions of administrative costs associated with operations in addition to direct costs of labor and materials. He failed to consider those other costs. Further, he admitted that the in-house accounting records he used in making his calculations [*55] for July and August already included several months of contract proceeds. Thus, when the figures from those documents were annualized to project EBITDA, as he had done, at least part of the new contract proceeds were already in his $3.5 million calculation. To some degree, he was double counting the contract revenue. Mr. Gerber maintained that the adjustment was appropriate by expressing confidence in ISCO's ongoing operations and said that he used the best evidence he had.

Mr. Sargent, in rebuttal, criticized the adjustment as double counting and incomplete because of the deduction of only the start-up operating costs. He said that ISCO's actual year-end EBITDA for 2013 was $3.67 million and that the "restated EBITDA" Mr. Gerber calculated at $4.875 million was well outside any reasonable range of assumptions or projections. Mr. Sargent's unrebutted testimony was that ISCO had never, in any year, achieved EBITDA that exceeded $4 million. Mr. Gerber said during his testimony that, when accountants make assumptions, the results of those assumptions must be "sanity checked" to avoid unsupportable results. Mr. Sargent suggested that Mr. Gerber should have seen that the EBITDA number he [*56] ended up with after adding in the additional contract proceeds was simply too high to pass a sanity check.

The Court agrees with Mr. Sargent on this issue. Mr. Gerber's upward adjustment of $1.375 million as additional cash related to the new contract is simply wrong. He added in the full contract price even though the monthly payments already received were included in the annualized calculation leading him to his initial $3.5 million EBITDA figure; this clearly resulted in some double counting. And he adjusted for expenses by deducting only the start-up costs rather than all costs associated with the project. So, again, his number is wrong. The Court cannot say that no adjustment to EBITDA could have been justified based on the new contract. The Court can say, however, without any hesitation or doubt, that the adjustment Mr. Gerber made did not reflect the reality of what was going on with ISCO's operations. The adjustment skewed Mr. Gerber's cash flow calculation, and he has offered no alternate or corrected calculation. The entire adjustment must be disregarded.

The adjustment Mr. Gerber made by adding the $3.6 million of refinanced debt into the calculation as a source of cash is [*57] also problematic. Mr. Gerber acknowledged that the refinance did not bring new cash into ISCO's accounts. He also admitted that the $3.6 million was current debt due within twelve months and that ISCO having virtually all its debt due in the short term was unusual. He justified the inclusion of the refinanced debt as a source of cash by asserting that ISCO had previously refinanced the debt, he expected ISCO to refinance the debt again when it became due, and, in fact, ISCO had refinanced the debt. He stated that, if he had not included the $3.6 million as a source of cash, he would have removed that same amount from the total current debt to be paid, resulting in the same bottom line.

Mr. Sargent strongly criticized the inclusion of the $3.6 million refinance as a source of cash. He emphasized that it was not a cash infusion to ISCO and that the purpose of the cash flow test was to determine if ISCO had enough projected cash flow to pay its debts, the vast majority of which

happened to be due in the current period. He said that removing from the equation debt that was undoubtedly current but could not be paid in the current period was inappropriate and that such a practice would routinely [*58] result in companies with cash flow problems nevertheless passing the cash flow test. The Court agrees with Mr. Sargent on this issue.

Mr. Gerber assumed that ISCO would not pay the $3.6 million when it became due and therefore treated the debt as though it would not be due. He said that to do otherwise was to assume that companies had to be debt free. But the fact that ISCO repeatedly refinanced the $3.6 million debt did not make the debt long-term debt—it always remained due within twelve months. Heartland Bank always had the option of nonrenewal. The Court cannot find that Mr. Gerber properly conducted the cash flow test when he effectively reduced current debt by the amount of such debt that ISCO could not pay. The fact that ISCO could not pay this debt and had to refinance it supports a finding of insolvency. The use of the $3.6 million refinance as a source of cash must be disregarded.

Recomputing Mr. Gerber's cash flow test calculation with the adjustments for the new contract proceeds and the $3.6 million refinance removed results in negative cash flow under both his historical and projected calculations for July 2013 and August 2013. This is true even though he used $3.5 million [*59] as his historical EBITDA and did not make any deductions for federal taxes—both matters which were different from the calculations of Mr. Sargent. But neither difference is enough to alter the ultimate outcome of the calculation. Giving Mr. Gerber the benefit of any doubt or question on these other contested issues still results in ISCO failing the cash flow test. Based on Mr. Sargent's cash flow analysis, which the Court found credible, and on Mr. Gerber's cash flow analysis, as altered by the rejection of the two adjustments, it is clear that ISCO was insolvent both before and after making the transfers at issue to CEFCU.

### 3. The Adequate Capital Test

Mr. Sargent described the adequate capital test as one to determine whether a debtor has sufficient available capital to pay not only its debts but also all operating expenses and capital expenditures within a specific period, typically twelve months. He opined that, because ISCO failed the cash flow test, by definition, it also failed the adequate capital test. If it did not have enough cash to pay its overwhelmingly current debts as they became due in the twelve-month period analyzed, it could not have had enough cash and other resources [*60] to pay current debts plus other expenses for the same period. He noted that both the GSW Financials and the Heartland Bank credit analyses repeatedly showed that ISCO had negative working capital through the relevant years. He concluded that ISCO failed the adequate capital test.

Mr. Gerber described the test in a similar manner. He relied on his cash flow test results to suggest that ISCO had significant revenues and cash available to pay current debts. He also noted that, although historical financial statements showed that ISCO had negative equity, his balance sheet test showed significant equity. He dismissed concerns about negative working capital, saying that the cause was the high level of ISCO's short-term debt that would be remedied by refinancing. He also said that he considered goodwill as an asset not on the balance sheets but nevertheless of significant value.

The Court finds that Mr. Sargent has the better position on this test as well. Mr. Gerber's cash flow test contained errors, and his reliance on his cash flow results to justify ISCO passing the adequate capital test is therefore flawed. ISCO did not pass the cash flow test and had significant negative working capital [*61] positions throughout all relevant time periods. For the reasons expressed by Mr. Sargent, ISCO failed the adequate capital test.

Based on an analysis of the expert testimony on all three insolvency tests, this Court finds that ISCO

was insolvent before, at the time of, and after the CEFCU transfers were made in August 2013.

## B. ISCO Received Less Than Reasonably Equivalent Value in Exchange

Having determined that ISCO was insolvent, the transfers it made to CEFCU are avoidable as fraudulent only if made "without receiving a reasonably equivalent value in exchange" therefor. 740 ILCS 160/5(a)(2); 740 ILCS 160/6; *see also* 11 U.S.C. § 548(a)(1)(B)(i). *HN8*[↑] As with the other statutory elements, here too, bankruptcy courts may look to cases decided under § 548 and other states' versions of the UFTA when determining whether reasonably equivalent value was received. *Creditor's Committee of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 947 (7th Cir. 2007) (citing *Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.)*, 139 F.3d 574, 577 (7th Cir. 1998)); *see also Reinbold v. Morton Community Bank (In re Mid-Illini Hardwoods, LLC)*, 576 B.R. 598, 604 (Bankr. C.D. Ill. 2017) (Perkins, J.). The Trustee bears the burden of proving by a preponderance of the evidence that ISCO received less than equivalent value in exchange for the transfers to CEFCU totaling $1.72 million. *Stone v. Ottawa Plant Food, Inc. (In re Hennings Feed & Crop Care, Inc.)*, 365 B.R. 868, 874-75 (Bankr. C.D. Ill. 2007). Once the Trustee's burden has been met, however, the burden shifts to CEFCU to demonstrate what value was received in exchange for the subject transfers. *Chatz v. Stepaniants (In re Fatoorehci)*, 546 B.R. 786, 793 (Bankr. N.D. Ill. 2016); *Combs-Skinner v. Gorman (In re Premier Data Solutions, Inc.)*, 2012 Bankr. LEXIS 407, 2012 WL 400063, at *2 (Bankr. C.D. Ill. Feb. 7, 2012) (Fines, J.).

*HN9*[↑]  Determining **[\*62]** whether a debtor received reasonably equivalent value in exchange for a transfer it made "involves a three-part inquiry: (1) the court must determine that a debtor received some value; (2) the value received must have been in exchange for a transfer made by the debtor; and

(3) the value of what was received by the debtor must have at least a reasonable equivalence to the value of what the debtor transferred." *Mid-Illini Hardwoods*, 576 B.R. at 604. Under Illinois law, value is given for a transfer if, in exchange for the transfer, property is transferred or an antecedent debt is secured or satisfied. 740 ILCS 160/4(a). As for whether there is a reasonable equivalence between values exchanged, the Seventh Circuit has described the test—at least under § 548—as one not controlled by a fixed mathematical formula but, instead, a comparison of the value of what was transferred to the value of what the debtor received in exchange. *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997). There appears to be no dispute that the test as articulated by the Seventh Circuit sets forth the correct standard for evaluating the reasonable equivalence of value under the IUFTA.[16]

## 1. The Trustee Met his Burden on Value

The Trustee met his *prima facie* burden of establishing that ISCO received less than reasonably equivalent **[\*63]** value in exchange for the transfers to CEFCU totaling $1.72 million. Mr. Sargent testified that, based on his investigation of ISCO's finances and review of the testimony of CEFCU's representatives, ISCO's relationship with and indebtedness to CEFCU was limited to the ISCO/Rebecca judgment of $261,800. The parties agree that CEFCU received a total of $2.02 million to settle all claims and debts relating to Hofmann judgments, including the ISCO/Rebecca judgment. In addition to the transfers at issue here, ISCO, along with Mr. Hofmann, borrowed $300,000 from Morton Community Bank ("MCB") that MCB paid directly to CEFCU on ISCO and Mr. Hofmann's behalf. And there is no dispute that,

---

[16] In its motion for summary judgment, CEFCU took the position that, given the lack of Illinois case law on this issue, the Seventh Circuit's approach to determining reasonably equivalent value under § 548 is also applicable to fraudulent conveyance actions brought under Illinois law. The Trustee has made no assertions to the contrary.

notwithstanding ISCO's $1.72 million in payments to CEFCU, the ISCO/Rebecca judgment was not released and satisfied until CEFCU received the final settlement payment of $300,000 from MCB. According to the Trustee, if the ISCO/Rebecca judgment was not satisfied until CEFCU received the final $300,000 payment from MCB on ISCO and Mr. Hofmann's behalf, then the judgment must be found to have been satisfied in exchange for those funds rather than ISCO's prior payments totaling $1.72 million. This Court agrees. **[*64]**

The MCB payment was part and parcel of the completed settlement between CEFCU, the Hofmanns, and ISCO. The $300,000 repayment obligation incurred by ISCO cannot be ignored when accounting for what value was exchanged in the transaction. But whether comparing $261,800 to $2.02 million or to $1.72 million, as CEFCU would have it, the result is the same: ISCO did not receive reasonably equivalent value for the CEFCU transfers. As such, the burden shifted to CEFCU to show what value ISCO did receive in exchange.

## 2. CEFCU Failed to Show ISCO Received Value for the Transfers

In addition to the $261,800 ISCO/Rebecca judgment being satisfied, CEFCU says it waived its right to pursue fees, which Attorney Heinz testified to being as much as $81,947.50, as well as costs and postjudgment interest. CEFCU also contends that ISCO received the benefit of CEFCU releasing back to the Hofmann Trust property purportedly worth $900,000 or more, making it available thereafter as collateral for future borrowing. Each of CEFCU's contentions are untenable.

### i. Satisfaction of the ISCO/Rebecca Judgment

As stated above, this Court disagrees with CEFCU's contention that ISCO received satisfaction of the ISCO/Rebecca **[*65]** judgment in exchange for the transfers to CEFCU totaling $1.72 million—at least inasmuch as CEFCU has

failed to show that it has not received credit for that value in exchange for the final settlement payment. By the Trustee pursuing the $1.72 million in transfers from ISCO to CEFCU and not the final $300,000 payment in the hands of CEFCU from MCB, the inference to be drawn, at least from the creditors' perspective, is that reasonably equivalent value was given in exchange for the MCB funds. And the most concrete item of value to ISCO that was received in the transaction was the release of the ISCO/Rebecca judgment.[17]

Indeed, in a separate proceeding commenced by the Trustee against MCB, the court determined that the satisfaction of the ISCO/Rebecca judgment was value exchanged for ISCO incurring liability on the MCB note used to make the final settlement payment. *Stone v. Morton Community Bank (In re Int'l Supply Co.)*, 631 B.R. 331, 343-44 (Bankr. C.D. Ill. 2021) (Perkins, J.). While not binding on CEFCU, the *Morton Community Bank* decision sheds light on the totality of the transactions and their import from the perspective of ISCO's creditors. And there is sufficient evidence in the record for this Court to take the MCB payment into account when considering what was exchanged; the parties agree **[*66]** that CEFCU received a total of $2.02 million from or on behalf of ISCO and CEFCU gave nothing in return until it received the final $300,000 payment through the MCB loan proceeds. To give CEFCU credit for the release of the ISCO/Rebecca judgment as value exchanged for the previous $1.72 million paid to it would be to ignore the final $300,000 payment and double count the value that was actually provided.

---

[17] The Trustee has argued that the satisfaction of judgment was not value received by ISCO because the underlying debts were always Mr. Hofmann's and ISCO only became liable because of Mr. Hofmann's actions to cause his own salary at ISCO to be diverted to his wife. While the Trustee is correct in his assessment of how ISCO's obligation to CEFCU arose, the fact remains that ISCO was indebted to CEFCU. And the satisfaction of an antecedent debt constitutes value as a matter of law under the IUFTA. *See* 740 ILCS 160/4(a); *see also* 11 U.S.C. § 548(d)(2)(A).

### ii. Waiver of Entitlement to Fees, Costs, and Interest

To a large extent, the same reasoning applies to CEFCU's waiver of whatever entitlement it had to attorney fees, costs, and postjudgment interest on the ISCO/Rebecca judgment. *See Morton Community Bank*, 631 B.R. at 343. While a dollar-for-dollar match is not required, the difference in value between the $300,000 MCB note and the $261,800 released judgment is easily made up by taking into account the value of whatever fees, costs, and postjudgment interest CEFCU might have been entitled to but waived as part of the settlement. Of course, CEFCU contends that the value is much greater. But that was CEFCU's burden to prove, and the record does not support such a finding.

CEFCU essentially asks this Court to make a finding as to the fees and costs that it would have been awarded **[*67]** by the state court had the matter been pursued. Several procedural and evidentiary hurdles prevent the Court from determining what value unpursued fees and costs yielded to ISCO. There is no dispute that the ISCO/Rebecca judgment arose from a supplemental proceeding to collect on the Hofmann judgments and that the amount of the ISCO/Rebecca judgment was "to be applied towards the satisfaction of the judgments" against Mr. Hofmann. Attorney Heinz testified that the issues of fees and costs were specifically reserved in the judgment and that such fees and costs were never ultimately pursued. Determining what fees or costs should be assessed against which party under these circumstances involves thorny issues of state law best resolved by the state court where the matters were pending.[18]

Combing through Illinois statutes and rules to support a finding of what fees and costs CEFCU might have been entitled to in decade-old state court proceedings with an incomplete record and no indication of how the state court might have ruled on issues that CEFCU declined to pursue is not an appropriate undertaking for this Court.

And even if the Court were in a position to evaluate the fees and costs that **[*68]** might have been awarded by the state court, the evidence presented does little to assist the Court in ascribing a value to the waiver of such fees and costs. Attorney Heinz asserted that CEFCU's attorney fees relating to the collection of the ISCO/Rebecca judgment totaled $81,947.50, but the Court determined that the billing and time records upon which Attorney Heinz's assertion was based were not reliable and that she was unable to provide the foundation necessary to support her assertions.[19] Further, while Attorney Heinz said that CEFCU's attorney fees totaled $81,947.50, it is unclear whether that figure includes costs.[20] To the extent that Attorney Heinz's assertion was limited to attorney fees, CEFCU presented no evidence of discrete costs that it incurred and were attributable to ISCO.

In addition, the above obstacles do not account for but would certainly be impacted by the fact that

---

[18] For instance, the Illinois statute cited by the state court as the basis for entering judgment against ISCO provides, in part, that the court "may enter judgment against [third parties who transfer property in violation of a citation] in the amount of the unpaid portion of the judgment and costs allowable under this Section, or in the amount of the value of the property transferred, whichever is lesser." 735 ILCS 5/2-1402(f)(1). The same section of the statute makes reference to other sections governing wage deductions and garnishments, which, separately, set forth their own procedures regarding the assessment

of costs and fees. 735 ILCS 5/2-1402(k-3), (k-5); 735 ILCS 5/12-715; 735 ILCS 5/12-814. Elsewhere, the statute provides that costs may be "allowed, assessed and paid in accordance with rules," unless the court, in its discretion, determines that the costs were improperly incurred. 735 ILCS 5/2-1402(h). The Illinois Supreme Court Rules, in turn, provide for the taxing of certain costs in supplemental proceedings. Ill. S. Ct. R. 277(i).

[19] As previously discussed, the heavily-redacted billing records covered periods predating Attorney Heinz's association with the WJNK firm. While she said she reviewed the records and made the redactions to show only entries relating to collection efforts against ISCO, she admitted that she did not speak with the other attorneys involved about their work on the matter and acknowledged several discrepancies that raised significant concerns about how charges were allocated to ISCO and the overall reliability of the records.

[20] In its motion for summary judgment, CEFCU asserted that the $81,947.50 represented its attorney fees and costs. Attorney Heinz's testimony, however, gave the impression that the amount covered only CEFCU's attorney fees.

Case 25-07009   Doc 9-13   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc Stone
v. Citizens Equity First Credit Union (In re Intl Supply Co.)   Page 27 of 34

Page 27 of 34

ISCO and Mrs. Hofmann appealed the judgment entered against them, and that appeal was pending when the parties negotiated the global settlement of all claims, the terms of which provided for dismissal of the appeal. Setting aside the issue of what additional value dismissal provided to CEFCU, the appeal [*69] itself only raises more questions about what fees and costs, if any, would have been taxed against ISCO. And, again, the Court will not speculate about what might have happened had CEFCU pursued such relief at the time.

The appeal of the ISCO/Rebecca judgment also raises questions about what postjudgment interest had accrued by the time the parties reached an agreement on settlement.[21] The ISCO/Rebecca judgment was entered January 11, 2013, and the first settlement agreement was dated June 6, 2013. No evidence was presented as to when ISCO filed its appeal, what bond was provided to stay the judgment pending the appeal, or whether enforcement of the judgment and therefore the accrual of postjudgment interest was in fact stayed. *See* 735 ILCS 5/2-1303(a). Absent any evidence on these issues, the Court cannot assume that significant interest accrued and if it did in what amount before the parties' settlement agreement was completed. Based on the record before it, this Court cannot quantify the value of CEFCU's waiver of whatever entitlement it might have had to payment of attorney fees, costs, and postjudgment interest against ISCO.

### iii. Release of the Hofmann Irrevocable Trust Property

Finally, CEFCU's assertion [*70] that its release of the Hofmann Trust property was value received by

ISCO in exchange for the transfers to CEFCU is not convincing. As the Trustee pointed out, ISCO never owned the trust property. It appears, though it is not entirely evident, that CEFCU obtained the deed to the Hofmann Trust property for recording as security for some portion of the collective judgments or the settlement. And as part of the global settlement between CEFCU, the Hofmanns, and ISCO, CEFCU agreed to release the property back to the Hofmann Trust. But at no point in time did ISCO have title to the trust property. CEFCU seems to believe that, because it was thereafter transferred to the Hofmanns, who, a year later, signed a deed of trust for the property in favor of Heartland Bank the same day that ISCO signed a promissory note in favor of Heartland Bank, the release of the trust property was a benefit to and thus value received by ISCO.

*HN10*[⬆] Courts do recognize indirect benefits of paying the debts of third parties as value received in certain situations where the debtor and third party share an identity of interests, the benefit is "fairly concrete," or the debtor receives the benefit of the original consideration. [*71] *See, e.g., Mid-Illini Hardwoods*, 576 B.R. at 607-10 (citations omitted). But none of these scenarios are representative of the present case. While Mr. Hofmann did control ISCO and what benefitted ISCO would also generally benefit him, the inverse was not necessarily true. As far as the Court can tell, every action taken by ISCO for Mr. Hofmann's benefit did more harm than good to ISCO. Although Mr. Hofmann treated ISCO as if its interests were aligned with his own, their interests often diverged. As a distinct legal entity, ISCO is presumed to exist separate from its owners and in furtherance of its own interests. *Flores v. Westmont Engineering Co.*, 2021 IL App (1st) 190379, ¶29. Mr. Hofmann's interests were not devoted to ISCO's success; he was separately focused on financing his personal and other business endeavors even at the expense of ISCO.

Whatever benefit ISCO stood to gain from the release of the Hofmann Trust property was too

---

[21] CEFCU's motion for summary judgment claimed with little explanation that statutory postjudgment interest had accrued in the amount of $56,674.90. In his response to CEFCU's motion, the Trustee disputed CEFCU's math and asserted that the maximum amount of statutory interest possibly available would have been $9424.30.

Case 25-07009   Doc 9-13   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc Stone v. Citizens Equity First Credit Union (In re Intl Supply Co.)   Page 28 of 34

Page 28 of 34

attenuated for it to constitute value received. *HN11*[⬆] Reasonably equivalent value is a factual issue that "must be evaluated as of the date of the transaction." *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002) (citation omitted). At the time CEFCU released the property back to the Hofmann Trust, it was not apparent that the property would later be transferred to Mr. Hofmann himself or that he might use it to [*72] bolster ISCO's borrowing power. And even if it was contemplated at the time that the release of the Hofmann Trust property would be used to secure additional credit for ISCO, there is nothing in the record for the Court to assume that it would have necessarily benefited ISCO's creditors.[22] *Id.* ("[S]ince the purpose of fraudulent conveyance law is to protect creditors, the determination of value is looked at from the vantage point of the debtor's creditors.") (citation omitted). CEFCU's release of the trust property was not value received by ISCO.

CEFCU failed to show that ISCO received value for the transfers it made to CEFCU in settlement of Mr. Hofmann's debts. The Hofmann Trust property never belonged to ISCO and was not value it received in exchange for payment. To the extent ISCO received value in the form of the satisfied ISCO/Rebecca judgment and associated fees, costs, and interest, this Court finds that such value was exchanged for payment other than the $1.72 million at issue here or was otherwise not established in concrete, measurable terms. Thus, the Court concludes that ISCO did not receive any value in exchange for the August 2013 transfers to CEFCU totaling $1.72 million. [*73]

## C. The Trustee's Recovery

Because ISCO was insolvent and undercapitalized when it made the August 2013 transfers to CEFCU totaling $1.72 million without receiving value in

---

[22] No information was presented about the use of the loan proceeds received when the Hofmann Trust property was pledged to Heartland Bank. The proceeds may well have been diverted to Lee Hofmann.

exchange therefor, those transfers will be avoided under § 544(b)(1) of the Bankruptcy Code through §§ 160/5(a)(2) and 160/6 of the IUFTA. As such, the Court must address Count VIII of the Trustee's complaint seeking recovery of the transfers and an award of attorney fees, costs, and prejudgment interest.

## 1. Recovery of the Avoided Transfers

Section 550(a)(1) provides for recovery of a fraudulent transfer from the "initial transferee." 11 U.S.C. § 550(a)(1). Under § 550(a)(2), a fraudulent transfer may also be recovered from an "immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a)(2). Section 550(b) creates a defense against recovery for an immediate or mediate transferee of the initial transferee if such transferee "takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided[,]" as well as for any subsequent "immediate or mediate good faith transferee of such transferee." 11 U.S.C. § 550(b). The defense is an affirmative one, and the transferee invoking § 550(b) bears the burden of persuasion on the issue. *Smith v. SIPI, LLC (In re Smith)*, 811 F.3d 228, 246 (7th Cir. 2016).

*HN12*[⬆] The term "transferee" is not defined in the Code. But [*74] the Seventh Circuit has described a "transferee" as one that has "dominion over the money or other asset, the right to put the money to one's own purposes." *Bonded Financial Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988). Naturally, an initial transferee is the first transferee in the line. *Smith*, 811 F.3d at 244. An immediate or mediate transferee, then, is "one who takes in a later transfer down the chain of title or possession." *Grochocinski v. Knippen (In re Knippen)*, 355 B.R. 710, 728 (Bankr. N.D. Ill. 2006) (quoting *First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*, 974 F.2d 712, 722 (6th Cir. 1992)). There is no defense against liability for an initial transferee under §

550. *Smith*, 811 F.3d at 244.

Turning to the transfers at issue here, the first was made when ISCO delivered to CEFCU a cashier's check in the amount of $1.4 million on August 2, 2013. Without question, CEFCU was the initial transferee of the $1.4 million cashier's check and has no defense against recovery under § 550. As such, the Trustee is entitled to recover the full value of that transfer.

The second transfer is a bit more complicated. It occurred on August 16, 2013, when ISCO transferred $320,000 from its savings account at Heartland Bank to the Games Management, LLC account at CEFCU, which, according to the parties' joint pretrial statement, CEFCU then applied "to the principal of the loan that CEFCU previously made to Games Management, LLC, as part of the settlement payment." No other **[*75]** evidence of CEFCU's status as transferee of the funds was presented.

In setting forth the seminal "dominion and control" definition of a transferee, the Seventh Circuit in *Bonded Financial* determined that a bank that accepted deposit into an account was a mere conduit for payment to the account holder and became a subsequent transferee only after the account holder directed that the funds be applied toward the repayment of his fully-secured, current loan with the bank. *Bonded Fin. Servs.*, 838 F.2d at 893-94. The court contrasted the "two-step" transaction before it from a hypothetical "one-step" transaction where funds are transferred to a bank with instructions to apply it to reduce a debt owed to the bank. *Id.* Importantly, the court found that the bank did not have a right to set off when the funds were deposited and that the account holder was free to use the funds at his discretion. *Id.* In a subsequent decision finding that a bank acting as trustee of a trust account could be liable as an initial transferee, the Seventh Circuit cited with approval several decisions from other circuit courts adopting and applying *Bonded Financial* but holding that "an entity that receives funds for use in paying down a

loan, or passing money to investors in a pool, **[*76]** is an 'initial transferee' even though the recipient is obliged by contract to apply the funds according to a formula." *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 691-92 (7th Cir. 2010) (citations omitted); *accord Barber v. Colchester State Bank (In re KZK Livestock, Inc.)*, 1998 Bankr. LEXIS 2111, 1998 WL 34064931, at *2 (Bankr. C.D. Ill. Oct. 14, 1998) (Altenberger, J.) (distinguishing *Bonded Financial* from the facts of the case before it where the account to which funds were transferred was overdrawn).

It is clear that CEFCU was a transferee of the $320,000 deposit into the Games Management, LLC account because it applied the funds to pay down amounts it was owed. Whether CEFCU was the initial transferee depends on Games Management, LLC's status as transferee. Under *Bonded Financial*, the fact that CEFCU applied the funds to pay down "the loan that CEFCU previously made to Games Management, LLC, as part of the settlement payment" is not dispositive. *Bonded Fin. Servs.*, 838 F.2d at 893-94. It is unclear whether CEFCU applied the funds at the direction of the account holder or based on some other authority. Under Illinois common law, banks may, in certain circumstances, be able to apply a deposit to matured debts the account holder owes to the bank. *Symanski v. First Nat. Bank of Danville*, 242 Ill. App. 3d 391, 396-97, 609 N.E.2d 989, 182 Ill. Dec. 455 (1993). But absent evidence of whether Games Management, LLC ever had "dominion and control" over the $320,000 deposited into its account at CEFCU or what set off rights CEFCU had and when, the Court cannot determine **[*77]** whether Games Management, LLC was a transferee such that CEFCU was not the initial transferee.

The Court's inability to determine whether CEFCU was the initial transferee, however, does not bar recovery by the Trustee. *HN13*[⬆] Section 550(a) provides for recovery against the initial transferee, as well as any immediate or mediate transferee. If not the initial transferee, CEFCU was, without

question, an immediate or mediate transferee. If CEFCU had a defense to recovery as an immediate or mediate transferee under § 550(b), it was CEFCU's burden to establish as much. As stated, no such showing was made. The Court has already determined that ISCO did not receive value for the transfers to CEFCU totaling $1.72 million. It would be remiss if it simply assumed good faith on the part of CEFCU, especially given the history between all involved in the transactions. The Trustee is therefore entitled to recovery of the $320,000 transfer from ISCO to the Games Management, LLC account at CEFCU.

*2. Awarding Prejudgment Interest, Attorney Fees, and Costs*

The Trustee asks for an award of prejudgment interest "at the legally allowable rate." *HN14*[⤴] Although the Bankruptcy Code makes no provision for it, bankruptcy courts have the discretion [*78] to award prejudgment interest to a trustee in a fraudulent conveyance action. *Carmel v. River Bank America (In re FBN Food Services, Inc.)*, 175 B.R. 671, 690 (Bankr. N.D. Ill. 1994); *see also In re Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 849 (7th Cir. 1997). But that discretion is not unfettered; it must be exercised according to the law. *Milwaukee Cheese*, 112 F.3d at 849. And the Seventh Circuit has expressed its preference for awarding prejudgment interest as a component of compensation in federal cases unless there is sound reason not to do so. *Id.*; *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989). In other words, "[t]he purpose of allowing prejudgment interest is compensatory, not punitive; such interest is granted to make the prevailing party whole." *Phillips*, 379 B.R. at 788 (citation omitted). After all, "[c]ompensation deferred is compensation reduced by the time value of money; . . . [t]hat is why prejudgment interest is an ingredient of full compensation." *Milwaukee Cheese*, 112 F.3d at 849.

Although the transfers here are avoidable under Illinois law, it is federal law under which the transfers are being avoided and that permits the Trustee to recover the avoided transfers in bankruptcy. *See* 11 U.S.C. §§ 544(b), 550(a). Again, the Bankruptcy Code does not specifically provide for awarding prejudgment interest. *HN15*[⤴] Absent other controlling authority, bankruptcy courts have awarded prejudgment interest pursuant to the rate set forth in 28 U.S.C. § 1961 from the date the adversary proceeding was filed. *See, e.g., Phillips*, 379 B.R. at 788; *Hennings Feed*, 365 B.R. at 892; *Krol v. Wilcek (In re H. King & Assocs.)*, 295 B.R. 246, 291 (Bankr. N.D. Ill 2003); *FBN Food Serv.*, 175 B.R. at 690-91 [*79] . This Court will exercise its discretion and award the Trustee prejudgment interest from the date this adversary proceeding was commenced, September 22, 2017, pursuant to the rate set forth in 28 U.S.C. § 1961.[23] *See Phillips*, 379 B.R. at 788; *Hennings Feed*, 365 B.R. at 892. To be clear, the interest awarded is "simply an ingredient of full compensation and should not be considered a windfall" to the Trustee or as punishment for any wrongdoing by CEFCU. *H. King & Assocs.*, 295 B.R. at 290 (citations omitted) (internal quotation marks omitted).

As for the Trustee's request for an award of fees, he has failed to cite any authority for his request. *HN16*[⤴] Neither § 544 nor § 550, the Code provisions upon which the Trustee relies in this proceeding, specifically authorizes the Court to award such fees. *See Phillips*, 379 B.R. at 789. Illinois law, which provides the basis for avoiding the transfers here, generally follows the "American Rule" that attorney fees are "not available to a prevailing party absent statutory authority or an express contractual provision between the parties." *Id.* (citations omitted). The Court is not aware of specific statutory authority or any agreement between the parties that would provide for an award of fees. Absent any showing of such authority and

---

[23] Section 1961 provides that "[i]nterest shall be calculated . . . at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[ ] the date of the judgment." 28 U.S.C. § 1961(a).

Case 25-07009   Doc 9-13   Filed 04/02/25   Entered 04/02/25 16:06:58   Desc Stone v. Citizens Equity First Credit Union (In re Intl Supply Co.)   Page 31 of 34

Page 31 of 34

what fees he in fact incurred, the Trustee's request for fees must be denied.

The Trustee also asks that he be awarded costs. Bankruptcy Rule 7054(b) provides that "[t]he court may allow costs to the prevailing party except when a statute of the United States or these **[*80]** rules otherwise provides." Fed. R. Bankr. P. 7054(b)(1). Although the decision whether to award costs falls within the bankruptcy court's discretion, there is a presumption that the prevailing party is entitled to costs absent "good reasons" for not doing so. *Mungo v. Taylor*, 355 F.3d 969, 978-79 (7th Cir. 2004). At this juncture, the only cognizable cost that the Trustee is entitled to without further showing is the filing fee for commencing this adversary proceeding. The Court will award the Trustee that filing fee cost of $350 and allow him to seek whatever further costs he believes he is entitled to under applicable law.

The Trustee will be given 14 days from the date of the Order entered with this Opinion to file a bill of costs if further costs are to be pursued; CEFCU will be given 14 days from the date of the filing of the bill of costs to respond or object. The matter will be taken under advisement thereafter. That said, the Court is disinclined to award additional costs as a matter of course or to set the matter for further hearing or argument. Any bill of costs filed by the Trustee should be narrowly tailored to the claims against CEFCU upon which he prevailed, specifically itemized, and accompanied by a supporting memorandum justifying his factual and **[*81]** legal entitlement to any costs asserted. Any response or objection from CEFCU should be made in kind.

## D. Unjust Enrichment

Count III, pleaded in the alternative to the Trustee's avoidance claims under the IUFTA and Bankruptcy Code §§ 544 and 550, seeks recovery of the entire $1.72 million received by CEFCU based on unjust enrichment. *HN17*[↑] Recovery under a theory of unjust enrichment is an equitable remedy only

available when there is no adequate remedy at law. *Season Comfort Corp. v. Ben A. Borenstein Co.*, 281 Ill. App. 3d 648, 656, 655 N.E.2d 1065, 211 Ill. Dec. 682 (1995). It appears that, under Illinois law, unjust enrichment may be recognized as a stand-alone cause of action. *See, e.g., Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 258, 807 N.E.2d 439, 282 Ill. Dec. 815 (2004). But at least one Illinois appellate court has suggested that the opposite is true: as an equitable remedy, unjust enrichment is not a separate cause of action but is tied to another underlying claim found in tort, contract, or statute. *Martis v. Grinnell Mut. Reinsurance Co.*, 388 Ill. App. 3d 1017, 1024-25, 905 N.E.2d 920, 329 Ill. Dec. 82 (2009). *HN18*[↑] Merging the two interpretations, the Seventh Circuit has reasoned that, while a plaintiff may be able to maintain a stand-alone cause of action for unjust enrichment, such a claim often rests on the same conduct or set of facts forming the basis for another claim against the same defendant, and, in such latter case, will be tied to and "will stand or fall with the related claim." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516-17 (7th Cir. 2011) (citations omitted).

Although **[*82]** the Trustee set forth his unjust enrichment claim in a separate count, the claim itself relies on the same allegations that formed the basis for his avoidance claims under Illinois fraudulent transfer law and the Bankruptcy Code. Incorporating those allegations by reference, Count III consists of only two other paragraphs alleging that ISCO paid CEFCU even though not obligated to and that CEFCU retained the money to ISCO's detriment,[24] violating the fundamental principles of justice, equity, and good conscience. This begs the question whether the Trustee's unjust enrichment claim is tied to his avoidance claims, the resolution

---

[24] The Trustee alleges that CEFCU retained the money to ISCO's—rather than ISCO's creditors'—detriment. Importantly, as discussed *supra*, the Trustee's standing to prosecute his avoidance claims is predicated on the "strong arm" provisions of the Code that allow trustees to stand in the shoes of certain lien creditors, unsecured creditors, or bona fide purchasers. *See* 11 U.S.C. § 544.

of which would be dispositive of the unjust enrichment claim, or whether the unjust enrichment claim stands alone.

But the Court does not need to decide what relief may be available to the Trustee under a theory of unjust enrichment or whether he has met his burden of proof on the issue. It suffices to say that, because it was pleaded in the alternative to the fraudulent transfer claims under the IUFTA and §§ 544 and 550 of the Bankruptcy Code upon which the Trustee has prevailed, the Court need not consider the claim for unjust enrichment. Count III will therefore be dismissed without [**83**] prejudice to reinstatement should the judgment against CEFCU on Counts I, II, and VIII be reconsidered or modified by further court order.

## IV. Conclusion

Viewed in isolation, ISCO bore all the hallmarks of a successful company. It was operationally profitable and showed potential for significant growth. At one point it had sizeable assets compared to its debts and was able to generate sufficient cash flows to meet its demands. But that was only half of the story. Over time, ISCO came to be used as the personal piggy bank of its controlling shareholder Lee Hofmann. In the years leading up to the events at issue in this proceeding, Mr. Hofmann caused ISCO to liquidate the company's assets to fund millions of dollars in distributions to himself or others on his behalf. When there were no longer sufficient assets to continue funding the shareholder distributions, Mr. Hofmann caused ISCO to incur substantial amounts of debt to provide him with needed cash. What resulted was an otherwise profitable company that was no longer adequately capitalized, unable to pay its debts, and unable to meet its own operational demands without incurring additional debt that it could not pay.

Despite its inability [**84**] to meet its own obligations ISCO continued to funnel whatever cash it had to Mr. Hofmann to satisfy his personal obligations and endeavors. The culmination of this practice came when, despite being unable to cover $1 million of its own input costs on a multi-million-dollar contract, ISCO paid CEFCU $1.72 million and incurred liability on another $300,000 loan to satisfy what were primarily Lee Hofmann's debts. And although ISCO was able to stay afloat for some time due to its lender's willingness to renew and extend the maturity of its existing loans on an annual basis, the company was stretched so thin by the siphoning of cash for Mr. Hofmann's benefit that it was only a matter of time before it sought relief under the Bankruptcy Code.

It is an unfortunate result for CEFCU to have the $1.72 million transferred to it by ISCO on Mr. Hofmann's behalf avoided and to be required to refund the sums to ISCO's bankruptcy estate. But the result here is required by the law and evidence. Judgment for the full $1.72 million plus prejudgment interest and costs will be entered in favor of the Trustee and against CEFCU.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to [**85**] Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

**SIGNED THIS: March 30, 2022**

/s/ Mary P. Gorman

**Mary P. Gorman**

**United States Bankruptcy Judge**

## ORDER

For the reasons set forth in an Opinion entered this day,

IT IS HEREBY ORDERED that:

    1. Judgment is entered in favor of Sheldon Stone, as trustee for the International Supply Co. creditor trust, and against Citizens Equity First Credit Union, on Count I of the Complaint (#1). The transfers made on August 2, 2013, in

the amount of $1,400,000, and August 16, 2013, in the amount of $320,000, from International Supply Co. to Citizens Equity First Credit Union are avoided pursuant to 11 U.S.C. § 544 and 740 ILCS 160/5(a)(2).

2. Judgment is entered in favor of Sheldon Stone, as trustee for the International Supply Co. creditor trust, and against Citizens Equity First Credit Union, on Count II of the Complaint (#1). The transfers made on August 2, 2013, in the amount of $1,400,000, and August 16, 2013, in the amount of $320,000, from International Supply Co. to Citizens Equity First Credit Union are avoided pursuant to 11 U.S.C. § 544 and 740 ILCS 160/6.

3. Judgment is entered on Count VIII of the Complaint (#1) as follows:

   a. In favor of Sheldon Stone, as trustee for the International Supply Co. creditor trust, and against Citizens Equity First [*86] Credit Union in the amount of $1,720,000, the full value of the avoided transfers.

   b. In favor of Sheldon Stone, as trustee for the International Supply Co. creditor trust, and against Citizens Equity First Credit Union for prejudgment interest from the date of the filing of the Complaint (#1) through the date of the entry of this Order pursuant to the rate set forth in 28 U.S.C. § 1961.

   c. In favor of Sheldon Stone, as trustee for the International Supply Co. creditor trust, and against Citizens Equity First Credit Union in the amount of $350 for the cost of the filing fee. Sheldon Stone may file a detailed bill of costs and memorandum in support within 14 days of the date of this Order. Citizens Equity First Credit Union shall have 14 days from the date of filing of such bill of costs to respond or object in writing.

   d. Sheldon Stone's request for attorney fees is denied.

4. Count III, pleaded in the alternative to Counts I and II against Citizens Equity First Credit Union, is dismissed without prejudice to reinstatement should judgment entered herein under Counts I, II, and VIII be reconsidered or modified by further court order.

5. Counts I, II, and VIII are dismissed without prejudice as to E. Lee [*87] Hofmann.

6. Count IV, seeking relief only against E. Lee Hofmann, is dismissed without prejudice.

7. Counts V, VI, VII, and IX, seeking relief only against Rebecca Hofmann, are dismissed without prejudice.

8. Count X, seeking relief against E. Lee Hofmann and Rebecca Hofmann, is dismissed without prejudice.

9. The cross claim for breach of contract, asserted by Citizens Equity First Credit Union and against E. Lee Hofmann, is dismissed without prejudice.

**IT IS SO ORDERED**.

**SIGNED THIS: March 30, 2022**

/s/ **ORDER**

**Mary P. Gorman**

**United        States        Bankruptcy        Judge**

**Table1** (Return to related document text**)**

| Description | 2011<br>*(Exhibit C-2a)* | 2012<br>*(Exhibit C-2b)* | 2013<br>*(Exhibit C-2c)* | 2014 [*22]<br>*(Exhibit C-2d)* |
|---|---|---|---|---|
| Cash Flow to Invested Capital | $1,051,500 | $1,549,760 | $1,717,200 | $1,656,800 |
| Projected Interest Expense | (250,000) | (250,000) | (250,000) | (250,000) |
| Scheduled Principal Payments<sup>()></sup> | (4,602,214) | (4,408,430) | (5,604,014) | (6,172,316) |
| Cash Surplus/(Shortfall) | $(3,800,714) | $(3,108,670) | $(4,136,814) | $(4,765,516) |
| Beginning Cash and Cash Equivalents | 2,889 | 5,746 | 6,819 | 7,353 |
| Ending Cash and Cash Equivalents | $(3,797,825) | $(3,102,924) | $(4,129,995) | $(4,758,163) |

**Table1** (Return to related document text**)**

**End of Document**